IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA

SANDRA GAIL CARRIN, as the
Personal Representative of the Estate
of RAYMOND MARSHALL CARRIN,

    Plaintiff,

v.

ERICA STRONG, Warden Federal Detention Center, Tallahassee, Florida, in her individual capacity; CRAIG COIL, Warden Federal Detention Center, Tallahassee, Florida, in his individual Capacity; SHAUNA MARIE SMILLIDGE, as Health Services Administrator Federal Detention Center, Tallahassee, Florida, in her individual capacity; JAMES WINSTON, MD, medical doctor Federal Detention Center, Tallahassee, Florida, in his individual capacity; J. JIMENEZ, MD, medical doctor Federal Detention Center, Tallahassee, Florida, in his individual capacity; and UNITED STATES BUREAU OF PRISONS,

    Defendants.
_____/

CASE NO.:
JURY TRIAL DEMANDED

## COMPLAINT

Plaintiff, SANDRA GAIL CARRIN, as the Personal Representative of the Estate of RAYMOND MARSHALL CARRIN, by through undersigned counsel, and sues ERICA STRONG; CRAIG COIL; SHAUNA MARIE SMILLIDGE; JAMES WINSTON, MD; AND J. JIMINEZ, MD; as individuals and alleges the following:

## JURISDICTION

1.) Sandra Gail Carrin ["Plaintiff"] is a citizen of the United States and is a resident of the State of Florida.

2.) Plaintiff has been designated as the Personal Representative of her deceased son, Raymond Marshall Carrin.

3.) At all material times hereto, Raymond Marshall Carrin ["Carrin"] was an inmate at the Federal Detention Center in Tallahassee, Florida.

4.) All incidents complained of in this matter took place or affected Carrin within the Northern District of Florida or were a continuation of legal wrongs that occurred within the Northern District of Florida.

5.) Defendant Erica Strong served as the Warden of the Federal Detention Center ["FDC"] in Tallahassee, Florida, and she had a duty to provide reasonable medical care to address any serious medical need inmate Carrin presented.

6.) Upon information and belief, at all material times Defendant Strong resided within the Northern District of Florida.

7.) Defendant Craig Coil served as the Warden of the Federal Detention Center ["FDC"] in Tallahassee, Florida, and he had a duty to provide reasonable medical care to address any serious medical need Carrin presented.

8.) Upon information and belief, at all material times Defendant Coil resided within the Northern District of Florida.

9.) Defendant Shauna Marie Smillidge served as the Health Services Administrator at FDC, and she had a duty to provide reasonable medical care to address any serious medical need Inmate Carrin presented.

10.) Upon information and belief, at all material times Defendant Smillidge resided within the Northern District of Florida.

11.) Defendant James Winston, MD, treated Carrin at the Federal Detention Center in Tallahassee, Florida, and he had a duty to provide reasonable medical care which addressed any serious medical need Carrin presented.

12.) Upon information and belief, at all material times Defendant Winston resided within the Northern District of Florida.

13.) Defendant J. Jimenez, MD, treated Carrin at the Federal Detention Center in Tallahassee, Florida, and he had a duty to provide reasonable medical care which addressed any serious medical need Carrin presented.

14.) Upon information and belief, at all material times Defendant J. Jimenez resided within the Northern District of Florida.

15.) Defendant United States Bureau of Prisons, at all times material hereto was an agency of the United States of America.

16.) At all times material hereto, Defendants Strong, Coil, Smillidge. Winston, and Jimenez, were acting agents and employee of the Defendant United States Bureau of Prisons.

17.) This action is brought pursuant to 28 U.S.C. §1331 and <u>Bivens v. Six Unknown Agents of Fed. Bureau of Narcotics</u>, 403 U.S. 388 (1971), and the Eighth Amendment to the United States Constitution, and 28 U.S.C. §§ 1346 and 2674, for claims which are, individually, in excess of Seventy-Five Thousand Dollars ($75,000), exclusive of costs and interest.

18.) Jurisdiction is vested in this Court pursuant to 28 U.S.C. §§ 1331 and <u>Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics</u>, 403 U.S. 388 (1971), and the Eighth Amendment to the United States Constitution.

