## IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF FLORIDA TALLAHASSEE DIVISION

**SANDRA GAIL CARRIN,**
**as the Personal Representative**
**of the Estate of**
**RAYMOND MARSHALL CARRIN,**

      **Plaintiff,**

**vs.**                            **Case No. 4:21cv486-MW-MAF**

**SHAUNA MARIE SMILEDGE,**
**JOSEPH JIMENEZ, MD,**
**and PAUL ROLSTON,**

      **Defendants.**
_____/

## REPORT AND RECOMMENDATION

This action is brought pursuant to 28 U.S.C. § 1331, 1343, and 2201, and <u>Bivens v. Six Unknown Fed. Narcotics Agents</u>, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971).  Plaintiff, represented by counsel, filed a first amended complaint, ECF No. 64, against four Defendants.  Subsequently, Plaintiff voluntarily dismissed the claim brought against one of those Defendants, Dr. Xinyu Daniel Li, ECF No. 79, and the amended complaint proceeds against the remaining three Defendants.  Each Defendant filed a

motion to dismiss, *see* ECF Nos. 74, 75, and 80, and Plaintiff has filed

responses.  ECF Nos. 81, 83, and 88.[1]  The motions are ready for a ruling.

**Standard of Review**

Each Defendant has moved to dismiss the complaint pursuant to

Fed. R. Civ. P. 12(b)(1) for failing to state a claim upon which relief can be

granted.  ECF No. 74 at 1-2; ECF No. 75 at 1-2; ECF No. 80 at 1-2.  To

state a claim, the complaint must allege enough plausible facts to support

the claim stated.  Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 127 S.Ct.

1955, 167 L. Ed. 2d 929 (2007).  "A complaint is facially plausible when

there is sufficient factual content to allow 'the court to draw the reasonable

inference that the defendant is liable for the misconduct alleged.'"  Ashcroft

v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949, 173 L.Ed.2d 868 (2009)

(quoted in Riddick v. United States, 832 F. App'x 607, 611 (11th Cir.

2020)).  At this stage of the proceeding, the factual allegations must be

"accepted as true," but legal conclusions couched as factual allegations are

---

[1] One of Plaintiff's responses, ECF No. 81, included exhibits which - to be clear - the Court has not reviewed.  In general, ruling on a motion to dismiss is "limited primarily to the face of the complaint and attachments thereto," and a plaintiff's response.  Reviewing other documents would require converting the motion to dismiss into a motion for summary judgment.  Starship Enterprises of Atlanta, Inc. v. Coweta Cnty., Ga., 708 F.3d 1243, 1253, n.13 (11th Cir. 2013).

insufficient.  <u>Ashcroft</u>, 129 S. Ct. at 1949-50; *see also* <u>Ziglar v. Abbasi</u>, 198 L. Ed. 2d 290, 137 S. Ct. 1843, 1852 (2017).  A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'"  129 S. Ct. at 1949 (quotation omitted).  Thus, "conclusory allegations, unwarranted factual deductions or legal conclusions masquerading as facts will not prevent dismissal."  <u>Davila v. Delta Air Lines, Inc.</u>, 326 F.3d 1183, 1185 (11th Cir. 2003).

One additional principle bears highlighting: a motion to dismiss does not test the truth of a complaint's factual allegations.  "Instead, . . . 'federal courts and litigants must rely on summary judgment and control of discovery to weed out unmeritorious claims sooner rather than later.'" <u>Leatherman v. Tarrant Cty. Narcotics Intelligence & Coordination Unit</u>, 507 U.S. 163, 168-69 (1993) (quoted in <u>Yawn v. Sec'y of Dep't of Corr.</u>, No. 5:13cv228-RH/EMT, 2017 WL 2691423, at *1 (N.D. Fla. June 21, 2017)).

**Plaintiff's Amended Complaint, ECF No. 64**

This case concerns the death of Raymond Marshall Carrin while in the custody of the Bureau of Prisons.  Mr. Carrin had been a detainee at the Federal Detention Center [FDC] in Tallahassee, Florida.  ECF No. 64 at 2.  He was booked into the FDC on August 9, 2018, and it was entered in

his medical chart that Mr. Carrin "was positive for Hepatitis C."  *Id.* at 4.  He later began serving a 10-year sentence at the FDC.

Plaintiff is the mother of Mr. Carrin and the Personal Representative of his estate.  ECF No. 64 at 2.  Defendant Smiledge was the Health Services Administrator at the Federal Detention Center [FDC].  *Id.* Defendant Jimenez is a medical doctor who provided treatment to Mr. Carrin at the FDC, and Defendant Rolson is a Physicians Assistant at FDC who also provided treatment to Mr. Carrin.  *Id.* at 2-3.

