**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION**

**SANDRA GAIL CARRIN,
as the Personal Representative
of the Estate of
RAYMOND MARSHALL CARRIN,**

     **Plaintiff,**

**vs.**                  **Case No. 4:21cv486-MW-MAF**

**SHAUNA MARIE SMILEDGE,
JOSEPH JIMENEZ, MD,
and PAUL ROLSTON,**

     **Defendants.**
_____/

**SECOND REPORT AND RECOMMENDATION**[1]

This is a civil rights case brought pursuant to 28 U.S.C. § 1331, 1343, and 2201, and <u>Bivens v. Six Unknown Fed. Narcotics Agents</u>, 403 U.S. 388, 91 S. Ct. 1999, 29 L. Ed. 2d 619 (1971), which challenges the medical care provided to Raymond Marshall Carrin during his detention in the Federal Detention Center in Tallahassee and his subsequent imprisonment

---

[1] The first Report and Recommendation, ECF No. 97, was entered on April 24, 2023, and recommended denying the Defendants' motions to dismiss. The recommendation was adopted without objection. ECF No. 98.

within the Bureau of Prisons (BOP).  Plaintiff is the mother of Mr. Carrin,

who passed away on December 5, 2019, having never received DAA

medications for the Hepatitis C Virus [HCV].  ECF No. 64 at 39.

Pending in this case are four motions for summary judgment, ECF

Nos. 108-111, responses from the opposing parties, ECF No. 113-115, and

replies, ECF Nos. 116-118.  The motions are ready for a ruling.

As a procedural note, Defendants filed a motion to strike Plaintiff's

expert witness opinion.  ECF No. 119.  Although it was concluded that

Plaintiff failed to supplement the expert opinion of Dr. Donald Kern as

required by Rule 26, the report was not stricken because there was no

showing that Defendants were substantially prejudiced or harmed by

Plaintiff's failure.  ECF No. 126.  Defendants were offered the opportunity

to engage in a 60-day supplemental discovery period so they could take

Dr. Kern's deposition or otherwise prepare their opposition, during which

the Court would delay consideration of the pending summary judgment

motions.  *Id.*  Defendants declined that opportunity and consented to ruling

on the motions as filed.  ECF No. 127.

## I.    Legal standards governing a motion for summary judgment

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  Thus, summary judgment is proper "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986).  The "party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."  Celotex Corp., 477 U.S. at 323, 106 S. Ct. at 2553.  The non-moving party must

then show[2] the court "that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325, 106 S. Ct. at 2554.

An issue of fact is "material" if it could affect the outcome of the case. Hickson Corp. v. Northern Crossarm Co., Inc., 357 F.3d 1256, 1259 (11th Cir. 2004) (citations omitted).  A party must show more than the existence of a "metaphysical doubt" regarding the material facts, Matsushita Elec. Indus. Co., LTD. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986), and a "scintilla" of evidence is insufficient.  The court must decide "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  Hickson Corp., 357 F.3d at 1260 (quoting Anderson v. Liberty Lobby, 477 U.S. 242, 252, 106 S. Ct. 2505, 2505, 91 L. Ed. 2d 202 (1986)).

---

[2] "Rule 56(e) . . . requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'"  Owen v. Wille, 117 F.3d 1235, 1236 (11th Cir. 1997), *cert. denied* 522 U.S. 1126 (1998) (quoting Celotex, 477 U.S. at 324, 106 S. Ct. at 2553) (quoting Fed. R. Civ. P. 56(c), (e))).  The nonmoving party need not produce evidence in a form that would be admissible as Rule 56(e) permits opposition to a summary judgment motion by any of the kinds of evidentiary materials listed in Rule 56(c).  Owen, 117 F.3d at 1236; Celotex, 477 U.S. at 324, 106 S. Ct. at 2553.

"Summary judgment is not a time for fact-finding; that task is reserved for trial."  Sconiers v. Lockhart, 946 F.3d 1256, 1263 (11th Cir. 2020) (citing Tolan v. Cotton, 572 U.S. 650, 655-57, 134 S. Ct. 1861, 188 L. Ed. 2d 895 (2014)).  Further, "when competing narratives emerge on key events, courts are not at liberty to pick which side they think is more credible." Sconiers, 946 F.3d at 1263.  On the other hand, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial."  Matsushita Elec. Indus. Co., 475 U.S. at 587 (internal quotation marks omitted) (quoted in Ricci v. DeStefano, 557 U.S. 557, 586, 129 S. Ct. 2658, 2677, 174 L. Ed. 2d 490 (2009)).

"Cross motions for summary judgment do not change the standard." Latin Am. Music Co. v. Archdiocese of San Juan of the Roman Catholic & Apostolic Church, 499 F.3d 32, 38 (1st Cir. 2007) (quoted in Ernie Haire Ford, Inc. v. Universal Underwriters Ins. Co., 541 F. Supp. 2d 1295, 1297 (M.D. Fla. 2008)).  "'Cross motions for summary judgment are to be treated separately; the denial of one does not require the grant of another.'" Christian Heritage Acad. v. Okla. Secondary Sch. Activities Ass'n, 483 F.3d 1025, 1030 (10th Cir. 2007) (quoting Buell Cabinet Co. v. Sudduth, 608

F.2d 431, 433 (10th Cir. 1979)) (quoted in <u>Ernie Haire Ford</u>, 541 F. Supp. 2d at 1297-98)).  Thus, each of the four motions for summary judgment will be separately evaluated.

