**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION**

**SANDRA GAIL CARRIN,
as the Personal Representative
of the Estate of
RAYMOND MARSHALL CARRIN,**

      **Plaintiff,**

**vs.**                  **Case No. 4:21cv486-MW-MAF**

**SHAUNA MARIE SMILEDGE,
JOSEPH JIMENEZ, MD,
and PAUL ROLSTON,**

      **Defendants.**

_____/

**THIRD REPORT AND RECOMMENDATION**[1]

    This is a civil rights case brought pursuant to 28 U.S.C. § 1331, 1343, and 2201, and <u>Bivens v. Six Unknown Fed. Narcotics Agents</u>, 403 U.S. 388, 91 S. Ct. 1999, 29 L. Ed. 2d 619 (1971), which challenges the medical care provided to Raymond Marshall Carrin during his detention in the Federal Detention Center in Tallahassee and his subsequent imprisonment

---

[1] The first Report and Recommendation, ECF No. 97, was entered on April 24, 2023, and recommended denying the Defendants' motions to dismiss. The recommendation was adopted without objection. ECF No. 98. The second Report and Recommendation has just recently been entered, ECF No. 129, and is pending.

within the Bureau of Prisons (BOP).  Plaintiff is the mother of Mr. Carrin,

who passed away on December 5, 2019, having never received DAA

medications for the Hepatitis C Virus [HCV].  ECF No. 64 at 39.

Pending in this case are four motions for summary judgment, ECF

Nos. 108-111, responses from the opposing parties, ECF No. 113-115, and

replies, ECF Nos. 116-118.  The motions are ready for a ruling.  This

Report and Recommendation deals only with the motion for summary

judgment filed by Defendant Rolston, ECF No. 111, Plaintiff's response,

ECF No. 113, and Defendant Rolston's reply.  ECF No. 116.

As a procedural note, Defendants filed a motion to strike Plaintiff's

expert witness opinion.  ECF No. 119.  Although it was concluded that

Plaintiff failed to supplement the expert opinion of Dr. Donald Kern as

required by Rule 26, the report was not stricken because there was no

showing that Defendants were substantially prejudiced or harmed by

Plaintiff's failure.  ECF No. 126.  Defendants were offered the opportunity

to engage in a 60-day supplemental discovery period so they could take

Dr. Kern's deposition or otherwise prepare their opposition, during which

the Court would delay consideration of the pending summary judgment

motions.  *Id.*  Defendants declined that opportunity and consented to ruling on the motions as filed.  ECF No. 127.

## I.     Legal standards governing a motion for summary judgment

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  Thus, summary judgment is proper "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986).  The "party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."  Celotex Corp., 477 U.S. at 323, 106 S. Ct. at 2553.  The non-moving party must

then show[2] the court "that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325, 106 S. Ct. at 2554.

An issue of fact is "material" if it could affect the outcome of the case. Hickson Corp. v. Northern Crossarm Co., Inc., 357 F.3d 1256, 1259 (11th Cir. 2004) (citations omitted).  A party must show more than the existence of a "metaphysical doubt" regarding the material facts, Matsushita Elec. Indus. Co., LTD. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986), and a "scintilla" of evidence is insufficient.  The court must decide "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  Hickson Corp., 357 F.3d at 1260 (quoting Anderson v. Liberty Lobby, 477 U.S. 242, 252, 106 S. Ct. 2505, 2505, 91 L. Ed. 2d 202 (1986)).

---

[2] "Rule 56(e) . . . requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'"  Owen v. Wille, 117 F.3d 1235, 1236 (11th Cir. 1997), *cert. denied* 522 U.S. 1126 (1998) (quoting Celotex, 477 U.S. at 324, 106 S. Ct. at 2553) (quoting Fed. R. Civ. P. 56(c), (e))).  The nonmoving party need not produce evidence in a form that would be admissible as Rule 56(e) permits opposition to a summary judgment motion by any of the kinds of evidentiary materials listed in Rule 56(c).  Owen, 117 F.3d at 1236; Celotex, 477 U.S. at 324, 106 S. Ct. at 2553.

"Summary judgment is not a time for fact-finding; that task is reserved for trial."  Sconiers v. Lockhart, 946 F.3d 1256, 1263 (11th Cir. 2020) (citing Tolan v. Cotton, 572 U.S. 650, 655-57, 134 S. Ct. 1861, 188 L. Ed. 2d 895 (2014)).  Further, "when competing narratives emerge on key events, courts are not at liberty to pick which side they think is more credible." Sconiers, 946 F.3d at 1263.  On the other hand, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial."  Matsushita Elec. Indus. Co., 475 U.S. at 587 (internal quotation marks omitted) (quoted in Ricci v. DeStefano, 557 U.S. 557, 586, 129 S. Ct. 2658, 2677, 174 L. Ed. 2d 490 (2009)).

"Cross motions for summary judgment do not change the standard." Latin Am. Music Co. v. Archdiocese of San Juan of the Roman Catholic & Apostolic Church, 499 F.3d 32, 38 (1st Cir. 2007) (quoted in Ernie Haire Ford, Inc. v. Universal Underwriters Ins. Co., 541 F. Supp. 2d 1295, 1297 (M.D. Fla. 2008)).  "'Cross motions for summary judgment are to be treated separately; the denial of one does not require the grant of another.'" Christian Heritage Acad. v. Okla. Secondary Sch. Activities Ass'n, 483 F.3d 1025, 1030 (10th Cir. 2007) (quoting Buell Cabinet Co. v. Sudduth, 608

F.2d 431, 433 (10th Cir. 1979)) (quoted in <u>Ernie Haire Ford</u>, 541 F. Supp.

2d at 1297-98)).  Thus, each of the four motions for summary judgment will

be separately evaluated.

## II.    Rule 56 Evidence

Mr. Carrin was indicted in the United States District Court for the

Northern District of Florida in case number 4:18-cr-43.  ECF No. 111-1 (Ex.