19.) Venue is appropriate in this Court pursuant to 28 U.S.C. § 1391 because the violations of Carrin's rights occurred in Leon County, Florida and within the Northern District of Florida.

20.) On or about June 5, 2020, Plaintiff served a Notice of Claim with the Federal Bureau of Prisons related to these claims brought herein, and a denial of these claims and a right to sue letter was issued on November 10, 2021.

21.) As such, all conditions precedent have been satisfied pursuant to 28 U.S.C. § 2401(b).

## GENERAL ALLEGATIONS

22.) On or about August 9, 2018, Carrin was arraigned before United States Magistrate Judge Charles Stampelos and an order of detention was issued.

23.) Carrin was booked into the Federal Detention Center Tallahassee, Florida on that same date.

24.) Carrin was immediately evaluated by Dr. Jimenez and diagnosed as having HCV (Hepatitis C virus) which needed immediate treatment.

25.) Hepatitis C is a blood borne disease that is caused by the hepatitis C virus, and it is a leading cause of liver disease.

26.) HCV can be either acute or chronic and chronic HCV is detectable through analysis of the viral level within the blood of the infected patient.

27.) Chronic HCV can cause fibrosis of the liver, and if left untreated will result in cirrhosis.

28.) Chronic HCV can also lead to chronic liver disease with painful complications.

29.) Complications of chronic HCV include, widespread itching, kidney disease, jaundice, fluid retention with edema, bruising, encephalopathy with compromised mentation, lymph disorders and extreme fatigue.

30.) HCV is prevalent in prisons and chronic HCV is treatable with direct-acting antiviral ["DAA"] drugs.

31.) DAA drugs are administered orally with the patient taking the pills on a daily basis for approximately 12 weeks.

32.) DAA drugs are successful in treating and curing chronic HCV in nearly all of the patients who receive the DAA regimen.

33.) Due to the success of DAA drugs in treating and curing chronic HCV, DAA treatment is recommended for all patients with HCV, regardless of the stage of the disease.

34.) A failure to treat advanced stage chronic HCV with DAA drugs causes the unnecessary and wanton infliction of pain and creates an unreasonable risk of death to an infected patient.

35.) On that same date, Carrin requested treatment, but his request was denied given his status as a pretrial detainee.

36.) On September 17, 2018, Carrin's criminal defense attorney (Nathan Prince) sent an email to Assistant United States Attorney ["AUSA"] Chris Thielemann indicating that Carrin was in dire need of medical care but noting that FDC would not administer treatment while Carrin was a pretrial detainee.

37.) Carrin's serious medical condition was plainly obvious regardless of medical training.

38.) As such, on October 1, 2018, Nathan Prince filed an emergency motion to resolve a potential conflict, and on October 4, 2018, United States District Court Judge Robert Hinkle heard the motion.

39.) Judge Hinkle found no conflict of interest, and Carrin was scheduled for a change of plea and sentencing on January 17, 2019.

40.) AUSA Thielemann cooperated in expediting the change of plea.

41.) On October 29, 2018, Carrin entered a plea of guilty.

42.) At the hearing for his change of plea, Carrin addressed Judge Hinkle and informed the court that he was suffering from HCV and that FDC was refusing to provide treatment.

43.) On December 11, 2018, Carrin's Presentence Report ["PSR"] was completed by U.S. Probation Officer Andrew Swope, and the report documented that Carrin was suffering from HCV.

44.) The PSR was filed with the court on January 8, 2019.

45.) On January 14, 2019, Mr. Prince sent an email to AUSA Mountain informing him that Carrin needed to be sentenced immediately due to his serious health condition, which FDC refused to treat. Mr. Prince advised AUSA Mountain that FDC indicated they would not treat Carrin for HCV prior to his sentence being imposed.

46.) During the sentencing, Nathan Prince informed the court that Carrin was providing substantial assistance to the government and that he would most likely seek a Rule 35 reduction of his sentence at some later date, but his sentencing could not wait due to his need for the DAA drugs which FDC was refusing to administer.