Mr. Carrin was evaluated by Dr. Jimenez on August 21, 2018, and diagnosed with "Asymptomatic Hepatitis C Virus."  *Id.* at 5.  He noted that Plaintiff was not jaundiced, did not "present with ascites, distension, or stigmata of liver disease."  *Id.* at 6.  Dr. Jimenez counseled Mr. Carrin on how to access medical care.  *Id.*

The health care plan was to order labs and "follow closely for symptoms of conditions with serial LFTS."  *Id.* at 5.  LFTS stands for "liver function tests," and Hepatitis C Virus [HCV] "is a blood borne disease that is a leading cause of liver disease."  *Id.*  HCV may be acute or chronic; it "can cause fibrosis of the liver," and if untreated, results in cirrhosis.  *Id.* Chronic HCV can "lead to chronic liver disease with painful complications"

which include "widespread itching, kidney disease, jaundice, fluid retention with edema, bruising, encephalopathy with compromised mentation, lymph disorders and extreme fatigue."  ECF No. 64 at 5.  "HCV is prevalent in prisons and chronic HCV is treatable with direct-acting antiviral ['DAA'] drugs."[2]  *Id.*

On August 30, 2018, Dr. Jimenez noted that Mr. Carrin's lab results revealed that his liver enzymes were elevated in comparison to the international normalized ratio (INR)."  ECF No. 64 at 6.  Dr. Jimenez also "noted that he needed the 'remainder of liver enzyme levels to assess if treatment should start.'"  *Id.* at 7.  The following day, a notation was made that Mr. Carrin wanted to seek treatment for HCV, *id.* at 7, a notation acknowledged by Dr. Jimenez.  ECF No. 64 at 8.  The "unit team" confirmed that Mr. Carrin would "likely be" at FDC for "at least 4 to 5 months."  *Id.* at 7.  Dr. Jimenez found that Mr. Carrin did not display symptoms of HCV, but "his laboratory results nonetheless indicated that Mr. Carrin needed to 'start treatment ASAP.'"  *Id.* at 8.

---

[2] "DAA drugs are administered orally with the patient taking the pills on a daily basis for 8 to 12 weeks."  *Id.* at 5.

On September 4, 2018, Dr. Jimenez noted that Mr. Carrin "had a large abdomen that was pale with a very small thin vein observed, but no edema." *Id.* at 8.  He also noted the plan was to "await regional non-formulary approval treatment." *Id.* at 8.  No prescriptions were issued although his condition was charted as "acute," and Dr. Jimenez put Mr. Carrin on "restricted duty status with no standing or working in the kitchen." *Id.* at 8-9.

On September 14, 2018, Mr. Carrin sent an email message through the BOP's "Trulincs message system" which asked Dr. Jimenez about his treatment.  ECF No. 64 at 9-10.  The reply from Health Services - which is alleged to have been sent from Administrator Smiledge - said, "if you are referring to Hep C treatment, you will not be able to start that until you reach your designated institution."[3] *Id.* at 10.  Plaintiff asserts that the response was contrary to BOP policy which permits treatment for pre-sentence detainees "if continuity of care can be reasonably assured and there is reliably sufficient time remaining in custody to complete treatment." *Id.* at 10-11.

---

[3] Notably, Mr. Carrin was a pre-trial detainee at that time.

Notwithstanding, Mr. Litton prescribed a "12-week course of Harvoni with low-dose Ribavirin" treatment for Mr. Carrin. *Id.* at 11. Again, it was confirmed that Mr. Carrin would likely be at FDC "for 4 to 5 months." *Id.* Furthermore, Mr. Carrin "was slated to testify on behalf of the Government in a criminal trial scheduled" for August 2019, and the U.S. Marshals placed a "hold" on Mr. Carrin to keep him at the FDC. *Id.* at 14.

Mr. Carrin sent a reply to the email he received from Health Services questioning his treatment and stating "[I] don't want to die in here." *Id.* at 12. Further, Mr. Carrin's criminal defense attorney (Nathan Prince) sent an email to the prosecutor[4] indicating that Mr. Carrin was in "dire need" of treatment but had been informed that FDC would not give that treatment while he was a pretrial detainee. *Id.*

In mid-October 2018, Mr. Carrin developed a rash that P.A. Rolston found to be "similar to Hep C associated rashes." ECF No. 64 at 13. On October 24th, Dr. Jimenez noted in Mr. Carrin's medical records that he was scheduled for a consult with a "local GI specialist" to assess

---

[4] The prosecutor "cooperated in expediting" a change of plea, which was held on October 29, 2018. *Id.* at 13. At Mr. Carrin's change of plea hearing, he addressed the presiding judge and said he was suffering from HCV but that FDC was refusing to provide treatment. *Id.* at 14. Mr. Carrin's Pre-Sentence Report also documented that Mr. Carrin was suffering from HCV. *Id.*

Mr. Carrin's HCV.  *Id.*  However, on November 5, 2018, Dr. Li acknowledged that Mr. Carrin "met the criteria for treatment but refused to authorize treatment to Mr. Carrin due [to] his status as a pretrial detainee." *Id.* at 14.