This Report and Recommendation deals only with the motion for summary judgment filed by Defendant Smiledge.  ECF No. 109.  Plaintiff filed a response, ECF No. 115, supported by over 500 pages of exhibits.  Defendant Smiledge filed a reply.  ECF No. 118.

## II.   Rule 56 Evidence

Mr. Carrin was indicted in the Northern District of Florida in case number 4:18-cr-43 and was admitted to the Federal Detention Center [FDC] in Tallahassee as a pre-trial detainee on August 9, 2018.  ECF No. 109, Ex. A (ECF No. 109-1).  His status was administratively changed to "holdover" status on October 30, 2018.[3]  ECF No. 109-1 at 8.  United States District Judge Robert Hinkle sentenced Mr. Carrin on January 15,

---

[3] The motion states that his status was "changed from pre-trial detainee awaiting criminal prosecution to holdover status awaiting sentencing, after he appeared before Judge Hinkle and pled guilty."  ECF No. 109 at 2.  The motion points to Exhibit A in support of that statement, but the exhibit shows that the "holdover" status continued after sentencing as well.  *See* ECF No. 109-1 at 7-8.  As a matter of clarification, the amended complaint alleged that an expedited change of plea hearing was set due to Mr. Carrin's need for treatment and FDC's refusal to provide treatment while he was a pretrial detainee.  *See* ECF No. 64 at 12-14.

2019, to a term of 120 months, after he entered a plea of guilty.  ECF No. 109-1 at 5.  According to BOP records, he was not designated as "committed" until June 25, 2019.  *Id.*

Defendant Shauna Marie Smiledge is a Health Services Administrator [HSA] for the BOP, employed currently at the Federal Correctional Institution [FCI] in Terre Haute, Indiana.  ECF No. 109-2 (Smiledge Declaration].  She was the HSA at FCI, Tallahassee, between October 15, 2018, and July 20, 2020.  *Id.* at 1.  Ms. Smiledge is not a "medical provider,"[4] is not "qualified to provide medical treatment," and cannot "prescribe or administer medications."  *Id.* at 3.  She cannot "request specific treatment plans" or "referrals for medical treatments outside of FCI/FDC Tallahassee," and she lacks training as to "what kinds of treatments are required for specific illnesses, viruses, or bacteria."  *Id.* She also is not "qualified to monitor or dictate the treatment rendered by medical providers."  *Id.*

Ms. Smiledge's role at FCI, Tallahassee, was "administrative in nature," and she was "not responsible for the medical care of inmates at

---

[4] Ms. Smiledge began her employment with BOP as a pharmacy technician in November 2010.  ECF No. 109-2 at 2.

the facility." ECF No. 109-2 at 3. She was, however, "involved with the

Utilization Review Committee ('URC')." *Id.* "The URC[5] is responsible for

addressing medical requests and/or treatment for inmates that requires

further approval, to include any pending consults that the physicians or

mid-level providers (physician assistants and nurse practitioners) have

requested." *Id.* The URC also reviews "requests for outside medical,

surgical, and dental procedures; requests for in-house or escorted trips to

medical specialist visits; requests for "limited medical value" treatments and

procedures; requests for nonformulary medications; and other services the

primary care provider or the Clinical Director have recommended." *Id.* The

URC can approve requests, deny requests, refer inmates for further

evaluations, put inmates on "a waiting list with recommended parameters,"

or decide a "procedure is contraindicated due to unacceptable risk to the

inmate if" performed. *Id.* at 3-4.

Ms. Smiledge could access the Health Services email account and

was one of several "staff members who could correspond with inmates

through" that account. ECF No. 109-2 at 4. She also made "'rounds' on a

---

[5] The URC also includes staff physicians, mid-level providers, the warden or
associate warden, the Assistant HSA, and "a Unit Team (case manager, case worker,
or unit manager) member." ECF No. 109-2 at 3.

weekly basis" and walked through the cell units, "addressing inmates'

concerns regarding their medical treatment." *Id.* at 4.  When inmates had

questions about their "medical treatment, [she] would contact the

appropriate medical staff and respond to the inmates' inquiry."  ECF No.

109-2 at 4.  Indeed, Ms. Smiledge's explanation of her duties is that she

acted as a "liaison" between an inmate and medical staff.  ECF No. 109-2

at 4; ECF No. 109 at 12.  She "would take the information related to [her]

by the [medical] providers and report back to the inmate."  ECF No. 109-2

at 4-5.  Ms. Smiledge states that she has no recollection of "any specific

conversations with Mr. Carrin during rounds or otherwise throughout" her

tenure at FCI Tallahassee.  *Id.* at 5.

She would also take telephone calls from inmates' family members

regarding medical concerns.  *Id.* at 5.  Again, Ms. Smiledge states that she

has no recollection of "any specific conversations with Ms. Sandra Carrin

during" her tenure at FCI Tallahassee.  *Id.* at 5.

Ms. Smiledge declares that she "was not responsible for ensuring

that Mr. Carrin received any medications at FCI/FDC Tallahassee."  *Id.*

She could not recommend treatment for him, dictate his treatment,

prescribe medications, or "ask the medical providers to start, stop, or

otherwise change the course of treatment for any inmate." ECF No. 109-2 at 5.