A).  He was admitted to the Federal Detention Center [FDC] in Tallahassee

as a pre-trial detainee on August 9, 2018.  ECF No. 111-1 at 8.  At the time

of admission, the "health screen" noted that Mr. Carrin had been diagnosed

with Hepatitis C in 2018.  ECF No. 113-3 at 2.  He was not jaundiced.  *Id.*

Mr. Carrin was evaluated by Defendant Jimenez, a physician, on

August 21, 2018, at the Chronic Care Clinic.  ECF No. 111-3 at 7.[3]

Mr. Carrin was evaluated for three complaints: Hepatitis C, hypertension,

and anxiety.  *Id.*  Dr. Jimenez documented Mr. Carrin's Hepatitis C as

asymptomatic and noted that "no prescriptions" were "currently assigned

for [that] specific condition."  *Id.*  Mr. Carrin denied Hepatic tenderness,

---

[3] Defendant cited to Exhibit B, at RMC MED RCDS_000001-5.  ECF No. 111 at 2-3.  Exhibit B is a 2-part exhibit.  The first part, ECF No. 111-2, consists of 186 pages which are not numbered and not identified by a Bates stamp or other reference point. The second part of Exhibit B, ECF No. 111-3, consists of an additional 169 pages and includes references by RMC MED RCDS_000001, etc.

Case No. 4:21cv486-MW-MAF

jaundice, recent weight/loss gain, bruising, bleeding, and digestive problems.  ECF No. 111-3 at 7.  Dr. Jimenez conducted a physical examination, renewed prescriptions for Citalopram (indicated for anxiety) and Lisinopril (indicated for hypertension), and ordered various labs.  *Id.* Dr. Jimenez documented a plan to renew medications and conduct lab tests.  *Id.* at 9-10.  Mr. Carrin was instructed in "how to obtain medical, dental, and mental health care."  *Id.* at 25.

On August 30, 2018, Dr. Jimenez entered an administrative note in Mr. Carrin's medical record to schedule a follow-up encounter with him on September 4 after receipt of his Hepatitis C labs.  ECF No. 111-3 at 26. The initial results as noted on that record showed "HEP-C PT/INR Elevated" and that Mr. Carrin had "pale" skin color.  *Id.*  Dr. Jimenez noted that the "remainder of liver enzyme levels" were needed "to assess if treatment should start."  *Id.*  Dr. Jimenez requested Dr. Li, the Clinical Director for FCI/FDC Tallahassee, cosign the note and Isaiah Litton, the Pharmacist, review the note.  *Id.*  Dr. Li signed the note that same day, *see* ECF No. 111-3 at 27, and Dr. Litton reviewed the note on the following day. *Id.* at 28.

Dr. Jimenez entered another administrative note in Mr. Carrin's record on August 31, 2018, "to notify Administration" that Mr. Carrin had "Positive recent labs" for HCV.  ECF No. 111-3 at 34.  Noted Mr. Carrin denied symptoms, but he "appeared pale" although he was not jaundiced." *Id.*  Dr. Jimenez advised that Mr. Carrin needed to "start Treatment ASAP." *Id.*  Dr. Ortiz, the medical director, cosigned the note, and Pharmacist Litton reviewed it.  *Id.* at 34-36.

Dr. Litton evaluated Mr. Carrin the same day he reviewed Dr. Jimenez's note.  ECF No. 111-3 at 29.  Dr. Litton noted Mr. Carrin was 43 years of age and had been diagnosed with Hepatitis C "approximately 7 years ago at a community clinic."  *Id.*  Mr. Carrin indicated he had noticed spots on his legs and was consuming large amounts of alcohol.  *Id.*  At that time, Mr. Carrin had no "knowledge of genotyping," and he did not follow-up with the clinic and did not pursue treatment.  *Id.*  Mr. Carrin admitted a history of IV drug use approximately 20 years ago, but said there had been "none recently."  *Id.*  He received tattoos at a friend's house in that past, and had a blood transfusion in 2001 after severe bleeding from a laceration to his hand.  *Id.*  Dr. Litton noted Mr. Carrin's desire to seek treatment for HCV.  *Id.*

Dr. Litton also noted Mr. Carrin was a pre-trial inmate awaiting trial "at local federal court."  ECF No. 111-3 at 30.  The medical record noted he would likely be at the facility for "at least 4 to 5 months."  *Id.*  Dr. Litton ordered labs necessary to submit a non-formulary request for the approval of Hepatitis C treatment.  *Id.*  Dr. Li cosigned the note and Dr. Jimenez reviewed the record.  *Id.* at 32-33.

On September 4, 2018, Dr. Jimenez examined Mr. Carrin, and he had a large abdomen that was pale with a "very small thin vein observed," but no edema.  ECF No. 111-3 at 40.  Mr. Carrin's duty status was restricted "to no standing or working in kitchen."  *Id.*  The medical record noted: "Await Regional Non-Formulary Approval Treatment," *id.* at 39, and stated "acute" HCV.  *Id.* at 41.  Dr. Jimenez advised Mr. Carrin to follow-up as necessary at sick call and ensured he knew how to access care.  *Id.*  On that same day, Dr. Jimenez entered an administrative note to document Mr. Carrin's viral load of 1,110,000.  *Id.* at 37.  Dr. Litton reviewed the note on September 5, 2018.  *Id.* at 38.

A "formulary is a list of medications that a health care system" uses, and medication on the formulary "means you can use these with little to no restriction."  ECF No. 111-8 at 3 (Klang Deposition, Ex. G).  Any medication

not on the formulary is a non-formulary medication.  *Id.*  All Hepatitis C medications (direct-acting antivirals) "are non-formulary," so a practitioner must submit a "non-formulary request form."  *Id.*  The request then goes through a four-level process for approval: from the institution's chief pharmacist to the institution's clinical director, then to the central office pharmacist, and finally the central office physician.  *Id.* at 4.

Prescribing medical staff may include a medical doctor, an advanced provider such a physician assistant or nurse practitioner, or a pharmacist "acting in a clinical capacity."  *Id.* at 3.  Defendant Rolston is a physician assistant employed by the Bureau of Prisons.  ECF No. 111-9 at 3 (Rolston Decl., Ex. H).  He has worked at FCI/FDC Tallahassee since January 2015. *Id.*  Defendant Rolston's "Practice Agreement" did not authorize him to prescribe non-formulary medications.  *Id.* at 4.