47.) Carrin addressed the court during his sentencing, and he pleaded for medical treatment. Plaintiff also addressed the court on behalf of her son, and she informed the

court that her son was very ill with HCV. Plaintiff noted that she did not want her son to die "like a dog" without treatment. A friend of Carrin also addressed the court on his behalf, and she similarly pleaded for Carrin to receive treatment for HCV. Mr. Prince asked that the court recommend Carrin be housed close to Tallahassee so that he could continue to provide assistance to the government, and Judge Hinkle adopted that request.

48.) On March 25, 2019, Carrin emailed Defendant Smillidge and stated: "Dear Ms. Smillidge, I was following up on our last talk of being seen by medical. I'm swelling up badly and am in discomfort to where it's almost unbearable. Can the doctor prescribe me something for the pain? I stated that I have cirrhosis of the liver and Hep C. Thank you for your time."

49.) On March 26, 2019, Smillidge replied to Carrin's email by stating "Seen by MD today."

50.) On March 26, 2019, Carrin was moved to a prison in Atlanta.

51.) On March 27, 2019, Mr. Prince sent an email to AUSA Gary Milligan advising that Carrin was moved to Atlanta and that he would need to be returned to testify on behalf of the government. AUSA Milligan replied that he had previously requested that Carrin be kept in Tallahassee, and AUSA Milligan assured Mr. Prince that he would have Carrin returned for trial.

52.) On March 28, 2019, AUSA Milligan informed Mr. Prince that the United States Marshals had arranged for Carrin's return to Tallahassee and he reiterated his confusion as to why Carrin was shipped out of Tallahassee.

53.) On April 3, 2019, Carrin was evaluated by FDC Dr. James Winston, who noted that Carrin presented a high risk for bleeding and that Carrin's liver condition needed to be treated.

54.) On June 2, 2019, Carrin sent an email to FDC Dr. Jimenez advising him that he ordered a pair of shoes that were a full size larger than he would normally wear, but his feet would not fit in those shoes due to swelling and fluid retention. Carrin pleaded with Dr. Jimenez to see him and to treat him for his swelling. Carrin also noted that his prescribed diuretics were not reducing the swelling.

55.) On June 5, 2019, a physician assistant at FDC (Paul Rolston) diagnosed Carrin as being a high risk for bleeding and noted that he needed immediate treatment for his liver condition.

56.) Upon or about June 10, 2019, a private contractor arrived at FDC with a delivery and noticed that Carrin was laying on the ground and apparently unresponsive. The private contractor asked the inmates why he was being allowed to suffer in that condition without any care, and the inmates told her that he had been that way for some time. The private contractor complained to prison officials and insisted that Carrin receive medical treatment.

57.) On June 11, 2019, Carrin was taken to Capital Regional Medical Center to be stabilized.

58.) On June 25, 2019, Mr. Prince's paralegal attempted to speak with Carrin, but FDC refused. FDC eventually relented and allowed her to speak with Carrin after she persisted.

59.) On June 27, 2019, Carrin sent an email to Defendant Smillidge requesting a full copy of his medical records so that he could provide the records to his lawyer.

60.) On July 2, 2019, Carrin was seen by Defendant Lee, and Defendant Lee assured Carrin that he would receive the DAA drugs as soon as a related liver infection was treated and abated.

61.) FDC did not fully treat the infection and Carrin did not receive the DAA drugs.

62.) On July 5, 2019, Carrin sent an email to Defendant Smillidge where he wrote: "Dear Ms. Smillidge, I am inquiring as to approximately when my treatment for Hep C will begin?" Carrin went on to note that he was in constant pain and that his genitals were grossly swollen. Carin closed the email by adding "I can't even put my own shoes and socks on. Anyhow, thank you for your time."

63.) On July 5, 2019, Mr. Prince emailed AUSA Eric Mountain and AUSA Gary Milligan informing them that Carrin had not received treatment for HVC and informing them that FDC was proposing to send Carrin to a prison in Tomoka for treatment. Mr. Prince indicated that there was no longer any faith in FDC providing treatment to Carrin and Mr. Prince requesting that Carrin be granted compassionate release so that he could obtain treatment outside of FDC.

64.) On July 8, 2019, AUSA Mountain replied and informed Mr. Prince that he had forwarded that information to the Chief AUSA over the criminal division and the Chief AUSA over the civil rights division.