On January 2, 2019, Mr. Carrin sent another email to Administrator Smiledge, requesting "a look over" and complaining of worsening symptoms.  ECF No. 64 at 14-15.  Mr. Carrin was seen by P.A. Rolston on January 9, 2019, who found "rashes associated with liver disease."  *Id.* at 15.  He noted in Mr. Carrin's chart that his "chronic Hepatitis C and rash" required "a long term solution" and HCV treatment.  *Id.*  He further noted that Mr. Carrin was "interested in starting treatment and hopes to be designated soon."  *Id.* at 15.   Also on January 9, 2019, the URC reviewed Mr. Litton's prescribed DAA regimen, "acknowledged that Mr. Carrin met the criteria for the treatment, but deferred treatment."  ECF No. 64 at 16.

On January 15, 2019, Mr. Carrin was sentenced.  *Id.*  During the sentencing hearing, Mr. Carrin and his attorney informed the Court that FDC was refusing treatment.  Mr. Carrin and his mother pleaded for HCV treatment, and counsel (Mr. Prince) requested that Mr. Carrin be housed

close to Tallahassee so he could continue providing assistance to the

government. *Id.* at 17.  The request was adopted by the Court.  *Id.*

After Mr. Carrin was returned to FDC following his sentencing, he

emailed Dr. Jimenez and informed him that he had received a 10-year

sentence and needed "medical assistance for [his] HCV" which he said was

"getting worse each day."  ECF No. 64 at 17.  He said, "You stated in

[A]ugust that I needed immediate treatment."  *Id.*  Administrator Smiledge

replied to the email stating, "Request sent."  *Id.*  On the following day,

another email was sent to Mr. Carrin advising that since he had been

sentenced, he would "have the chance to begin" HCV treatment "in the

designated facility . . . ."  *Id.* at 17-18.  Mr. Carrin inquired of Administrator

Smilege about beginning treatment at FDC since he had been sentenced,

but she replied that his "treatment would start once he got to his

'permanent institution.'" *Id.* at 18.

On January 31, 2019, Mr. Carrin complained to Administrator

Smiledge of "terrible back pains" as well as spasms and cramps in his

hands and legs and requested "some kind of medicine to help" him.  ECF

No. 64 at 18-19.  His email also said that his legs and hands would "draw

up" like he was "a contortionist."  *Id.* at 19.  Between January and March

25, 2019, Mr. Carrin had "several verbal conversations with Administrator Smiledge," explaining his need for HCV treatment and requesting her assistance. *Id.* No treatment was provided. *Id.*

Mr. Carrin was evaluated by Dr. Jimenez on March 26, 2019, for the first time since January 2019. *Id.* He noted in the medical record that Mr. Carrin "appeared jaundiced and obese." *Id.* Dr. Jimenez said that the "non-formulary request for DAA treatment was still pending approval." *Id.* at 20. On March 26, 2019, Mr. Carrin was moved to a prison facility in Atlanta. *Id.*

The following day, Mr. Carrin's defense attorney (Mr. Prince) contacted an Assistant United States Attorney (Mr. Milligan) about Mr. Carrin's transfer. ECF No. 64 at 20. Mr. Milligan informed Mr. Prince that he "had previously requested that [Mr.] Carrin be kept in Tallahassee, and AUSA Milligan assured Mr. Prince that he would have" him returned for trial. *Id.*

Upon arrival at BOP in Atlanta, a nurse practitioner noted Mr. Carrin needed "emergency evaluation and treatment" due to his "volume overload and shortness of breath." *Id.* He was kept in the hospital until April 2, 2019, when deemed "medically stable" and "was returned to the prison in

Atlanta." *Id.* at 21.[5]   On April 3rd, Mr. Carrin was evaluated by Dr. Winston who determined that he was a "high risk for bleeding," his liver condition needed to be treated, and he had "obvious abdominal ascites." *Id.*

On May 22, 2019, Mr. Carrin sent an email to Administrator Smiledge, also addressing Dr. Jimenez, and advising of new symptoms which he believed was from medication he was then taking. ECF No. 64 at 21. There was no response. *Id.* at 22. Another email was sent on June 2, 2019, advising of swelling in his feet and fluid retention, and stating that his "prescribed diuretics were not reducing the swelling." ECF No. 64 at 22. On June 5, 2019, P.A. Rolston also diagnosed Mr. Carrin as "being a high risk for bleeding and noted that he needed immediate treatment for his liver condition." *Id.* Further, P.A. Rolston recommended Mr. Carrin be moved "to permanent facility" so treatment could be initiated.[6] *Id.* On the following

---

[5] The complaint did not allege that Mr. Carrin was taken to a hospital, but said he was "scheduled to be discharged from the emergency room 'once clinically stable.'" ECF No. 64 at 21. Later, the complaint alleged he was "returned to the prison," suggesting he was taken to an outside medical center. *Id.* Defendant Jimenez' motion to dismiss indicates Mr. Carrin was admitted to the Grady County Hospital. ECF No. 74 at 11. The complaint is unclear as to when Mr. Carrin returned to FDC, Tallahassee.

[6] This allegation is far from clear as Mr. Carrin had been transferred to a prison in Atlanta in late March 2019. *See* ECF No. 64 at 20-21. It is unclear why emails were sent from Mr. Carrin to medical providers at FDC if he was located in Atlanta, but the date he was returned to FDC in Tallahassee is not alleged.

day, Dr. Jimenez evaluated Mr. Carrin, charted that he had advanced stage

Hepatitis C, documented Mr. Carrin's pain and "remarkable" edema, and

noted that Mr. Carrin had "been subject on URC and needs effective

treatment plan approach." *Id.* at 23.