As the HSA, Ms. Smiledge managed staff along with the Clinical Director. ECF No. 115-5 at 13. She could "make recommendations" if she saw that something was occurring "outside of policy." *Id.* at 14. She had oversight over scheduling and staffing of the employees who work for the Clinical Director, and her job duties included the hiring and managing of employees. *Id.* at 13-14. She and the Clinical Director had "frequent communication about "concerns or emergent medications or emergent treatments." *Id.* at 15.

In her capacity as the HSA, Ms. Smiledge also was "the Cost Center Manager for the budget." *Id.* at 11. She had "complete oversight . . . for the budget." *Id.* During her deposition, Ms. Smiledge explained that she is "given a set budget," but if an emergency arose, she would discuss it with the business office and together they would "make it happen." *Id.* at 13.

Plaintiff's evidence as it concerns Ms. Smiledge is that on March 25, 2019, Mr. Carrin sent an email addressed to Ms. Smiledge. ECF No. 115 at 6. His email stated:

> "Dear Ms. Smiledge, I was following up on our last talk of being seen by medical. Do you know approximately when that will be? I'm sweeling [sic] up badly and am in discomfort to where its almost unbearable. Can the doctor prescribe me something for the pain? Remember i [sic] stated that I have cirrhosis of the liver, and hep C. Thank you for your time."

*Id.* (citing to ECF No. 107 at 13, ¶116); *see also* ECF No. 64, ¶116.[6]  This email was obviously received because Mr. Carrin was evaluated the following day by Defendant Jimenez.  ECF No. 115 at 6.  Defendant Jimenez was the staff physician who treated Mr. Carrin while he was at FDC Tallahassee.  ECF No. 115-5 at 22.

On July 5, 2019, Mr. Carrin sent another email to Ms. Smiledge.  ECF No. 115 at 9 (citing to ECF No. 107 at ¶168).[7]  As included within the amended complaint, the email stated: "Dear Mrs. Smiledge, I am inquiring as to approximately when my treatment for Hep C will begin?"  ECF No. 64

---

[6] Plaintiff's response, ECF No. 115, to Defendant Smiledge's summary judgment motion often makes pinpoint citations to certain paragraphs of ECF No. 107 as evidence.  *See, e.g.,* ECF No. 115 at 5-6.  To be clear, ECF No. 107 is Defendants' answer.  The answer did not include the text from Mr. Carrin's email.  ECF No. 107.  Instead, the answer stated in relevant part: "Ms. Smiledge admits on March 25, 2019, Inmate Carrin sent an email to the Health Services email account.  Inmate Carrin's email speak for itself."  ECF No. 107 at 13, ¶116.  The actual language of the email was presented in the amended complaint, ECF No. 64 at 19, ¶116, which is not a sworn document.  Plaintiff's response has required the Court to undertake a more tedious process than necessary to verify the information cited.

[7] Again, the pinpoint citation provides only the following: "Ms. Smiledge admits on July 5, 2019, Inmate Carrin sent an email to Health Services email box email account.  Inmate Carrin's email speaks for itself."  ECF No. 107 at 18, ¶168.

at 27, ¶168.  Mr. Carrin also said he was in constant pain, that his genitals were grossly swollen, and he added: "I can't even put my own shoes and socks on.  Anyhow, thanks for you [sic] time."  *Id.*  There is no evidence of a response to that email, but Defendant Rolston made a notation in Mr. Carrin's medical chart four days later: "Patient with approved HEP C treatment approval awaiting medical hold placed on MDS. Placing Med Hold now."  ECF No. 115 (citing to ECF No. 107 at ¶ 171 and RMSJ-1 at 114 [ECF No. 115-1 at 115]).

Inmates at FDC Tallahassee were informed "that the only way to request medical treatment was to e-mail the Health Service Manager, Ms. Smiledge, from one of the four computer terminals in [the] dorm."  ECF No. 115-12 at 2.  "[A]sking guards, nurses, P.A.'s or doctors for treatment would not get [the inmates] treatment;" inmates "were instructed to email Ms. Smiledge if [they] needed medical care."  *Id.*

Plaintiff also points to an interrogatory response from the United States which acknowledges that Mr. Carrin's "treatment with DAA medication" was delayed.  *See* ECF No. 115-2 at 3.  Another response acknowledges that Mr. Carrin was informed on three occasions (9/15/2018, 1/16/2019, and 1/24/2019) that "treatment would begin when he got to his

parent institution (designated institution)."  ECF No. 115-2 at 4.

Ms. Smiledge personally told Mr. Carrin that he could not receive the DAA

"medication until after he was sentenced."  *Id.*  at 2.  Mr. Carrin "rush[ed]

his plea and sentencing in order to become 'eligible,' to use Ms. Smiledge's

word, for treatment."  *Id.* at 3.

DAA treatment involves 12 weeks "of closely monitored treatment."

ECF No. 115-2 at 9.  Pursuant to the BOP's own Clinical Guidance, "[a]ll

sentenced inmates are eligible for consideration of treatment for chronic

HCV infection."  ECF No. 115-2 at 5.  The BOP has assigned priority levels

(low - intermediate - high) for treatment which include having sufficient time

remaining on an inmate's sentence to complete treatment, and "a life

expectancy" of greater than 18 months.  *Id.* at 6-7.  Mr. Carrin had "severe

Hepatitis C."  ECF No. 115-5 at 22.