Lab results showed Mr. Carrin had Hepatitis C Genotype 1a.  ECF No. 111-3 at 42.  On September 12, 2018, Dr. Litton submitted a non-formulary request for Mr. Carrin.  *Id.*  He made an administrative note which noted that Mr. Carrin was a "pre-trial inmate, so unable to place on medical hold."  *Id.*  Dr. Litton again noted that Mr. Carrin was housed at "FDC to stand trial at local federal court."  *Id.*

Dr. Litton inadvertently requested Hepatitis B treatment instead of Hepatitis C. ECF No. 111-2 at 2, 4. The mistake was corrected a few days later, and Dr. Litton entered a second request - this time for Hepatitis C - on September 18th. *Id.* at 2, 6-7. A comment on the request form stated: "Appears to be Priorty [sic] level 1." *Id.* at 6. If approved, the request was for "Harvoni plus low dose RBV for 12 weeks." *Id.* The Clinical Director, Dr. Li, agreed with Dr. Litton's request and directed "refer up." *Id.* However, on September 28, 2018, Dr. Katrina Klang, the Central Office Pharmacist, deferred the request and directed Dr. Litton to resubmit it "with all required documentation attached." *Id.* at 6-7.

Dr. Litton submitted a third HCV treatment request on October 1, 2018. *Id.* at 9-10. That request included a diagnosis of "HCV - Genotype 1a - Decompensated Cirrhosis (CTP = 7). *Id.* at 9. The request also noted again that Mr. Carrin was a "pre-trial inmate," so a medical hold could not be placed, but it was noted that he would "likely be [at FDC] at least 4 to 5 months." *Id.*

Dr. Litton's request was approved by Dr. Li on October 2, 2018, and referred to the Central Office Pharmacist, Dr. Mell. ECF No. 111-2 at 9-10. Dr. Mell approved the non-formulary drug authorization request on October

15, 2018.  *Id.* at 9.  Dr. Mell noted the complicating factor that Mr. Carrin's status was "pre-sentencing," but would likely remain at FDC for 4-5 months.  *Id.* at 10.  Another comment identified Mr. Carrin as "priority level 1 due to APRI>2."  Dr. Mell recommended "Epclusa plus weight-based ribavirin for 12 weeks, or Harvoni plus initial low-dose ribavirin . . . . increase as tolerated for 12 weeks."  *Id.*  Dr. Mell[4] concluded: "Please submit an NFR for the medication regimen, and ensure medical hold is placed in BEMR and Sentry.  *Id.*  That form does not include approval from the fourth step in the process - the Central Office Physician.  *Id.*  That section is blank.

It appears that after approval of what was essentially an "algorithm request," Dr. Mell selected a treatment for Mr. Carrin and directed the requesting official to "submit an NFR for the medication regimen."  ECF No. 111-6 at 6.  The form then goes back to the institution to "redo the whole thing again," this time, specifying the medication.  *Id.*

---

[4] Dr. Mell also recommended "abdominal imaging to determine if cirrhosis is present and to screen for hepatocellular carcinoma."  ECF No. 111-2 at 10.  It was suggested that they consider an "EGD to screen for varices" - dilated veins in the esophagus caused by cirrhosis.  *Id.*; see also ECF No. Ortiz Dep. Tr. 24:1-25:23, 28:10-30:1.  the efficacy of Hepatitis C treatment regimens are decreased if the patient has cirrhosis. See Mell. Dep. Tr. 24:8-14. If the presence of cirrhosis is confirmed, the patient will require a more robust regimen. Id.

Case No. 4:21cv486-MW-MAF

On October 18, 2018, Dr. Litton submitted two nonformulary drug requests for Ribavirin 200 MG CAP and Ledipasvir/Sofosbuvir (Harvoni) 90-400 MG Tab.  ECF No. 111-2 at 29-30.  Both treatments were to be given over the course of 12 weeks.  *Id.*  Dr. Litton's requests were directed to the Institutional Clinical Director, Dr. Ortiz, who referred the request on October 23, 2018, to the Central Office Pharmacist.  *Id.*  The Chief Pharmacist, Dr. Rodriguez, approved the requests on October 25, 2018.  *Id.*

Notably, Dr. Rodriguez commented that this was a "priority level 1" and to "ensure medical hold is placed in BEMR and Sentry."  *Id.* at 29-30.  She also noted that the "[p]rovider ha[d] been contacted regarding recommendations for imaging/consultation with liver specialist."  *Id.*

On October 24, 2018, Dr. Jimenez entered an administrative note to schedule Mr. Carrin "to see a local GI specialist and assess his Hepatitis Condition."  ECF No. 111-3 at 50.  Dr. Jimenez requested Mr. Carrin be evaluated and recommendations given "for Treatment or Plan of Care."  *Id.*  Requests for such outside medical procedures or consults require approval by the institution's Utilization Review Committee ("URC").  ECF No. 111-10 at 3 (Smiledge Decl., Ex. I).  On January 9, 2019, Dr. Jimenez's GI consult

request for Mr. Carrin was deferred by the URC.[5]  ECF No. 111-10 at 10.

A notation on the report form acknowledges that although Mr. Carrin met

the criteria, he was "a pre-sentence inmate awaiting designation."[6]  ECF

No. 111-10 at 10.  Another notation below the request noted the level of

care was "medically necessary - non-emergent."  *Id.*  Just a week later, on

January 15, 2019, United States District Judge Robert Hinkle sentenced

Mr. Carrin to a term of 120 months.  ECF No. 111-1 at 5.

Defendant Rolston saw Mr. Carrin on four occasions - October 15,

2018, January 9, 2019, June 5, 2019, and June 25, 2019.  ECF No. 111-9

at 3.  In the first encounter, Defendant Rolston noted that Mr. Carrin was

complaining of a rash on his lower right abdomen near an appendectomy

site which he said had been present for five years.  ECF No. 111-3 at 45.

There were two additional sites that he said had appeared "this year" on his

---

[5] Defendant Rolston's motion for summary judgment asserted that "Dr. Li, as Clinical Director and Chair of the URC, deferred Dr. Jimenez's GI consult request . . . ." ECF No. 111 at 11-12 (citing to Defendant Smiledge's declaration, ¶9).  The citation requires an unsupported inference.  Defendant Smiledge's declaration at paragraph 9 only certified that the URC records attached to her declaration were "true and accurate copies of records maintained by the Federal [Bureau] of Prisons in the ordinary course of business: January 9, 2019, URC committee meeting record."  ECF No. 111-10 at 3. The attached record for the URC meeting does not reveal who made the decision to defer the consult.  ECF No. 111-10 at 10.