65.) On July 10, 2019, Chris Canova, who was the United States Attorney at that time, called Mr. Prince to discuss FDC's refusal to treat Carrin, and he informed Mr. Prince that he would go to FDC to demand that Carrin received treatment for HCV.

66.) Shortly thereafter, Carrin was once again shipped out of FDC Tallahassee, despite the U.S. Marshals having placed a hold on his transport pending his being called as a government witness in an upcoming criminal trial.

67.) On July 31, 2019, acting United States Attorney Chris Canova contacted Mr. Prince to inquire as to Carrin's availability to testify in the upcoming trial which was scheduled for August. Mr. Prince informed United States Attorney Canova that Carrin had been shipped out of Tallahassee, and that he would need to be returned for trial.

68.) On August 1, 2019, AUSA Mountain identified Carrin as a cooperating witness in the upcoming criminal trial, and Carrin was scheduled to testify on August 12, 2019.

69.) On August 12, 2019, United States Attorney Chris Canova emailed Mr. Prince and stated: "Last I heard, Ray Carrin was improving. I hope he continues to get better."

70.) On August 16, 2019, Carrin wrote a letter to Plaintiff wherein he informed her that his condition had deteriorated to the point where DAA drugs could not be administered and that he needed a liver transplant.

71.) On August 21, 2019, Carrin wrote a letter to Plaintiff and informed her that his liver was no longer functioning and that his ammonia levels were extremely elevated.

72.) Carrin told his mother that the elevated ammonia levels would eventually cause swelling on the brain and hallucinations, for which he was given laxatives.

73.) On August 22, 2019, Officer Larsen made a derogatory remark which caused Carrin to be in fear of Officer Larsen and which caused Carrin to resolve that he would no longer make requests for medical treatment.

74.) On September 10, 2019, Dr. Jimenez charted that Carrin's HCV treatment was on "hold" and noted that approval from the clinical director was needed before Carrin could

be moved. Carrin was again diagnosed as presenting a high bleeding risk, and he was restricted from being exposed to any prolonged standing or any activities which could pose a risk for injury.

75.) On October 24, 2019, Carrin filed a request for compassionate release, and on November 12, 2019, Warden Francisco J. Quintana denied that request after finding that Carrin did not "satisfy the medical components as provided in the program statement."

76.) On December 5, 2019, Carrin died.

77.) On December 6, 2019, Warden Quintana wrote a letter to Plaintiff which expressed condolences over her son's passing from "Hepatic Cirrhosis."

**COUNT I—CIVIL RIGHTS VIOLATIONS: DELIBERATE INDIFFERENCE EIGHTH AMENDMENT INADEQUATE MEDICAL CARE CONSTITUTING CRUEL AND UNUSUAL PUNISHMENT (STRONG, COIL, & SMILLIDGE)**

78.) Paragraphs 1-74 are realleged and incorporated herein by reference.

79.) Defendants Strong, Coil, and Smillidge had a duty to provide reasonable medical care to Carrin and breached that duty by ignoring the professional judgment of medical officials who worked at FDC, Tallahassee, and who treated Carrin.

80.) Defendants Strong, Coil, and Smillidge by either act or omission, denied Carrin access to reasonable medical care.

81.) As a result, Carrin was subjected to cruel and unusual punishment in violation of the Eighth Amendment.

82.) Likewise, defendants Strong, Coil, and Smillidge did not take reasonable available measures to abate the obvious risk confronting Carrin, even though a reasonable official in the circumstances would have appreciated the high degree of the risk involved.

83.) As such, the consequences of the acts or omissions of defendants Strong, Coil, and Smillidge were obvious and caused Carrin to suffer his injuries and damages.

84.) As a direct and proximate cause of the deliberate indifference of defendants Strong, Coil, and Smillidge, Carrin sustained emotional pain, anguish, humiliation, insult, indignity, loss of self-esteem, inconvenience, injury, loss of wages, and death for which his estate is entitled to compensatory damages.

85.) Likewise, as a direct result of the deliberate indifference of defendants Strong, Coil, and Smillidge, Carrin suffered a willful disregard for his rights, which entitles his estate to a substantial award of punitive damages against Defendants in their individual capacities.