On June 11, 2019, Mr. Carrin was again transported to the

emergency room. *Id.* On June 17th, he underwent a liver biopsy. *Id.* at

24. He was returned to FDC on June 25th and it was entered in his chart

that Mr. Carrin had been sent out for "complications related to untreated

viral Hepatitis C." *Id.* On June 27th, Mr. Carrin requested a full copy of his

medical records to provide to his lawyer. *Id.* at 25.

On July 2, 2019, Dr. Li evaluated Mr. Carrin and entered in his chart

that Mr. Carrin needed "immediate treatment of his Hep C." ECF No. 64 at

26. FDC's substituted course of antibiotics (Keflex) was not effective and

Mr. Carrin's "pain was 9 out of 10 and was constant." *Id.* A pharmacist,

Isaiah Litton, reviewed Mr. Carrin's records and noted that he "continued to

be a priority level 1," that his "APRI was greater than 2 when" the initial

non-formulary request was prepared nearly a year ago - in August 2018,

and that "Harvoni plus initial low-dose ribavirin remained the appropriate

medical regimen for Mr. Carrin." *Id.* at 26.  Further, Mr. Litton

recommended that Mr. Carrin be evaluated for a liver transplant.[7]  *Id.* at 27.

On July 5, 2019, Mr. Carrin emailed Administrator Smiledge, asking

when his HCV treatment would begin.  *Id.*  He said he "was in constant

pain," his genitals were grossly swollen, and he could not even put on his

own shoes and socks.  *Id.*  On July 9th, P.A. Rolston charted that

Mr. Carrin had been approved for HCV treatment and a medical hold was

being placed for him.  *Id.* at 28.  A notation indicated Mr. Carrin needed

"consultant approval prior to initiation of" treatment.  *Id.*

On July 11, 2019, P.A. Rolston evaluated Mr. Carrin and scheduled

him for a GI consult since he met "criteria for treatment of his HEP C and

BOP Policy requires a specialist to follow clinical course of treatment."

ECF No. 64 at 28.  On July 13th, a correctional officer reported that

Mr. Carrin "was weak and pale with complaints of pain."  *Id.* at 29.  A nurse

responded and found Mr. Carrin in a wheelchair, awake, but with a "blank

stare."  *Id.*  He was cold and could not get warm.  *Id.*  He was also "pale

with an ashy appearance."  *Id.*  Mr. Carrin said the swelling had returned

---

[7] When Mr. Carrin returned from the outside hospital, he advised that he had been "placed on the transplant list" but it was "not in the note."  ECF No. 64 at 24.

and there was a "pink fluid oozing out of penis." *Id.* at 29.  He had difficulty urinating and reported "pain all over that he rated as being 10 out of 10." *Id.*  He said he felt like he needed "to go to the hospital." *Id.* at 30.  He was sent to the emergency room. *Id.*

A nurse checked on Mr. Carrin's status at the hospital.  ECF No. 64 at 30.  His blood pressure was 94 over 53, and he had been admitted to the intensive care unit. *Id.*  P.A. Rolston learned on July 17, 2019, that Mr. Carrin was given a blood transfusion, "treated for hepatic encephalopathy," and was septic. *Id.* at 31.  By the following day, Mr. Carrin's hepatic encephalopathy "had vastly improved as had his kidney function."  ECF No. 64 at 32.  However, on July 25th, Mr. Carrin's condition worsened with "increasing jaundice and edema." *Id.* at 33.

After giving Mr. Carrin IV antibiotics, the hospital planned to release him by July 31, 2019. *Id.* at 34.  However, Nurse Paynter (from FDC) implored the hospital not to discharge him. *Id.* at 34-35.  Mr. Carrin was not released. *See* ECF No. 64 at 37.

In the meantime, AUSA Chris Canova contacted Mr. Prince to inquire as to Mr. Carrin's availability to testify in the upcoming trial which was

scheduled for August.  *Id.* at 35.  Mr. Carrin was identified as a cooperating witness and was scheduled to testify on August 12, 2019.  *Id.*

Dr. Li entered a note in Mr. Carrin's chart on August 2, 2019, stating that he "was scheduled to begin receiving" HCV treatment "on an outpatient basis," and was scheduled for a GI consult "in the next couple of weeks."  ECF No. 64 at 36.  On August 5, 2019, P.A. Rolson confirmed that Mr. Carrin was "not on HEP C regimen" and was "not on a liver transplant list."  *Id.*

On August 16th, Mr. Carrin wrote a letter to Plaintiff (his mother) and said "his condition had deteriorated to the point where DAA drugs could not be administered and that he needed a liver transplant."  ECF No. 64 at 36. Five days later Mr. Carrin informed Plaintiff that "his liver was no longer functioning and that his ammonia levels were extremely elevated."  *Id*.  He also told her that the "elevated ammonia levels would eventually cause swelling on the brain and hallucinations, for which he was given laxatives." *Id.* at 37.