There is evidence that Mr. Carrin was approved for HCV treatment in

October of 2018.  ECF No. 115-5 at 19.  Ms. Smiledge testified in her

deposition that she did not know why he was not given that treatment at

FDC Tallahassee.  *Id.*  When an inmate starts the 12-week treatment for

Hepatitis C, the BOP would not transfer the inmate; a transfer would be

paused.  ECF No. 115-5 at 19.  Defendants Jiminez and Rolston had

"authority to place a medical hold on Raymond Carrin to ensure that he remained at FDC to complete treatment."  ECF No. 115-11 at 18.

Plaintiff presented the sworn affidavit of Dale Folsom who was a friend of Mr. Carrin who was also incarcerated with him at FDC Tallahassee.  ECF No. 115-12 at 4.   Mr. Folsom said that Ms. Smiledge was aware of Mr. Carrin's "obviously dire medical condition."[8]  *Id.* According to Mr. Folsom, Ms. Smiledge was tired of hearing about Mr. Carrin's need for treatment and said she'd had enough of the griping about it from Mr. Carrin's paralegal and Mr. Carrin's mother.  *Id.*  She reiterated that Mr. Carrin "would receive his treatment when he got to a permanent camp."  *Id.*

Mr. Folsom said that he and other inmates witnessed Plaintiff's "deterioration" and were "mad" when they heard Defendant Rolston tell

---

[8] Defendant Smiledge argues in her reply that Plaintiff's response "relies on affidavits containing inadmissible hearsay" and has presented "mischaracterizations" used "inadmissible evidence."  ECF No. 118 at 2.  "The general rule is that inadmissible hearsay cannot be considered on a motion for summary judgment."  Macuba v. Deboer, 193 F.3d 1316, 1322 (11th Cir.1999) (footnote omitted) (internal quotation marks omitted) (quoted in Jones v. UPS Ground Freight, 683 F.3d 1283, 1293-94 (11th Cir. 2012)).  "Nevertheless, 'a district court may consider a hearsay statement in passing on a motion for summary judgment if the statement could be reduced to admissible evidence at trial or reduced to admissible form.'" Jones, 683 F.3d at 1294 (citation omitted).  The Court considers that the hearsay statements could be presented in a form that would be admissible in evidence, and Defendant Smiledge does not argue to the contrary.  *See* ECF No. 118; Fed. R. Civ. P. 56(c)(2).

Mr. Carrin that he could not get treatment until he was transported to his "final destination." *Id.* at 3. Mr. Folsom knew of another inmate at FDC Tallahassee who received treatment for Hepatitis C while there. *Id.* Mr. Folsom's affidavit demonstrates that Mr. Carrin's condition was obvious, and when Mr. Carrin was transported to Atlanta, "the staff was appalled at his condition." *Id.* at 3-4. Mr. Carrin was returned to FDC Tallahassee in just a few weeks. *Id.* at 4.

Plaintiff Sandra Garrin also submitted a sworn affidavit. ECF No. 115-13. She states that she had several conversation with Dr. Jiminez concerning the delay in Mr. Carrin's treatment. *Id.* at 2. Dr. Jiminez told Plaintiff that he did not know why Mr. Carrin "had not received the prescribed treatment, because he knew it had been ordered." *Id.* After multiple conversations, Dr. Jiminez told Plaintiff to follow up with Ms. Smiledge "to get more information about when the treatment might begin." *Id.* Plaintiff advises that she spoke with Ms. Smiledge "on multiple occasions" before Mr. Carrin was sentenced. *Id.* Ms. Smiledge confirmed what Mr. Carrin had told the Plaintiff - that Mr. Carrin "was not eligible to receive the prescribed medication until after he was sentenced, because pre-trial detainees could not receive lengthy or expensive treatments." *Id.*

Based on that information, counsel for Mr. Carrin was requested to

"expedite his sentencing" so he could begin treatment.  *Id.*  Sentencing

occurred on January 15, 2019.  *Id.*

However, weeks passed and Mr. Carrin "received no treatment

despite continuing to get more sick."  ECF No. 115-13 at 2-3.  Plaintiff

"began calling Ms. Smiledge several times every week."  *Id.* at 3.  Plaintiff

said that over the course of the months which passed between sentencing

and Mr. Carrin's transfer to Kentucky, she "personally spoke to

Ms. Smiledge on the phone at least once per week and more often twice

per week."  ECF No. 115-13 at 3.  According to the Plaintiff, Ms. Smiledge

"was well aware of" Mr. Carrin's condition and both Plaintiff and Mr. Carrin

"repeatedly" told her of his condition "and implored her for help."  *Id.*  When

questioned as to why treatment had not begun after Mr. Carrin was

sentenced, Ms. Smiledge "started telling [Plaintiff] and [Mr. Carrin] that the

reason he could not receive the treatment was that FDC was a transitory

facility and that [Mr. Carrin] would have to wait until he arrived at his

permanent camp to receive treatment."  *Id.*

Both Plaintiff and Mr. Carrin advised Ms. Smiledge "numerous times

that he was not going to be moved anytime soon" because he was a

cooperating witness and "the United States Attorney had directed the Marshals to keep [Mr. Carrin] at FDC Tallahassee."  ECF No. 115-13 at 3. Ms. Smiledge "constantly assured" the Plaintiff that he would "receive the treatment eventually, and always promised that he would not be moved out of state for permanent placement."  *Id.*