[6] Mr. Carrin had entered a plea on October 30, 2018, but was awaiting sentencing as of January 9th.

right and left inner biceps. *Id.* Defendant Rolston noted Mr. Carrin had been using an anti-fungal cream since September 12th which did not resolve the problem. *Id.* For the past two weeks, he had also tried a hydrocortisone cream without any improvement. *Id.* Defendant Rolston noted he would refer the "rash to MDs," as he was unsure of what cream would help the "HEP C related abdominal rash." *Id.* In the meantime, Defendant Rolston advised Mr. Carrin to "use anti biotic ointment on belly rash for 12 days and use anti fungal [cream] on inner arm rashes." *Id.* at 46-47. Notably, Mr. Carrin denied any "symptoms related to Hepatitis," but Defendant Rolston noted the rash appeared similar to Hepatitis C associated rashes. *Id.*

Defendant Rolston requested Dr. Jimenez cosign the record and Dr. Li review the record. *Id.* at 47. Dr. Jimenez did so on October 16, 2018, and Dr. Li reviewed the note on November 5, 2018. *Id.* at 48-49. Defendant Rolston explained in his declaration that he routinely made those requests to ensure Mr. Carrin's physicians were aware of his care for Mr. Carrin "and the status of his health." ECF No. 111-9 at 4.

Defendant Rolston next saw Mr. Carrin 12 weeks later on January 9, 2019, when he again complained about the rash. ECF No. 111-3 at 51.

The notes from that encounter state that the rash appeared to be "associated with liver disease" and was "probably related to his liver disease." *Id.* Mr. Carrin said he had been "scrubbing the lesions in an attempt to remove them," but Defendant Rolston advised him to stop doing that as it was making "the raised patches-discolored area more prominent." *Id.* Defendant Rolston noted the rash had "not spread since the last visit" and said that Mr. Carrin had "not adhered to medical advice." *Id.* Specifically, Defendant Rolston stated that Mr. Carrin had been "told to buy selenium sulfide off the commissary and apply that and use it but chose not to." *Id.* Defendant Rolston prescribed a topical zinc oxide ointment to be applied 2 times a day for 180 days, and prescribed hydrochlorothiazide oral tablets, 12.5 mg, to be taken daily. *Id.* at 52. Mr. Carrin was also told to "purchase selenium sulfide" and advised that a "long term solution" would come from HCV treatment. *Id.* at 53. There was no cosign required of that visit. *Id.*

On that same day, Mr. Carrin was also seen by Defendant Rolston as a "Chronic Care" patient.[7] ECF No. 111-3 at 54. The notes indicate his

---

[7] The Clinical Encounter notes that Mr. Carrin had a "health services" visit with Defendant Rolston at 2:21 pm on January 9, 2019, *see* ECF No. 111-3 at 51, and then a "Chronic Care" visit, also with Defendant Rolston, at 2:46 pm on January 9, 2019.

HCV symptoms were "unchanged."  Mr. Carrin was further "interested in

starting treatment and hope[d] to be designated soon."  *Id.*

Despite noting unchanged symptoms, the record reflects that

Mr. Carrin said "his legs [had] been swelling more lately."  *Id.*  He also said

he was "having some symptoms that he wanted to discuss" and felt they

were HCV "related."  *Id.*  He complained of back pain over the past year,

which he described as "cramping in his sides," and thought it was because

his kidneys were "being effected by his liver."  *Id.*  He had never had a

kidney issue before.  *Id.*  He also complained of leg cramps which were

"intermittent" and worse after exercising a lot.  *Id.*  That pain was

associated "often with leg fluid."  *Id.*  He had edema bilaterally for 2-3

years.  *Id.*  Defendant Rolston noted there was "pitting edema to mid shin

2+, feet warm, with sensation and mobile."  *Id.* at 55.  Defendant Rolston

noted the new prescription given for the rash (Hydrochlorothiazide) and

medications renewed for hypertension and anxiety disorder.  ECF No. 111-

3 at 56. Mr. Carrin's blood pressure[8] was ordered to be taken every

Tuesday and Thursday for 14 days.  *Id.*  They discussed "potential HCV

---

ECF No. 111-3 at 54.

[8] His blood pressure was at a desirable 125/81.  ECF No. 111-3 at 51, 54.

treatment," the new medication, and Mr. Carrin was directed to "follow-up at Sick Call as Needed." *Id.* Defendant Rolston requested Dr. Jimenez co-sign the record, which he did the following day (January 10th). *Id.* at 56-58.

Defendant Rolston did not see Mr. Carrin again until June 5, 2019, five months later.[9] ECF No. 111-3 at 77. Mr. Carrin was complaining of pain[10] and swelling in his legs. *Id.* Defendant Rolston noted that Mr. Carrin's swelling was so great that he was "swollen to [the] point that his socks [were] indenting his skin." *Id.* Mr. Carrin requested a soft shoe pass and it was noted that he had an "antalgic waddling gait." *Id.* No rashes, open lesions, or sores were noted. *Id.* Defendant Rolston also noted Mr. Carrin's commissary report which showed "a diet full of salty, high sugar food" and "high fat foods." ECF No. 111-3 at 77. Mr. Carrin

---

[9] Notably, Mr. Carrin was seen by Dr. Jimenez on March 26, 2019. ECF No. 111-3 at 63. Dr. Jimenez noted he needed treatment for HCV, but was "awaiting court and facility assignment for [treatment] to start per URC." *Id.* On the following day, the record reflects that Mr. Carrin was evaluated by Dr. Martin who recommended Mr. Carrin "obtain evaluation at ER." *Id.* at 64. Those records also indicate Mr. Carrin was in Tallahassee, Florida, on March 26th, but in Atlanta, Georgia, on the 27th. He was admitted to Grady Hospital. *Id.* at 69, 72. Mr. Carrin was returned to Tallahassee and examined by Dr. Jimenez on June 4, 2019, the day before he was seen by Defendant Rolston. *Id.* at 76.