WHEREFORE, Plaintiff seeks compensatory damages and punitive damages against all of defendants Strong, Coil, and Smillidge in their individual capacities.

### COUNT II—CIVIL RIGHTS VIOLATIONS: DELIBERATE INDIFFERENCE EIGHTH AMENDMENT INADEQUATE MEDICAL CARE CONSTITUTING CRUEL AND UNUSUAL PUNISHMENT (WINSTON & JIMENEZ)

86.) Paragraphs 1-74 are realleged and incorporated herein by reference.

87.) Defendants Winston and Jimenez had a duty to provide reasonable medical care to Carrin and breached that duty by either act or omission.

88.) As a result, Carrin was subjected to cruel and unusual punishment in violation of the Eighth Amendment.

89.) Likewise, defendants Winston and Jimenez did not take reasonable available measures to abate the obvious risk confronting Carrin, even though a reasonable official in the circumstances would have appreciated the high degree of the risk involved.

90.) As such, the consequences of the acts or omissions of defendants Winston and Jimenez were obvious and caused Carrin to suffer his injuries and damages.

91.)    As a direct and proximate cause of the deliberate indifference of defendants Winston and Jimenez, Carrin sustained emotional pain, anguish, humiliation, insult, indignity, loss of self-esteem, inconvenience, injury, loss of wages, and death for which his estate is entitled to compensatory damages.

92.)    Likewise, as a direct result of the deliberate indifference of defendants Winston and Jimenez, Carrin suffered a willful disregard for his rights, which entitles his estate to a substantial award of punitive damages against Defendants in their individual capacities.

WHEREFORE, Plaintiff seeks compensatory damages and punitive damages against all of defendants Strong, Coil, and Smillidge in their individual capacities.

## COUNT III—FTCA NEGLIGENCE OF UNITED STATES BUREAU OF PRISONS

93.)    Paragraphs 1 through 74 are realleged and incorporated herein by reference.

94.)    Plaintiff alleges that the United States Bureau of Prisons through its agents, servants, and employees as set forth above, acting within the scope of their agency for the Defendant United States Bureau of Prisons, as medical physicians or as administrators neglected to provide reasonable and appropriate medical care to Carrin, in breach of their duty to provide reasonable and appropriate medical care to Carrin, which caused him to suffer injuries and damages in the form of his untimely death, pain and suffering, disability, disfigurement, mental anguish, loss of capacity for the enjoyment of life, and loss of the ability to earn money in the future.

WHEREFORE, Plaintiff sues the Defendant United States Bureau of Prisons for the negligence of its agents and employees and seeks damages for wrongful death and demands judgment for damages for any other relief in law or equity that this Court deems appropriate. Undersigned counsel has been retained to represent Plaintiff in this cause and owes reasonable

attorney's fees to undersigned counsel. Plaintiff requests that this Court enter an award of reasonable attorney's fees.

## DEMAND FOR JURY TRIAL

Plaintiffs demand trial by jury on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for the following relief:

(1) That process issue and this Court take jurisdiction over this case;

(2) Judgment against the Defendants and for Plaintiff awarding compensatory damages and punitive damages against Defendants;

(3) Prejudgment interest on monetary recovery obtained pursuant to law;

(4) An award of reasonable attorneys' fees; and

(5) Such further relief as is equitable and just.

DATED this 6th day of December, 2021.

Respectfully submitted,

/s/ STEPHEN G. WEBSTER
STEPHEN G. WEBSTER, ESQUIRE
FBN: 14054
Primary E-mail: sw@websterandbaptiste.com
Secondary E-mail: jw@websterandbaptiste.com
/s/ LOUIS J. BAPTISTE
LOUIS J. BAPTISTE, ESQUIRE
FBN: 126082
Primary E-mail: lb@websterandbaptiste.com
Secondary E-mail: jw@websterandbaptiste.com
WEBSTER + BAPTISTE
  ATTORNEYS AT LAW, LLC
1785 Thomasville Road
Tallahassee, FL 32303
T: (850) 597-7142
F: (850) 848-4655
ATTORNEYS FOR PLAINTIFFS