On September 3, 2019, Mr. Carrin was able to walk with the use of a walker, but no more than 150 feet, and he "required constant supervision." *Id.* at 38.  Mr. Carrin's attending physician agreed that he "should not be

returned to FDC upon his release from the hospital," but instead, should be "transferred to a medical center to receive appropriate care." *Id.* However, Mr. Carrin was discharged on September 10, 2019, and returned to FDC in Tallahassee. *Id.* at 38.

Dr. Jimenez evaluated Mr. Carrin that same day, noting his HCV treatment was "on hold" and "approval from the clinical director was needed before Mr. Carrin could be moved." *Id.* Dr. Jiminez recommended that Mr. Carrin be "placed on light duty upon discharge with 'non-strenuous greater than 30 minutes' work assignments." ECF No. 64 at 39. He also charted that "Mr. Carrin was not suffering from any pain." *Id.*

On September 11, 2019, Mr. Carrin was transferred out of FDC Tallahassee, and "after 15 days of transport arrived in Lexington, Kentucky on September 26, 2019." *Id.* at 39. On October 24th, Mr. Carrin submitted a request for compassionate release, which was denied by Warden Francisco J. Quintana on November 12, 2019. *Id.* The Warden said that Mr. Carrin did not "satisfy the medical components as provided in the program statement." *Id.*

Mr. Carrin passed away on December 5, 2019. *Id.* at 39. He never received available, and approved, DAA medications. *Id.*

Count I of the Amended Complaint is an Eighth Amendment deliberate indifference claim brought against Defendant Smiledge; Count II is an Eighth Amendment deliberate indifference claim brought against Defendants Jimenez and Rolston. *Id.* at 39-42. Count III is a Fifth Amendment deliberate indifference claim brought against Defendant Smiledge; Count IV is a Fifth Amendment deliberate indifference Amendment claim brought against Defendants Jimenez and Rolston. *Id.* at 43-46. All Defendants are sued in their individual capacities for compensatory and punitive damages. *Id.* at 39-46.

**Analysis**

Each Defendant's motion argues that the complaint should be dismissed pursuant to Rule 12(b)(1) because Defendants are "entitled to qualified immunity and Plaintiff has failed to establish a valid constitutional claim" against them. ECF No. 74 at 2; ECF No. 75 at 2; and ECF No. 80 at 2. Defendants acknowledge that qualified immunity is only appropriately granted if Defendants' conduct, performed within their discretionary functions, "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." ECF Nos. 74, 75, and 80 at 4 (citing to Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)).

Defendants contend there can be no dispute that they were acting within their capacity as BOP employees and within their discretionary authority. ECF Nos. 74, 75, and 80 at 4-5.  Plaintiff does not address Defendant's discretionary argument in any of the three responses filed, but the Court accepts the argument as true.  Each Defendant was acting in his and her capacity as a BOP employee in the medical unit of the FDC, performing legitimate job-related functions within their authority and medical judgment.

Next, it must be determined whether the factual allegations show that the Defendants violated a constitutional right and whether that right was "clearly established."  ECF Nos. 74, 75, and 80 at 5.  "Assessing a claim of qualified immunity involves a two-step process: once a defendant raises the defense, the plaintiff bears the burden of establishing both that the defendant committed a constitutional violation and that the law governing the circumstances was already clearly established at the time of the violation."  Youmans v. Gagnon, 626 F.3d 557, 562 (11th Cir. 2010) (citing Pearson v. Callahan, 555 U.S. 223, 129 S.Ct. 808, 815-16, 172 L.Ed.2d 565 (2009)).

"Federal and state governments . . . have a constitutional obligation to provide minimally adequate medical care to those whom they are

punishing by incarceration."  Harris v. Thigpen, 941 F.2d 1495, 1504 (11th

Cir. 1991) (quoted in Hoffer v. Sec'y, Fla. Dep't of Corr., 973 F.3d 1263,

1270 (11th Cir. 2020)).  In conjunction with that obligation, the law has

been clearly established since 1976 that prisoners have an Eighth

Amendment right to medical care.  Estelle v. Gamble, 429 U.S. 97, 103, 97

S. Ct. 285, 290, 50 L. Ed. 2d 251 (1976) ("An inmate must rely on prison

authorities to treat his medical needs; if the authorities fail to do so, those

needs will not be met").  In addition, pretrial detainees have the same right

to medical care as do convicted prisoners, a right protected by the Due

Process Clause of the Fifth Amendment.  Jordan v. Doe, 38 F.3d 1559,

1564 (11th Cir. 1994).  The Due Process Clause "require[s] the responsible

government or governmental agency to provide medical care to persons"

who have not yet been convicted of a crime.  City of Revere v.

Massachusetts Gen. Hosp., 463 U.S. 239, 244, 103 S. Ct. 2979, 2983, 77

L. Ed. 2d 605 (1983) (noting "the due process rights of a person in Kivlin's

situation are at least as great as the Eighth Amendment protections

available to a convicted prisoner").  The standard of review for either claim

is the same, whether based on the Fifth or Eighth Amendment.  Jordan, 38

F.3d at 1565.  Thus, Mr. Carrin had a clearly established constitutional right to medical care.