Plaintiff said that she believed that she was annoying Ms. Smiledge "because it became harder and harder to reach her."  ECF No. 115-13 at 3. She believed Ms. Smiledge was "screening" her calls, so she began using the telephone at her place of employment to call her.  *Id.*  Plaintiff believes Ms. Smiledge recognized that phone number, too, because she could no longer reach Ms. Smiledge on the telephone.  *Id.*  Plaintiff said she could reach Ms. Smiledge again only when "using an unfamiliar number."  *Id.* Ms. Smiledge gave her the same information each time, that "treatment was too expensive for a detention center to provide and [Mr. Carrin] would have to wait until he arrived at a permanent camp."  *Id.*

Plaintiff declares that she had a multitude of conversations with Ms. Smiledge.  ECF No. 115-13 at 4.  She states "without any hesitation" that Ms. Smiledge "knew [her] by [her] first name because of the frequency of [her] complaints."  *Id.* at 4-5.

Allison Carothers worked as a paralegal "for the Law Office of Pumphrey and Prince, who represented Ray Carrin."  ECF No. 115-14 at 2. When she first met Mr. Carrin at the Leon County Jail, "he appeared to be in very good health."  *Id.*  Later in 2018, he began showing "effects" from Hepatitis C such as swelling.  *Id.*  In the fall of 2018, after he was "moved to the Federal Detention Center in Tallahassee, Florida," Mr. Carrin's "symptoms continue[d] to worsen."  ECF No. 115-14 at 2.  Ms. Carothers saw him again on July 1, 2019, and was "absolutely taken aback by Mr. Carrin's physical appearance."  *Id.* at 4.  "He was roughly 4 times the size he was when [she] originally met him, his eyes were yellow and his skin was jaundiced."  *Id.*

Ms. Carothers had a number of telephone calls with Mr. Carrin during which "he continuously complained about his deteriorating medical condition and the fact that staff at FDC was doing nothing to treat him." ECF No. 115-14 at 2.  Mr. Carrin told Ms. Carothers that he had given Ms. Smiledge permission to speak with her about his condition.  *Id.* at 3. So Ms. Carothers "began making contact with" her about Mr. Carrin's medical condition.  *Id.*  The two women had numerous telephone conversations about his "condition and prognosis," and the telephone calls

were frequent "enough that staff would answer the phone 'Hi Allison.'" *Id.*

Ms. Carothers also said there were many "times that no one answered but

if [she] called from a different number or used *67 from [her] phone, the call

would be answered immediately."  ECF No. 115-14 at 3.

    In considering Defendant's summary judgment motion, the following

relevant dates are noted.  Mr. Carrin began his federal pretrial detention at

FDC Tallahassee on August 9, 2018.  ECF No. 109-1 at 8.  He entered

"holdover" status eleven weeks later on October 30, 2018, after entering a

guilty plea.  *Id.*  An exact date is unclear, but Mr. Carrin was approved for

Hepatitis C treatment in October 2018.  ECF No. 115-5 at 19.  Mr. Carrin

was sentenced on January 15, 2019, eleven weeks after he entered his

plea.  ECF No. 109-1 at 8.  He was not transferred away from FDC/FCI

Tallahassee until March 27, 2019, ten weeks later, and a total of seven and

a half months after his detention began.  *Id.*  He was returned to

Tallahassee on April 4, 2019, after having been taken to a local hospital in

late March.  *Id.*  Despite having been sentenced in January 2019, *see* ECF

No. 109-1 at 5, Mr. Carrin was not designated as "committed" until June 25,

2019.  *Id.*  A notation in Mr. Carrin's medical records in early July 2019 by

Defendant Rolston shows he was still awaiting a "medical hold."  ECF No.

115-1 at 115.  Mr. Carrin remained in Tallahassee for two more months,

until September 2019, when he was again transferred away.  ECF No. 109-

1 at 9.  He passed away on December 5, 2019.  *Id.*

**Analysis**

The Eighth Amendment governs the conditions under which

convicted prisoners are confined and the medical treatment they receive

while in prison.  Farmer v. Brennan, 511 U.S. 825, 832, 114 S. Ct. 1970,

128 L. Ed. 2d 811 (1994).  The Eighth Amendment guarantees that

prisoners will not be "deprive[d] ... of the minimal civilized measure of life's

necessities."  Rhodes v. Chapman, 452 U.S. 337, 347, 101 S. Ct. 2392,

2399, 69 L. Ed. 2d 59 (1981) (quoted in Chandler v. Crosby, 379 F.3d

1278, 1289 (11th Cir. 2004)).  Those necessities include food, clothing, and

medical care.  Harris v. Thigpen, 941 F.2d 1495, 1511 (11th Cir. 1991); *see*

*also* Collins v. Homestead Corr. Inst., 452 F. App'x 848, 850-851 (11th Cir.

2011).

The Eighth Amendment establishes "the government's obligation to

provide medical care for those whom it is punishing by incarceration."