[10] The record shows he was "distressed" and "writhing in pain." *Id.* at 78.

was counseled on those foods and informed that his diet was making his medications "less effective."  *Id.*

Defendant Rolston's notes reveal Mr. Carrin had "obvious ascites, peripheral edema of limbs and" Mr. Carrin reported "edema of his testicles." ECF No. 111-3 at 77.  He noted Mr. Carrin met "conditions to be qualified for the HEP C treatment program once he reaches his designated prison location."  *Id.*  He requested labs, recommended treatment for Hepatitis C and a "move to permanent facility so" for treatment, and noted Mr. Carrin might "qualify to be care level 3."  *Id.* at 80.  Defendant Rolston approved the soft shoe request.  *Id.*  Again, Defendant Rolston requested Dr. Jimenez cosign the record and Dr. Li review it.  *Id.*  They did so on June 6th and June 7th, respectively.  *Id.* at 81-82.

On June 6, 2023, Dr. Li refilled Mr. Carrin's medications, and an administrative note was entered by Dr. Jimenez.  ECF No. 111-3 at 83-84. He stated: "Patient has been subject on URC and needs effective treatment plan approach.  Please advise how we should proceed at this time in lieu of medical status."  *Id.* at 84.  He requested Dr. Li cosign the note and Defendant Rolston review the note.  *Id.*  Mr. Rolston did so on June 10th, and Dr. Li cosigned the note on July 3rd.  *Id.* at 85-86.

Defendant Rolston saw Mr. Carrin for the final time on June 25, 2019, after he was released from a local hospital.[11]  ECF No. 111-3 at 97-98.  Defendant Rolston noted Mr. Carrin had been "urgently sent" for emergency care "regarding complications related to untreated viral hepatitis C."  *Id.* at 98.  Mr. Carrin had obvious "ascetic fluid in his abdomen" and "severe edema" which could not be managed at the institution "with medicine."  *Id.*  The diagnosis from the hospital was "scrotal edema, cellulitis of scrotum, anasarca, liver cirrhosis, HEP C an thrombocytopenia."  *Id.*  Defendant Rolston noted it was emphasized "that he needs immediate treatment of his HEP C."  *Id.*  Further, he reported that Mr. Carrin had said that he "was placed on the transplant list for 'liver transplant'" but Defendant Rolston said that information "was not in the note."  *Id.*

Mr. Rolston's own examination revealed a "bulging" waist, "severe edema," an unspecified disorder "of male genital organs" with testicular edema, and "unspecified cirrhosis of liver."  *Id.* at 100.  Defendant Rolston noted that Mr. Carrin was a "[s]eriously ill patient" and he "needs urgent

---

[11] Mr. Carrin had been sent to the emergency room on June 11, 2019, due to problems urinating and a significantly swollen scrotum.  ECF No. 113-1 at 93-95.

HEP C treatment." *Id.*  He requested Dr. Jimenez cosign the record and Dr. Li review the record.  ECF No. 111-3 at 101.  Dr. Li[12] reviewed the record on July 8th and Dr. Jimenez cosigned the record on July 25th.  *Id.* at 102-103.

On July 2, 2019, Dr. Li evaluated Mr. Carrin at Health Services for his gastrointestinal complaints.  ECF No. 111-3 at 109.  It was noted that Mr. Carrin had constant pain of a "9/10." *Id.*  His edema was 3+ and the scrotum had "severe edema, tender to touch." *Id.*  Dr. Li determined Mr. Carrin needed "immediate treatment" for HCV. *Id.*

On July 3rd, Dr. Litton reviewed Mr. Carrin's records and noted his previous "algorithm [was] approved for Harvoni plus low dose ribavirin" but that it had "now expired."  ECF No. 111-3 at 111.  He noted Mr. Carrin had been sentenced and his "Sentry designation reads 'Awaiting Med Designation.'" *Id.*  Dr. Litton found that Mr. Carrin was still a "priority level 1" and recommended the same treatment.  *Id.* at 112.  He entered "the NFR" request for the medication regimen, and recommended "referral to

---

[12] Dr. Li was the Clinical Director at FDC beginning in mid-2018.  ECF No. 113-11 at 3.  He did not personally see or assess Mr. Carrin until after he had been admitted to the hospital.  *Id.* at 4.  Dr. Li said he "went to see him a couple of times in the hospital." *Id.*  He saw Mr. Carr "one time in the prison."  *Id.*

practitioner with expertise, ideally a liver transplant center to evaluate the need for a transplant vs DAA therapy." *Id.*

That same day, July 3rd, Dr. Litton referred the "Non-Formulary Drug Authorization" request for "Harvoni plus Ribavirin" treatment up to the Clinical Director, Dr. Li, who referred it on to the Central Office Pharmacist, Dr. Mell, on July 8, 2019. ECF No. 111-2 at 33-34. Dr. Mell approved the NFR request on July 12, 2019. *Id.* at 34. Dr. Mell noted that no medical hold[13] had yet been "placed in Sentry," and requested that be done "prior to starting HCV" treatment. *Id.*

Notably, Defendant Rolston made an administrative note on July 9, 2019, prior to Dr. Mell's approval of the treatment, stating that Mr. Carrin was approved for HCV treatment and was "awaiting medical hold." ECF No. 111-3 at 114. Defendant Rolston stated: "Placing Med Hold now." *Id.*[14] He further noted that Mr. Carrin would need "consultant approval prior to initiation of" the treatment. *Id.* He also contacted the HSA, Defendant

---

[13] A "medical hold" means that the inmate is not going to be transferred. ECF No. 113-11 at 17. Notably, the deposition transcript had a typographic error and incorrectly said that when a medical hold is placed, it "means when we start the medication, he's now going to transfer." ECF No. 113-11 at 17. The word "now" should obviously be "not."

[14] Either Defendant Rolston or Jimenez could put Mr. Carrin on hold. ECF No. 113-11 at 18.

Smiledge, about the possibility of providing Mr. Carrin with a different size "briefs to reduce symptoms of scrotal edema and XXL compression stockings to help with peripheral edema." *Id.*  That note was cosigned by Dr. Li on July 9th, and reviewed by Dr. Jimenez on July 25th.  *Id.* at 115-116.