Mr. Carrin also had a serious medical need.  Black v. Alabama Dep't of Corr., 578 F. App'x 794, 795 (11th Cir. 2014) ("Hepatitis C is a serious medical need"); *see, e.g.,* Roe v. Elyea, 631 F.3d 843, 862 (7th Cir. 2011)*;* Hoffer, 973 F.3d at 1270; Gordon v. Schilling, 937 F.3d 348, 356 (4th Cir. 2019); Woodcock v. Correct Care Sols., 861 F. App'x 654, 659 (6th Cir. 2021).  Defendants do not dispute the seriousness of Mr. Carrin's medical need or his right to medical treatment.  Rather, Defendants contend that Plaintiff's claims should be dismissed because they did not violate Mr. Carrin's constitutional rights.  ECF No. 74 at 6; ECF No. 75 at 6-7; ECF No. 80 at 6-7.  Defendants argue that their actions or inactions did not rise "to the level of deliberate indifference."  ECF No. 74 at 9; ECF No. 75 at 9-10; ECF No. 80 at 9-10.  Thus, the issue is whether the complaint sufficiently alleged that Defendants committed a constitutional violation.

The Eighth Amendment is violated when prison officials are deliberately indifferent to a prisoner's "serious medical needs."  Estelle, 429 U.S. at 104, 97 S. Ct. at 291.  To "prove a claim for deliberate indifference," a plaintiff must show: (1) a "serious medical need (the objective

component)"; (2) a prison official's "deliberate indifference to that serious medical need (the subjective component); and (3) the official's wrongful conduct caused the injury."  Fischer v. Fed. Bureau of Prisons, 349 F. App'x 372, 374 (11th Cir. 2009) (citing to Goebert v. Lee Cnty., 510 F.3d 1312, 1326 (11th Cir. 2007)).  "To satisfy the subjective component, the plaintiff must prove the prison official subjectively knew of a risk of serious harm, the official disregarded that risk, and the official's conduct was more than gross negligence."  Fischer, 349 F. App'x at 374 (citation omitted).

Here, the amended complaint sufficiently alleges that all three Defendants were aware of Mr. Carrin's medical diagnosis and his need for treatment for a serious medical need.  On August 9, 2018, Dr. Jimenez knew Mr. Carrin was positive for HCV.  At that time, he was not experiencing symptoms, pain, or other indications of liver disease.  ECF No. 64 at 4-6.  However, on August 30, 2018, Defendant Jimenez learned that Mr. Carrin's lab results showed elevated liver enzymes and Dr. Jiminez noted that the lab results showed he needed to "start treatment ASAP." ECF No. 64 at 7-8.  The following day medical staff confirmed that Mr. Carrin would be at FDC for "at least 4 to 5 months" and he wanted HCV treatment.  *Id.*

On September 4, 2018, while they were awaiting "regional non-formulary approval treatment," Mr. Carrin developed a "large abdomen" which led to Dr. Jiminez placing him on restricted duty status. *Id.* at 8-9. In mid-September 2018, staff again confirmed that Mr. Carrin would be at FDC for the required duration of treatment, and the "non-formulary request for Hepatitis C treatment algorithm had been placed and charted . . . ." *Id.* at 9. Mr. Carrin sought to know the status of his treatment and asked whether they had forgotten about him. *Id.* at 10. In response, he was informed on September 15, 2018, that he would not be able to start treatment until he reached his "designated institution." *Id.* at 10. That response was alleged to have come from Administrator Smiledge, even though a prescription had been entered by Mr. Litton on September 12, 2018, to provide Mr. Carrin with a "12-week course" of treatment (Harvoni and Ribavirin). *Id.* at 10-11.

Aware of the response, which Plaintiff alleges is contrary to BOP policy, Mr. Carrin's defense attorney sought an expedited date for a change of plea hearing because Mr. Carrin needed medical care which FDC would not provide while Mr. Carrin was a pretrial detainee. *Id.* at 12. On October 29, 2018, Mr. Carrin entered a plea of guilty. *Id.* at 13. On November 5,

2018, Dr. Li "acknowledged" that Mr. Carrin "met the criteria for treatment" but treatment was refused "due to his status as a pretrial detainee." *Id.* at 14.

On January 2, 2019, Mr. Carrin alerted both Dr. Jimenez and Administrator Smiledge of his worsening condition. *Id.* at 14. P.A. Rolston examined him and noted "rashes associated with liver disease." *Id.* at 15. He further noted that Mr. Carrin needed treatment for his HCV. *Id.* Because Dr. Jimenez co-signed Rolston's clinical encounter notes, he was aware of Mr. Carrin's deteriorating condition. *Id.* at 16.