Estelle v. Gamble, 429 U.S. 97, 103, 97 S. Ct. 285, 290, 50 L. Ed. 2d 251

(1976).  That obligation exists on both the "[f]ederal and state governments

. . . to provide minimally adequate medical care . . . ."  Harris v. Thigpen, 941 F.2d 1495, 1504 (11th Cir. 1991) (quoted in Hoffer v. Sec'y, Fla. Dep't of Corr., 973 F.3d 1263, 1270 (11th Cir. 2020)).

Mr. Carrin was both a pretrial detainee and a convicted prisoner during the events at issue in this case.  Pretrial detainees have the same right to medical care as do convicted prisoners.  However, a pretrial detainee's right to medical care is protected by the Due Process Clause of the Fifth Amendment rather than the Eighth Amendment.  Jordan v. Doe, 38 F.3d 1559, 1564 (11th Cir. 1994).  The Due Process Clause "require[s] the responsible government or governmental agency to provide medical care to persons" who have not yet been convicted of a crime.  City of Revere v. Massachusetts Gen. Hosp., 463 U.S. 239, 244, 103 S. Ct. 2979, 2983, 77 L. Ed. 2d 605 (1983) (noting "the due process rights . . . are at least as great as the Eighth Amendment protections available to a convicted prisoner").  Nevertheless, the standard of review for a denial of medical care claim is the same, whether based on the Fifth or Eighth Amendment.  Jordan, 38 F.3d at 1565.

Mr. Carrin had a clearly established constitutional right to medical care and was dependent upon the actions of prison officials to receive that

care.  Estelle, 429 U.S. at 103, 97 S. Ct. at 290 ("An inmate must rely on

prison authorities to treat his medical needs; if the authorities fail to do so,

those needs will not be met").  The Constitution is violated when prison

officials are deliberately indifferent to a prisoner's "serious medical needs."

429 U.S. at 104, 97 S. Ct. at 291.

To "prove a claim for deliberate indifference," a plaintiff must show:

(1) a "serious medical need (the objective component)"; (2) a prison

official's "deliberate indifference to that serious medical need (the

subjective component); and (3) the official's wrongful conduct caused the

injury."  Fischer v. Fed. Bureau of Prisons, 349 F. App'x 372, 374 (11th Cir.

2009) (citing to Goebert v. Lee Cnty., 510 F.3d 1312, 1326 (11th Cir.

2007)).  "To satisfy the subjective component, the plaintiff must prove the

prison official subjectively knew of a risk of serious harm, the official

disregarded that risk, and the official's conduct was more than gross

negligence."  Fischer, 349 F. App'x at 374 (citation omitted).

As for the first element, the evidence is undisputed that Mr. Carrin

had a serious medical need.  Black v. Alabama Dep't of Corr., 578 F. App'x

794, 795 (11th Cir. 2014) ("Hepatitis C is a serious medical need"); *see,*

*e.g.,* Roe v. Elyea, 631 F.3d 843, 862 (7th Cir. 2011)*;* Hoffer, 973 F.3d at

1270; <u>Gordon v. Schilling</u>, 937 F.3d 348, 356 (4th Cir. 2019); <u>Woodcock v. Correct Care Sols.</u>, 861 F. App'x 654, 659 (6th Cir. 2021).  Ms. Smiledge's motion for summary judgment does not acknowledge the seriousness of Mr. Carrin's medical needs, but she also does not dispute it.  ECF No. 109.[9]

Rather, the focus of Defendant Smiledge's motion for summary judgment is on the second element - whether she was deliberately indifferent to that need.  Defendant contends that Plaintiff's claim against her is insufficient because she "was not a medical provider" and she was "not qualified to dictate his medical treatment in any capacity."  *Id.* at 11.  Essentially, Defendant Smiledge argues that she could not be "deliberately indifferent to Mr. Carrin's needs in her administrative role."  *Id.* at 12, 14.

Plaintiff correctly points out that even non-medical providers may be liable under the Eighth Amendment.  ECF No. 115 at 25.  For example, non-medical providers cannot delay necessary medical care.  *See* <u>Alsobrook v. Alvarado</u>, 477 F. App'x 710 (11th Cir. 2012) (affirming denial of motion to dismiss a prisoner's § 1983 complaint which alleged that a

---

[9] Defendant Smiledge does acknowledge "that Mr. Carrin's Hepatitis C status constituted a serious medical need requiring treatment" in her reply.  ECF No. 118 at 7.

sergeant was deliberately indifferent to the serious medical needs of an inmate "by refusing to transport him to medical care for nearly two hours after he sustained significant injuries in an altercation with his cellmate"); Goebert v. Lee Cnty., 510 F.3d 1312, 1331 (11th Cir. 2007) (denying qualified immunity to Captain Weaver who had reason to know that the pretrial detainee had a serious medical problem, but took no actions to ensure the detainee received medical care); Harris v. Coweta Cnty., 21 F.3d 388, 390 (11th Cir. 1994) (affirming denial of qualified immunity for sheriff who was allegedly deliberately indifferent to medical needs of pretrial detainee by delaying a prescribed diagnostic nerve conduction "test and surgery while he was incarcerated in the county jail in order to transfer him to the state system for the surgery").