Defendant Rolston entered another administrative note on July 11th, which placed a request for the necessary "GI-Hepatology Consult to manage Hepatitis Patient."  ECF No. 111-3 at 117.  That note was cosigned by Dr. Li on July 15th.  *Id.* at 118.  Although Defendant Rolston "had the ability to request consultation from outside providers," those requests still "needed the approval [of] the Utilization Review Committee and/or the Clinical Director."  ECF No. 111-9 at 4.  "A consult is not made until the Clinical Director [or] URC approves it."  *Id.*

On July 13, 2019, Mr. Carrin was "weak and pale" in his cell, so an officer called for medical.  ECF No. 111-3 at 120.  A nurse arrived in the housing unit and found Mr. Carrin "pale with ashy appearance," and with a "blank stare."  *Id.*  After the nurse got Mr. Carrin alert, he said he was cold and could not get warm.  *Id.*  He complained that he was "in a lot of pain," which he described as "throbbing," and rated it a "10."  *Id.* at 119.  He said

he felt like he needed "to go to the hospital," and the nurse deemed the situation a "medical emergency." *Id.* at 120.  Mr. Carrin was transported to the emergency room via ambulance, and was admitted to the ICU.  *Id.* at 120, 124.

Defendant Rolston monitored Mr. Carrin's care during his extended hospitalization and made notes in the BOP's medical records.  ECF No. 111-3 at 124, 127, 129, 131, 136, and 139.  Defendant Rolston informed the "medical team that [Mr. Carrin] was approved for HEP C Treatment and shared the approved regimen."  *Id.* at 127.  He noted: "They will discuss initiating treatment" and said there was "no current plan for discharge from the ICU or hospital."  *Id.*

On July 17, 2019, Defendant Rolston documented communications with the hospitalist concerning Mr. Carrin's status, improvement, and medication changes.  *Id.* at 129.  Defendant Rolston noted discussions as to whether Mr. Carrin could start HCV treatment immediately upon release, whether he should be added to a liver transplant list, whether there was certainty as to "kidney strain" being the cause of sepsis, and his long term prognosis and clinical plan.  *Id.*

On July 18th, Defendant Rolston noted the possibility of Mr. Carrin's discharge "in roughly a week," if he continued to improve.  *Id.* at 131.  He also noted the "hospitalist stressed that he [would] require significant monitoring and clinical follow-up," and Defendant Rolston noted that he would follow up "with FDC clinical director about the possibility of changing his care level and the potential to send him to [a BOP] medical center." ECF No. 111-3 at 131.

Defendant Rolston's July 24th administrative note advised that Mr. Carrin had been moved over the weekend from "ICU to the step down clinic."  ECF No. 111-3 at 136.  Upon his release, the hospitalist advised that he would "continue to be at a risk of hepatic encephalopathy" and would "need 'intensive medical, clinical and nursing follow up.'" *Id.*  A notation in the medical record also stated: "He is expected to continue to worsen."  *Id.*  The hospitalist also said that Mr. Carrin would "be able to start HEP C treatment with Harvoni and Riboflavin at the doses which were prescribed by BOP."  *Id.*  It was expected that Mr. Carrin would be released in approximately a week.  *Id.*

Defendant Rolston noted on July 25th that Mr. Carrin had a "negative clinical change with notable increasing jaundice."  ECF No. 111-3 at 139.

He had 4+ increasing edema and critically high Potassium. *Id.* An

ultrasound showed cirrhosis and ascites, but he was reported as "stable."

*Id.*

A July 29th notation in the medical record reveals Mr. Carrin was

being cleared for discharge and would be transferred to "Select." ECF No.

111-3 at 148. He was in "Select [H]ospital" as of August 1, 2019. *Id.* at

149.

Defendant Rolston made an administrative note on August 5, 2019,

stating Mr. Carrin was "not on HEP C regimen nor is on a Liver transplant

list." *Id.* at 151. There was no anticipated discharge from the hospital at

that time. *Id.* He was on oxycodone for pain and was unable to ambulate.

*Id.* Defendant Rolston provided a status update in the record on

September 3, 2019, indicating Mr. Carrin needed a "walker to ambulate"

and "someone assisting his efforts." *Id.* at 160; *see also Id.* at 163.

It appears that Mr. Carrin was discharged on or about September 10,

2019. ECF No. 111-3 at 166; *see also* ECF No. 111-1 at 7. On September

11, 2019, Mr. Carrin was transferred out of FCI/FDC Tallahassee to a

medical center in Lexington, Kentucky. ECF No. 111-1 at 7. Mr. Carrin

passed away on December 5, 2019. *Id.*

Case No. 4:21cv486-MW-MAF

Additional evidence reveals that Dale Folsom was housed at FDC in the same dormitory with Mr. Carrin and has "first-hand knowledge of the physical deterioration" experienced by Mr. Carrin.  ECF No. 113-12 at 2. Mr. Folsom said that Ms. Smiledge, the "Health Services Manager," spoke with Mr. Carrin "during her weekly rounds" and told him that he could not receive the HCV treatment "until after he was sentenced."  *Id.*  Mr. Folsom said that Mr. Carrin rushed to enter a plea and be sentenced "in order to become 'eligible' to use Ms. Smiledge's word, for treatment."  *Id.* at 3.

At some point, Defendant Rolston told Mr. Carrin "that he would receive his approved treatment once he arrived at his camp of final destination."  ECF No. 113-12 at 3.  Mr. Folsom explained that Mr. Carrin "was concerned" upon hearing that news from Defendant Rolston "because the US Attorney we were cooperating with had placed a Marshal's hold on us."  *Id.*  Both Mr. Carrin and Mr. Folsom "were supposed to remain at FDC Tallahassee for trial preparation" so they could testify in an upcoming trial. *Id.*  Mr. Folsom said that when Mr. Carrin "expressed his concern to Rolston, Rolston told him that he was going to be transported to Butner so that he could receive his treatment, and that they would then transport him back to FDC Tallahassee after that."  *Id.*  Mr. Folsom heard Defendant

Rolston tell Mr. Carrin, "don't worry, we're going to take care of you."  ECF No. 113-12 at 3.

Mr. Folsom said that he and other inmates witnessed Plaintiff's "deterioration" and were "mad" when they heard Defendant Rolston tell Mr. Carrin that he could not get treatment until he was transported to his "final destination."  *Id.* at 3.  Mr. Folsom said that he "personally called Rolston a liar and told him that he and other inmates knew of another inmate at FDC Tallahassee "at that very time who had been diagnosed with Hep C and received the treatment *while he was there at FDC Tallahassee."  Id.*  Mr. Folsom said that it seemed like Defendant Rolston "actually cared" that Mr. Folsom "was in such bad shape, but just kept saying that there was nothing they could do until [Mr. Carrin] got to a permanent camp."  *Id.*  Indeed, Dr. Li testified in his deposition that inmates at FDC Tallahassee could receive treatment for Hepatitis C."  ECF No. 113-11 at 7.