It took approximately four months for the URC to review Mr. Litton's "prescribed DAA regimen." *Id.* Although Mr. Carrin met the criteria for treatment, treatment was deferred. *Id.*

Plaintiff's allegations suggest that defense counsel worked to have Mr. Carrin "sentenced immediately" because FDC was refusing treatment.[8] *Id.* Following Mr. Carrin's January 2019 sentencing, he sent an email stating that he had now been sentenced and requesting medical treatment for his HCV which he said was "getting worse each day." *Id.* at 17. That

---

[8] Notwithstanding, the Court takes judicial notice that the date for sentencing (January 15, 2019) was set at Mr. Carrin's plea hearing which was held on October 29, 2018. *See* ECF No. 34 at 24 of case number 4:18-cr-43-RH.

message was seen by Administrator Smilege and Dr. Jiminez.  *Id.*

However, Mr. Carrin was not scheduled for treatment and, instead, he was

informed that he would begin treatment in his designated facility.  *Id.* at 18.

On January 24, 2019, Mr. Carrin again inquired about receiving treatment

at FDC since he had been sentenced, but once again, Administrator

Smiledge told him his treatment would not start until he got to his

"permanent institution."  *Id.*  On numerous occasions over the next two

months, Mr. Carrin expressed to Administrator Smiledge that he needed

treatment and asked for her assistance in obtaining it.  *Id.* at 19.  No steps

were taken by any Defendant, nor was Mr. Carrin's condition monitored.

    He was not seen or examined again until March 25, 2019, when

Mr. Carrin requested medical care for "almost unbearable" pain.  *Id.* at 19.

Dr. Jimenez examined Mr. Carrin, saw that he was jaundiced, obese, and

needed treatment, but took no action since Mr. Carrin was awaiting a

facility assignment.  *Id.* at 19-20.

    Mr. Carrin was sent to a prison in Atlanta, but upon arrival, he was

transferred to the hospital for emergency medical care.  ECF No. 64 at 20.

The allegations of the complaint suggest that Mr. Carrin was transferred on

March 26, 2019, and returned to FDC Tallahassee by at least May 6, 2019,

when Dr. Li reviewed his chart.  *Id.* at 20-21.  Despite the hospital

admission and his worsening condition, Mr. Carrin was still not provided

HCV treatment.[9]  Mr. Carrin sent emails seeking medical care in late May

and early June 2019, but HCV treatment still did not begin.  Defendants

Rolston and Jimenez knew that Mr. Carrin needed immediate treatment,

but none was provided.  *Id.* at 21-24.  Defendant Smiledge had previously

declared that Mr. Carrin would not receive HCV treatment at FDC.

In late June, he was admitted to the hospital for care related to his

untreated HCV, but still treatment was not provided.  *Id.* at 24-26.  He

reported constant pain, and despite being a "priority level 1" patient in

August of 2018, was still not provided HCV treatment.  *Id.* at 26.  According

to the complaint, it took until July 9, 2019, for Mr. Carrin to be approved for

treatment.  *Id.* at 28.  Even so, treatment did not begin.  Instead, a notation

was entered by P.A. Rolston that Mr. Carrin would need "consultant

approval" before treatment would begin.  *Id.* at 28.  Before he could attend

that appointment - whenever it was scheduled[10] - Mr. Carrin was taken to

___

[9] It is likely that Mr. Carrin was returned to FDC because he was needed to assist in an upcoming criminal trial.   ECF No. 64 at 20-21.

[10] One chart notation made on August 2, 2019, stated that Mr. Carrin was scheduled for a GI consult "in the next couple of weeks."  ECF No. 64 at 36.

the emergency room and ultimately admitted to the ICU for care.  *Id.* at 30.

He was hospitalized for nearly two months,[11] and it appears he was unable

to testify as a cooperating witness because of his hospitalization.  *Id.* at 35-

38.

Treatment was deferred and delayed for so long that by the summer

of 2019, it was determined that Mr. Carrin would need a liver transplant.  *Id.*

at 27, 36.  He was discharged from the hospital on September 10, 2019,

and Dr. Jimenez noted his treatment was on "hold."  *Id.* at 38.  Mr. Carrin

was transferred the following day to a prison facility in Kentucky.  *Id.* at 39.

He died just three months later.

The allegations of the amended complaint - which must be accepted

as true - reveal that during Mr. Carrin's 13-month detention at FDC,

Defendants knew that he needed HCV treatment.  As medical personnel,

they were aware that the need for treatment was urgent and that the failure

to provide treatment could be fatal.  Mr. Carrin was a priority 1 patient who

never received the treatment prescribed, despite knowledge that his

condition was deteriorating and he was in extreme pain.  He was held at

---

[11] He was admitted to the hospital on or about July 13, 2019, and discharged on
September 10, 2019.  *Id.* at 29-30, 38.

FDC long enough to have received the 12-week treatment regimen, a fact that staff confirmed on several occasions.

In short, the amended complaint sufficiently alleges that treatment was not provided to Mr. Carrin, first, because he was a pretrial detainee, and second, because he was not at his permanent institution.  Necessary and life-saving medical treatment was deferred for non-medical reasons.