Defendant Smiledge's defense is not a viable one. Defendant Smiledge is the Health Services Administrator. She is the avenue by which inmates receive medical care. Indeed, Plaintiff's evidence is that she was the *only* avenue to request medical care. Mr. Carrin requested care and was told, first, that he could not receive care as a pretrial detainee for a life-

threatening condition.[10]  That statement, in and of itself, is problematic.

*See*  Harris, 21 F.3d at 394 (citing to H.C. by Hewett v. Jarrard, 786 F.2d

1080, 1086 (11th Cir. 1986), in support of well established law holding "that

delay of necessary treatment for non-medical reasons ... establishe[s]

deliberate indifference sufficient to establish a constitutional violation").

Defendant Smiledge informed Mr. Carrin that he could not have life-saving

medical treatment because of his status as a pre-trial detainee and she

suggested it was due to the high cost of such treatment.  If that statement

is true, it is unconstitutional.  Jarrard, 786 F.2d at 1086 (delay of necessary

treatment for non-medical reasons such as cost establishes "deliberate

indifference sufficient to establish a constitutional violation"); Ancata v.

Prison Health Servs., Inc., 769 F.2d 700, 704 (11th Cir. 1985) (finding

constitutional violation in placing "the financial interest of Prison Health

Services ahead of the serious medical needs of Ancata").

Defendant has argued that she could not be "deliberately indifferent

to Mr. Carrin's medical needs" because she is a non-medical provider.

ECF No. 118 at 10.  That argument is rejected.  The question is not

---

[10] Defendant Smiledge told the Plaintiff that Mr. Carrin "was not eligible" to receive the treatment "until after he was sentenced, because pre-trial detainees could not receive lengthy or expensive treatments."

Case No. 4:21cv486-MW-MAF

whether Defendant Smiledge was responsible for providing medical care to

Mr. Carrin, but whether she delayed access to that care and did so for

improper (non-medical) reasons.   The facts of Harris are noteworthy for

this issue.

There, inmate Willie Harris needed surgery for a medical condition

and the Sheriff knew it.  21 F.3d at 391.  Harris was at the Coweta County

jail for "pre-conviction incarceration from September 1990 through January

1991."  *Id.* at 389.  But instead of providing the medical care that was

recommended by an orthopedic physician, "the Sheriff took steps to have

Harris transferred to the state system."  *Id.* at 391.  Those steps were not

successful.  Harris could not have his parole revoked without a bond

hearing, but the judge refused to set bond.  21 F.3d at 391-92.  When the

parole board "agreed to take Harris into the state system if there was a

bond," the Sheriff "arranged a second bond hearing, informing the judge

that there was an inmate who may have a medical problem that would be

more appropriately treated in the state system."  *Id.* at 392.  The "second

bond hearing resulted in bond set at $100,000, an amount which Harris

could not pay."  *Id.*  Harris was in a "catch-22" situation - unable to obtain

medical care at the jail but the Sheriff made no attempt to have him transferred or have the surgery.  *Id.*

Mr. Carrin was in a similar predicament.  The undisputed evidence shows he could not receive expensive medical care as a pre-trial detainee. Defendant Smiledge - the Health Services Administrator - conveyed that information as a matter of policy, and she is responsible for doing so.  The denial of necessary medical care for such a reason does not comply with the Constitution.  "Like prisoners, pretrial detainees 'have a right to receive medical treatment for their illnesses and injuries.'"  Taylor v. Hughes, 920 F.3d 729, 732–33 (11th Cir. 2019) (quoted in Christmas v. Nabors, 76 F.4th 1320, 1335 (11th Cir. 2023)); *see also* Hamm v. DeKalb Cnty., 774 F.2d 1567, 1573-74 (11th Cir. 1985).

Yet even after Mr. Carrin entered a plea and was a convicted felon, he was still not provided medical care.  The second reason given was that he must be sentenced and sent to his "permanent" institution.  In that moment, Mr. Carrin was also in a "catch 22" situation because a hold had been placed to keep him at FDC Tallahassee because he was needed to testify in another pending criminal case.  That information was conveyed to Defendant Smiledge by Mr. Carrin and his mother.

Plaintiff's evidence is that she knew Mr. Carrin needed medical care, knew the medical care had been ordered, but took no steps to assist in the process or rectify the dilemma.  According to Plaintiff's evidence, Defendant Smiledge could make recommendations to medical providers if they were "doing something that maybe would fall outside of policy."  It should not be debatable that failing to provide life-saving medical care for non-medical reasons is outside the policy of the Bureau of Prisons.

Mr. Carrin was at the mercy of prison officials to act on his behalf so he could be provided medical treatment - treatment which was already approved.  Mr. Carrin's liaison was Defendant Smiledge, and there is evidence that repeated requests were made to Defendant Smiledge from Plaintiff, Ms. Carothers, and, likely, other inmates.  Plaintiff's evidence is that Defendant Smiledge began avoiding communications with those persons seeking help for Mr. Carrin.  A jury could reasonably conclude that the Defendant "recklessly ignore[d] the medical situation in the face of information that a reasonable person would know requires action."  Howell v. Evans, 922 F.2d 712, 720, n.7 (11th Cir.), vacated pursuant to settlement, 931 F.2d 711 (11th Cir. 1991), and opinion reinstated sub nom. Howell v. Burden, 12 F.3d 190 (11th Cir. 1994).  Defendant Smiledge was

the "go to" person for requesting medical care, but the requests met a stop sign. Plaintiff's evidence is that Defendant Smiledge did nothing in the face of an obvious need for care; that is the quintessential example of being deliberately indifferent. Mr. Carrin did not receive HCV treatment, and the harm to Mr. Carrin carried fatal consequences.