Mr. Folsom stated in his affidavit that Mr. Carrin's condition was obvious and "rapidly worsened" while waiting for treatment.  ECF No. 113-12 at 3.  He said Mr. Carrin's "feet were as big as footballs and he couldn't even get his feet in his shoes."  *Id.*  Mr. Carrin could not stand on his own, so Mr. Folsom and other inmates would carry Mr. Carrin to the restroom

and "hold him up by the toilet so he could try to urinate." *Id.* He said Mr.

Carrin "would just sob and sob because he was in so much pain." *Id.*

Inmates requested a wheelchair for him, "but it took a month just to get

that." *Id.* The inmates also kept a "mop handy because [they] had to clean

up after" Mr. Carrin; anytime he sat down in the dormitory, "his skin was

leaking and he would leave puddles and wet spots everywhere he sat." *Id.*

at 4.

Mr. Folsom said that he and the other inmates saw Mr. Carrin's

deterioration; he said "it was apparent to everyone [Mr. Carrin] was dying."

*Id.* Even the officers bemoaned "the fact that [Mr. Carrin] was going to die"

and were worried that the medical staff would "blame them for it." *Id.*

Further, Mr. Folsom said that "Counselor Arnold yelled at the medical staff

about [Mr/ Carrin's] condition on more than one occasion, accusing

[Defendants] Jimenez and Rolston of putting 'band-aids on bullet holes'

and saying that he wasn't going to let 'Mr. Carrin] just lay there and die on

his watch." *Id.* Mr. Folsom said that he and other inmates got mad and

"combative" with both Defendants Rolston and Jimenez because of the

lack of treatment for Mr. Carrin. *Id.*

**Analysis**

The Eighth Amendment governs the conditions under which convicted prisoners are confined and the medical treatment they receive while in prison.  Farmer v. Brennan, 511 U.S. 825, 832, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994).  The Eighth Amendment guarantees that prisoners will not be "deprive[d] ... of the minimal civilized measure of life's necessities."  Rhodes v. Chapman, 452 U.S. 337, 347, 101 S. Ct. 2392, 2399, 69 L. Ed. 2d 59 (1981) (quoted in Chandler v. Crosby, 379 F.3d 1278, 1289 (11th Cir. 2004)).  Those necessities include food, clothing, and medical care.  Harris v. Thigpen, 941 F.2d 1495, 1511 (11th Cir. 1991); *see also* Collins v. Homestead Corr. Inst., 452 F. App'x 848, 850-851 (11th Cir. 2011).

The Eighth Amendment establishes "the government's obligation to provide medical care for those whom it is punishing by incarceration." Estelle v. Gamble, 429 U.S. 97, 103, 97 S. Ct. 285, 290, 50 L. Ed. 2d 251 (1976).  That obligation exists on both the "[f]ederal and state governments . . . to provide minimally adequate medical care . . . ."  Harris v. Thigpen, 941 F.2d 1495, 1504 (11th Cir. 1991) (quoted in Hoffer v. Sec'y, Fla. Dep't of Corr., 973 F.3d 1263, 1270 (11th Cir. 2020)).

Case No. 4:21cv486-MW-MAF

Mr. Carrin was both a pretrial detainee and a convicted prisoner during the events at issue in this case.  Pretrial detainees have the same right to medical care as do convicted prisoners.  However, a pretrial detainee's right to medical care is protected by the Due Process Clause of the Fifth Amendment rather than the Eighth Amendment.  Jordan v. Doe, 38 F.3d 1559, 1564 (11th Cir. 1994).  The Due Process Clause "require[s] the responsible government or governmental agency to provide medical care to persons" who have not yet been convicted of a crime.  City of Revere v. Massachusetts Gen. Hospital., 463 U.S. 239, 244, 103 S. Ct. 2979, 2983, 77 L. Ed. 2d 605 (1983) (noting "the due process rights . . . are at least as great as the Eighth Amendment protections available to a convicted prisoner").  Nevertheless, the standard of review for a denial of medical care claim is the same, whether based on the Fifth or Eighth Amendment.  Jordan, 38 F.3d at 1565.  "[D]eliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' and violates the Constitution.  Estelle, 429 U.S. at 104, 97 S. Ct. at 291.

Mr. Carrin had a clearly established constitutional right to medical care and was dependent upon the actions of prison officials to receive that

care.  Estelle, 429 U.S. at 103, 97 S. Ct. at 290 ("An inmate must rely on

prison authorities to treat his medical needs; if the authorities fail to do so,

those needs will not be met").  The Constitution is violated when prison

officials - whether prison doctors or prison guards - are deliberately

indifferent to a prisoner's "serious medical needs."  429 U.S. at 104, 97 S.

Ct. at 291.

　　　To "prove a claim for deliberate indifference," a plaintiff must show:

(1) a "serious medical need (the objective component)"; (2) a prison

official's "deliberate indifference to that serious medical need (the

subjective component); and (3) the official's wrongful conduct caused the

injury."  Fischer v. Fed. Bureau of Prisons, 349 F. App'x 372, 374 (11th Cir.

2009) (citing to Goebert v. Lee Cnty., 510 F.3d 1312, 1326 (11th Cir.