Within the Eleventh Circuit, the law has been clearly established for nearly 40 years that "if necessary medical treatment has been delayed for non-medical reasons, a case of deliberate indifference has been made out." Ancata v. Prison Health Servs., Inc., 769 F.2d 700, 704 (11th Cir. 1985) (citing to Archer v. Dutcher, 733 F.2d 14, 17 (2d Cir. 1984)); *see also* H.C. by Hewett v. Jarrard, 786 F.2d 1080, 1086 (11th Cir. 1986).  "A core principle of Eighth Amendment jurisprudence in the area of medical care is that prison officials with knowledge of the need for care may not, by failing to provide care, delaying care, or providing grossly inadequate care, cause a prisoner to needlessly suffer the pain resulting from his or her illness." McElligott v. Foley, 182 F.3d 1248, 1257 (11th Cir. 1999).  The amended complaint sufficiently alleged facts showing that the refusal to provide medical treatment was in "reckless disregard" of Mr. Carrin's serious

medical needs.  <u>Jarrard</u>, 786 F.2d at 1086.  As alleged, the Court concludes that Defendants were deliberately indifferent to Mr. Carrin's needs, and that such indifference caused, or at least, contributed to his death.

Mr. Carrin was to be held at FDC to assist the Government in another criminal prosecution.  Despite not being at a "permanent institution" to serve his 10-year sentence, Mr. Carrin was in a federal detention facility that could, and should, have provided him medical treatment.  Based on these allegations, he suffered needlessly, and may have died prematurely. Treatment was available but not accessible.

Defendant Smiledge raises an additional argument - that she is "not a medical provider" and does not monitor or control a prisoner's treatment. ECF No. 75 at 11, 12.  She argues that Plaintiff is attempting to bring claims against her on the basis of "supervisory or vicarious liability."  *Id.* at 12-14.  The Court disagrees.  Plaintiff's allegations against her are not based on vicarious liability but, rather, Defendant Smiledge's personal involvement in delaying - and ultimately denying - medical care to Mr. Carrin.  Plaintiff points out that Mr. Carrin contacted her repeatedly begging for her assistance in obtaining medical treatment for HCV.  ECF

No. 81 at 18-19.  That treatment never happened.  Furthermore, it was Defendant Smiledge's personal communication to Mr. Carrin on two separate occasions which advised that treatment would not be provided to him.  She did so, first, because he was a pretrial detainee, then after he was convicted, she did so because he was not at his permanent facility, despite the fact that he would be present at FDC for many months to assist the Government as a material witness in a criminal trial.  Administrator Smiledge saw nearly all of Mr. Carrin's emails in which he complained of pain and deteriorating health issues, but took no action to ensure he received the medically necessary treatment his doctors prescribed. According to the complaint, she prevented Mr. Carrin's access to life saving medical care and, thus, was deliberately indifferent.

Qualified immunity may appropriately be denied even when a named defendant is not a medical provider.  *See* Harris v. Coweta Cnty., 21 F.3d 388, 390 (11th Cir. 1994) (affirming denial of qualified immunity for Sheriff who delayed prescribed diagnostic tests and surgery while he was incarcerated in the county jail until inmate could be transferred to the state correctional system).  In Goebert v. Lee Cnty., 510 F.3d 1312, 1328 (11th Cir. 2007), the Eleventh Circuit denied qualified immunity to Captain

Weaver, a non-medical jail official, who failed to act on a pregnant inmate's complaint that she needed immediate medical care and "misstated jail policy" in responding to her request for medical care.   The fact that Defendant Smiledge is "not a medical provider" does not entitle her to qualified immunity.

The amended complaint sufficiently alleges facts to show that all three Defendants' failed to provide medical treatment known to be necessary and urgent.  Doing so was deliberate indifference.  Defendants' actions, as alleged in the amended complaint, violated Mr. Carrin's constitutional rights and also violated clearly established law.  The motions to dismiss based on qualified immunity should be denied.

## **<u>RECOMMENDATION</u>**

It is respectfully **RECOMMENDED** that the motions to dismiss, ECF Nos. 74, 75, and 80, should be **DENIED** and this case **REMANDED** for further proceedings.

**IN CHAMBERS** at Tallahassee, Florida, on April 24, 2023.


 S/    Martin A. Fitzpatrick
**MARTIN A. FITZPATRICK**
**UNITED STATES MAGISTRATE JUDGE**

Case No. 4:21cv486-MW-MAF

## <u>NOTICE TO THE PARTIES</u>

**Within fourteen (14) days after being served with a copy of this Report and Recommendation, a party may serve and file specific written objections to these proposed findings and recommendations.  Fed. R. Civ. P. 72(b)(2).  A copy of the objections shall be served upon all other parties.   A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.  Fed. R. Civ. P. 72(b)(2).  <u>Any different deadline that may appear on the electronic docket is for the Court's internal use only and does not control.</u>  If a party fails to object to the Magistrate Judge's findings or recommendations as to any particular claim or issue contained in this Report and Recommendation, that party waives the right to challenge on appeal the District Court's order based on the unobjected-to factual and legal conclusions.  *See* 11th Cir. Rule 3-1; 28 U.S.C. § 636.**