Defendant Smiledge denies those conversations even took place. Those conversations are relevant to proving the subjective component of an Eighth Amendment claim. Accordingly, there is a genuinely disputed fact of a material issue which precludes granting summary judgment.[11]

Notably, there is also a dispute of fact as to whether Mr. Carrin could receive Hepatitis treatment at FDC/FCI Tallahassee. Inmate Folsom declared in his affidavit that it had happened before, and Defendant Smiledge testified in her deposition that she did not know why Mr. Carrin was not given that treatment at FDC Tallahassee. Such an answer suggests that it could have happened.

---

[11] Even without those conversations, there is also evidence that Defendant Smiledge was aware of Mr. Carrin's need for medical care and his deteriorating conditions because she made weekly "rounds" and could view Mr. Carrin's condition. Mr. Carrin's need for medical care was obvious to inmates, to his paralegal, and would certainly have been obvious to her.

Case No. 4:21cv486-MW-MAF

Further, the evidence reveals that transfers would be paused for an inmate undergoing the 12-week treatment for Hepatitis C.  There is evidence that Defendants Jiminez and Rolston could have placed a "medical hold" on Mr. Carrin so he could receive treatment at FDC.[12]  That also suggests that Mr. Carrin should have received treatment at FCI, despite Defendant Smiledge's prior statement that he could not have the treatment until he went to his permanent institution.  This dispute is also relevant and material, and precludes granting the motion for summary judgment.

**Qualified Immunity.**

Defendant Smiledge has asserted the defense of qualified immunity. ECF No. 109 at 5-7.  She contends that she is "entitled to qualified immunity because Plaintiff has failed to establish that she violated [Mr. Carrin's] constitutional rights." *Id.* at 7.

First, this argument was raised in the Defendant's prior motion to dismiss.  ECF No. 85.  It was rejected then, *see* ECF Nos. 97-98, and it should be rejected again now.

---

[12] In addition, a hold issued by the United States Marshals Service was supposedly in place to keep Mr. Carrin in Tallahassee for an upcoming criminal trial in which he was to be a witness.

Case No. 4:21cv486-MW-MAF

The right to medical care was clearly established by <u>Estelle</u> nearly fifty years ago.[13]  It has also been clearly established for many years "that an official's denial of or delay in obtaining proper treatment could constitute deliberate indifference."  <u>Howell</u>, 922 F.2d at 722.  Further, a prison official may be deliberately indifferent to a prisoner's need for medical care even if the official has an administrative role and is not directly involved in medical care.  922 F.2d at 722.[14]  "Inaction in the face of a known serious medical need, a prescribed course of care, and the failure of an alternative course of action (the transfer to the state system), is not conduct that a sheriff could reasonably consider lawful."  <u>Harris</u>, 21 F.3d at 394.  It is also not conduct that is reasonable for an administrator of health services. Defendant Smiledge is not entitled to qualified immunity.

---

[13]  <u>Estelle v. Gamble</u>, 429 U.S. 97, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976).

[14] One of the defendants in <u>Howell</u> was Mr. Burden, the prison superintendent at ACMI.  Although the proper medical care and diet could not be provided at ACMI, and Burden knew the prisoner "was in serious condition," he did nothing to remedy the problem and argued "that it was the medical staff's responsibility to provide proper treatment, not his."  <u>Howell</u>, 922 F.2d at 722.  He further argued he only had "administrative responsibility for all those working at ACMI," and said he did "not supervise, review, or have responsibility for clinical decisions made by medical staff."  *Id.* at 723.  Because Burden allowed the budgetary process to proceed and did not take the administrative steps which he could take to ensure Howell received treatment, the Eleventh Circuit concluded that Burden was "not entitled to immunity, and his motion for summary judgment was properly denied."  *Id.* at 723.  There are differences in <u>Howell</u> and this case, but it is notable for an important similarity - having a non-medical position does not insulate a defendant from liability in failing to provide medical care.

## RECOMMENDATION

In light of the foregoing, it is respectfully **RECOMMENDED** that the motion for summary judgment, ECF No. 109, filed by Defendant Smiledge be **DENIED** because genuine issues of material fact exist.

**IN CHAMBERS** at Tallahassee, Florida, on February 14, 2024.


 S/    Martin A. Fitzpatrick
**MARTIN A. FITZPATRICK**
**UNITED STATES MAGISTRATE JUDGE**


## NOTICE TO THE PARTIES

**Within fourteen (14) days after being served with a copy of this Report and Recommendation, a party may serve and file specific written objections to these proposed findings and recommendations.  Fed. R. Civ. P. 72(b)(2).  A copy of the objections shall be served upon all other parties.   A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.  Fed. R. Civ. P. 72(b)(2).  Any different deadline that may appear on the electronic docket is for the Court's internal use only and does not control.  If a party fails to object to the Magistrate Judge's findings or recommendations as to any particular claim or issue contained in this Report and Recommendation, that party waives the right to challenge on appeal the District Court's order based on the unobjected-to factual and legal conclusions.  *See* 11th Cir. Rule 3-1; 28 U.S.C. § 636.**