2007)).  "To satisfy the subjective component, the plaintiff must prove the

prison official subjectively knew of a risk of serious harm, the official

disregarded that risk, and the official's conduct was more than gross

negligence."  Fischer, 349 F. App'x at 374 (citation omitted).[15]

---

[15] The Court notes that there has been debate within the Eleventh Circuit as to whether this claim requires a showing of "more than gross negligence" or "more than mere negligence."  See Wade v. McDade, 67 F.4th 1363, 1372 (11th Cir.), reh'g en banc granted, opinion vacated sub nom. Wade v. Georgia Corr. Health, LLC, 83 F.4th 1332 (11th Cir. 2023).  That debate may ultimately be considered a matter of semantics

As for the first element, the evidence is undisputed that Mr. Carrin had a serious medical need.  Black v. Alabama Dep't of Corr., 578 F. App'x 794, 795 (11th Cir. 2014) ("Hepatitis C is a serious medical need"); *see, e.g.,* Roe v. Elyea, 631 F.3d 843, 862 (7th Cir. 2011)*;* Hoffer, 973 F.3d at 1270; Gordon v. Schilling, 937 F.3d 348, 356 (4th Cir. 2019); Woodcock v. Correct Care Sols., 861 F. App'x 654, 659 (6th Cir. 2021).  Defendant Rolston's motion for summary judgment does not acknowledge that Mr. Carrin had a serious medical need, but he did so in his reply.  *See* ECF No. 116 at 8.

As for the second element, the Court notes at the outset that the parties have not demonstrated that the facts concerning Defendant Rolston's care are disputed.  The evidence reveals Defendant Rolston encountered Mr. Carrin only four times, and on each occasion, the evidence reveals he was not deliberately indifferent to Mr. Carrin's medical needs.

---

because the standard as explained by the Supreme Court ultimately requires a Plaintiff to show that a defendant was aware of a risk of serious harm, but recklessly disregarded that risk.  Farmer v. Brennan, 511 U.S. 825, 836, 114 S. Ct. 1970, 1978, 128 L. Ed. 2d 811 (1994).  The "reckless" standard adequately provides a framework for evaluating this claim.  Farmer, 511 U.S. at 837, 114 S. Ct. at 1979 (clarifying that recklessness requires showing that an "official knows of and disregards an excessive risk to inmate health or safety").

Defendant Rolston first examined Mr. Carrin for complaints of a rash. Despite Plaintiff's contention that he had any HCV symptoms, Defendant Rolston noted the rash appeared to be a HCV-associated rash, and he referred the issue to the medical doctor. He also gave Mr. Carrin an ointment and anti fungal cream to use. In other words, he treated the problem and referred it to Mr. Carrin's physicians - Disciplinary reports. Jimenez and Li.

When Defendant Rolston saw Mr. Carrin 12 weeks later for the rash, he once again associated the rash with HCV and prescribed another ointment along with oral tablets. Defendant Rolston noted Mr. Carrin's interested in starting treatment, and requested Dr. Jimenez cosign the record, making him aware once again of the need for treatment.

The third examination 5 months later focused on Mr. Carrin's pain and swelling. Defendant Rolston provided Mr. Carrin with a soft shoe pass, counseled him as to food choices, and requested labs and treatment for Mr. Carrin's Hepatitis C - specifically requesting that he be moved to a permanent facility. Again, Defendant Rolston requested Dr. Jimenez cosign the record and Dr. Li review it.

The fourth and final encounter was June 2019, after Mr. Carrin was released from the hospital.  Defendant Rolston noted Mr. Carrin's severe condition and emphasized that he needed "immediate treatment."  He again requested Drs. Jimenez and Dr. Li cosign and review the record.

At each visit, Defendant Rolston provided medical care to Mr. Carrin within his limits.  He could not prescribe non-formulary medications such as HCV treatment, and there is no evidence that he could direct Mr. Carrin's transfer to another location so treatment could begin.  He could make a recommendation to do so, which he did.  There is no evidence that Defendant Rolston could provide that which Mr. Carrin ultimately needed - HCV treatment.

It is true that the evidence reveals Defendant Rolston was authorized to place a medical hold for Mr. Carrin to remain at FDC/FCI and receive HCV treatment.  However, that single fact is insufficient to find that the Defendant was deliberately indifferent.  The reason is simple - a hold by itself is simply a piece of paper.  A medical hold is not the equivalent of medical treatment.  Without an order in place to start HCV treatment, the hold would make no difference.

Case No. 4:21cv486-MW-MAF

The month of October 2018 is important.  On October 25th, HCV treatment was approved, and a medical hold was directed.  However, treatment could not begin until after imaging was complete and a consultation with liver specialist had occurred.  Dr. Jimenez made those requests in October 2018, but the URC "deferred" the request to schedule Mr. Carrin with a local GI specialist in January 2019.  Even if a medical hold had been placed by Defendant Rolston in October, treatment could not yet begin.  That is not the fault or failure of Defendant Rolston.

Defendant Rolston eventually entered a medical hold for Mr. Carrin on July 9, 2019.  Mr. Carrin had been approved for HCV treatment at that point, but there is no evidence that Defendant Rolston could have done anything more to have the treatment begin.  Furthermore, even without the hold, Mr. Carrin was held at FCI for significant periods of time.  Yet without an order for a GI consult, treatment could not begin.

There was undeniable delay in providing treatment for Mr. Carrin, but there is no evidence that Defendant Rolston was responsible for that delay.  There is no evidence that Defendant Rolston ignored Mr. Carrin's requests for treatment; indeed, he forwarded the requests to the physicians who could seek approval for HCV treatment.  The undisputed evidence confirms

that Defendant Rolston was not deliberately indifferent to Mr. Carrin's serious medical needs.  For that reason, summary judgment should be granted in his favor.

## RECOMMENDATION

In light of the foregoing, it is respectfully **RECOMMENDED** that Defendant Rolston's motion for summary judgment, ECF No. 111, be **GRANTED** and judgment entered in his favor.

**IN CHAMBERS** at Tallahassee, Florida, on February 26, 2024.


 S/    Martin A. Fitzpatrick
**MARTIN A. FITZPATRICK**
**UNITED STATES MAGISTRATE JUDGE**


## NOTICE TO THE PARTIES

**Within fourteen (14) days after being served with a copy of this Report and Recommendation, a party may serve and file specific written objections to these proposed findings and recommendations.  Fed. R. Civ. P. 72(b)(2).  A copy of the objections shall be served upon all other parties.   A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.  Fed. R. Civ. P. 72(b)(2).  Any different deadline that may appear on the electronic docket is for the Court's internal use only and does not control.  If a party fails to object to the Magistrate Judge's findings or recommendations as to any particular claim or issue contained in this Report and Recommendation, that party waives the right to challenge on appeal the District Court's order based on the unobjected-to factual and legal conclusions.  *See* 11th Cir. Rule 3-1; 28 U.S.C. § 636.**


Case No. 4:21cv486-MW-MAF