# IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF FLORIDA TALLAHASSEE DIVISION

**SANDRA GAIL CARRIN,**
**as the Personal Representative**
**of the Estate of**
**RAYMOND MARSHALL CARRIN,**

      **Plaintiff,**

**vs.**                         **Case No. 4:21cv486-MW-MAF**

**SHAUNA MARIE SMILEDGE,**
**JOSEPH JIMENEZ, MD,**
**and PAUL ROLSTON,**

      **Defendants.**
_____/

## FOURTH REPORT AND RECOMMENDATION[1]

This is a civil rights case brought pursuant to 28 U.S.C. § 1331, 1343, and 2201, and Bivens v. Six Unknown Fed. Narcotics Agents, 403 U.S. 388, 91 S. Ct. 1999, 29 L. Ed. 2d 619 (1971).  Plaintiff challenges the

---

[1] The first Report and Recommendation, ECF No. 97, was entered on April 24, 2023, and recommended denying the Defendants' motions to dismiss.  That recommendation was adopted without objection.  ECF No. 98.  The Second Report and Recommendation, ECF No. 129, was entered on February 14, 2024, regarding Defendant Smiledge's summary judgment motion, ECF No. 109.  It is still pending.  The Third Report and Recommendation, ECF No. 130, was entered on February 26, 2024, and concerns Defendant Rolston's summary judgment motion.  It is also still pending.

medical care provided to Raymond Marshall Carrin during his detention in the Federal Detention Center in Tallahassee and his subsequent imprisonment within the Bureau of Prisons (BOP).  Plaintiff is the mother of Mr. Carrin, who passed away on December 5, 2019, having never received DAA medications for the Hepatitis C Virus [HCV].  ECF No. 64 at 39.

The parties filed four motions for summary judgment, ECF Nos. 108-111, on August 14, 2023.  Responses were timely filed, ECF No. 113-115, as were the replies, ECF Nos. 116-118.  This Report and Recommendation deals only with the motion for summary judgment filed by Defendant Jimenez, ECF No. 110, Plaintiff's response, ECF No. 113, and Defendant Jimenez's reply, ECF No. 117.

As a procedural note, Defendants filed a motion to strike Plaintiff's expert witness opinion.  ECF No. 119.  Although it was concluded that Plaintiff failed to supplement the expert opinion of Dr. Donald Kern as required by Rule 26, the report was not stricken because there was no showing that Defendants were substantially prejudiced or harmed by Plaintiff's failure.  ECF No. 126.  Defendants were offered the opportunity to engage in a 60-day supplemental discovery period so they could take Dr. Kern's deposition or otherwise prepare their opposition, during which

time the Court would delay consideration of the pending summary

judgment motions.  *Id.*  Defendants declined that opportunity and

consented to ruling on the motions as filed.  ECF No. 127.

## I.    Legal standards governing a motion for summary judgment

"The court shall grant summary judgment if the movant shows that

there is no genuine dispute as to any material fact and the movant is

entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  Thus,

summary judgment is proper "after adequate time for discovery and upon

motion, against a party who fails to make a showing sufficient to establish

the existence of an element essential to that party's case, and on which

that party will bear the burden of proof at trial."  Celotex Corp. v. Catrett,

477 U.S. 317, 322, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986).  The

"party seeking summary judgment always bears the initial responsibility of

informing the district court of the basis for its motion, and identifying those

portions of 'the pleadings, depositions, answers to interrogatories, and

admissions on file, together with the affidavits, if any,' which it believes

demonstrate the absence of a genuine issue of material fact."  Celotex

Corp., 477 U.S. at 323, 106 S. Ct. at 2553.  The non-moving party must

then show[2] the court "that there is an absence of evidence to support the

nonmoving party's case." *Id.* at 325, 106 S. Ct. at 2554.

An issue of fact is "material" if it could affect the outcome of the case.

Hickson Corp. v. Northern Crossarm Co., Inc., 357 F.3d 1256, 1259 (11th

Cir. 2004) (citations omitted).  A party must show more than the existence

of a "metaphysical doubt" regarding the material facts, Matsushita Elec.

Indus. Co., LTD. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct.

1348, 1356, 89 L. Ed. 2d 538 (1986), and a "scintilla" of evidence is

insufficient.  The court must decide "whether the evidence presents a

sufficient disagreement to require submission to a jury or whether it is so

one-sided that one party must prevail as a matter of law."  Hickson Corp.,

357 F.3d at 1260 (quoting Anderson v. Liberty Lobby, 477 U.S. 242, 252,

106 S. Ct. 2505, 2505, 91 L. Ed. 2d 202 (1986)).

---

[2] "Rule 56(e) . . . requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'"  Owen v. Wille, 117 F.3d 1235, 1236 (11th Cir. 1997), *cert. denied* 522 U.S. 1126 (1998) (quoting Celotex, 477 U.S. at 324, 106 S. Ct. at 2553) (quoting Fed. R. Civ. P. 56(c), (e))).  The nonmoving party need not produce evidence in a form that would be admissible as Rule 56(e) permits opposition to a summary judgment motion by any of the kinds of evidentiary materials listed in Rule 56(c).  Owen, 117 F.3d at 1236; Celotex, 477 U.S. at 324, 106 S. Ct. at 2553.

"Summary judgment is not a time for fact-finding; that task is reserved for trial."  Sconiers v. Lockhart, 946 F.3d 1256, 1263 (11th Cir. 2020) (citing Tolan v. Cotton, 572 U.S. 650, 655-57, 134 S. Ct. 1861, 188 L. Ed. 2d 895 (2014)).  Further, "when competing narratives emerge on key events, courts are not at liberty to pick which side they think is more credible." Sconiers, 946 F.3d at 1263.  On the other hand, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial."  Matsushita Elec. Indus. Co., 475 U.S. at 587 (internal quotation marks omitted) (quoted in Ricci v. DeStefano, 557 U.S. 557, 586, 129 S. Ct. 2658, 2677, 174 L. Ed. 2d 490 (2009)).

"Cross motions for summary judgment do not change the standard." Latin Am. Music Co. v. Archdiocese of San Juan of the Roman Catholic & Apostolic Church, 499 F.3d 32, 38 (1st Cir. 2007) (quoted in Ernie Haire Ford, Inc. v. Universal Underwriters Ins. Co., 541 F. Supp. 2d 1295, 1297 (M.D. Fla. 2008)).  "'Cross motions for summary judgment are to be treated separately; the denial of one does not require the grant of another.'" Christian Heritage Acad. v. Okla. Secondary Sch. Activities Ass'n, 483 F.3d 1025, 1030 (10th Cir. 2007) (quoting Buell Cabinet Co. v. Sudduth, 608

F.2d 431, 433 (10th Cir. 1979)) (quoted in <u>Ernie Haire Ford</u>, 541 F. Supp. 2d at 1297-98)).  Each of the four motions for summary judgment filed in this case have been, or will be, separately evaluated.

## II.   Rule 56 Evidence

Defendant Jimenez is a physician.  ECF No. 113-10 at 14.  During 2018 and 2019, he provided medical care to inmates at the Federal Detention Center [FDC] in Tallahassee and was Mr. Carrin's treating physician.  ECF No. 113-6 at 7.[3]  Dr. Jimenez was the only doctor on duty at the facility.  ECF No. 113-10 at 15.

Mr. Carrin was indicted in the United States District Court for the Northern District of Florida in case number 4:18-cr-43.  ECF No. 110-1 (Ex. A).[4]  He was admitted to FDC as a pre-trial detainee on August 9, 2018.  *Id.* at 8.  At the time of his detention, his "health screen" intake form noted that

---

[3] Dr. Jimenez worked at FDC between November 28, 2016, and April 16, 2020. ECF No. 113-10 at 4.

[4] Defendants filed three separate summary judgment motions.  ECF Nos. 109-111.  The summary judgment motions filed by Defendants Jimenez, ECF No. 110, and Rolston, ECF No. 111, are generally supported by the same exhibits.  To be more efficient, the Court has sometimes referenced the exhibits submitted with Defendant Rolston's summary judgment motion which were previously reviewed.  *See* ECF No. 129.  Pursuant to Rule 56(c), the Court is not required to only consider "the cited materials, but it may consider other materials in the record."  Fed. R. Civ. P. 56(c)(3).

Mr. Carrin had been diagnosed with Hepatitis C in 2018.  ECF No. 110-3 at 89.  He was not jaundiced at that time.  *Id.*

Dr. Jimenez was requested to cosign the health screen to ensure he was aware of Mr. Carrin's condition.  *Id.* at 91-92.  Dr. Jimenez then examined Mr. Carrin on August 21, 2018, at the Chronic Care Clinic.  ECF No. 110-3 at 93.[5]  Mr. Carrin was evaluated for three complaints: Hepatitis C, hypertension, and anxiety.  *Id.*  Dr. Jimenez documented Mr. Carrin's Hepatitis C as asymptomatic and noted that "no prescriptions" were "currently assigned for [that] specific condition."  *Id.*  Mr. Carrin denied Hepatic tenderness, jaundice, recent weight/loss gain, bruising, bleeding, and digestive problems.  ECF No. 110-3 at 93.

During Dr. Jimenez's physical examination, he appears to have noted that Mr. Carrin had "Rashes."  *Id.*  It also appears that he found Mr. Carrin

---

[5] Defendant Jimenez cited to Exhibit B, at RMC MED RCDS_000001-5.  ECF No. 110 at 2.  Exhibit B is a 4-part exhibit.  The first two parts of the exhibit, ECF Nos. 110-2 and 110-3, consist of 200 pages which are not numbered and not identified by a Bates stamp or other reference point (with the exception of the final 13 pages).  *See* ECF No. 110-3 at 87-100.  Review of such exhibits is a tedious, time-consuming task without page numbers.  "Judges are not like pigs, hunting for truffles buried in briefs" or in unnumbered pages of exhibits.  United States v. Dunkel, 927 F.2d 955, 956 (7th Cir. 1991) (quoted in Chavez v. Sec'y Fla. Dep't of Corr., 647 F.3d 1057, 1061 (11th Cir. 2011)).  Part 3 of Exhibit B, ECF No. 110-4, is comprised of another 100 pages, but these appropriately include references to Defendant's citation of RMC MED RCDS_000016 - 000114.  Part 4 of Exhibit B, ECF No. 110-5, also includes pages referenced by RMC MED RCDS_000115 - 000169.

to have some jaundice and a pale appearance.[6]  *Id.* at 93, 95.

Prescriptions for Citalopram (indicated for anxiety) and Lisinopril (indicated

for hypertension) were renewed, and he ordered various labs.  *Id.* at 93.

Dr. Jimenez documented a plan to renew medications, await labs, and

"follow closely for Symptoms of conditions with serial LFTS."  *Id.*  He also

counseled Mr. Carrin in "how to obtain medical, dental, and mental health

care."  ECF No. 110-3 at 96.

On August 30, 2018, Dr. Jimenez entered an administrative note in

Mr. Carrin's medical record to schedule a follow-up encounter with him on

September 4, 2018, after receipt of his Hepatitis C labs.  ECF No. 110-4 at

12.  The administrative note included a notation of "Initial PT/INR elevated"

and that Mr. Carrin had a "pale" skin coloring.  *Id.*  Dr. Jimenez noted that

---

[6] The medical record could be subject to multiple interpretations, but the Court finds it reasonable to conclude that Mr. Carrin had rashes at the time and appeared to be at least somewhat jaundiced.  ECF No. 110-3 at 93.  The medical record lists "Skin" and has both a "Yes" and "No" section.  For yes, there is a notation of "Within Normal Limits."  *Id.*  Below the "yes" section is a "no" section which shows: "No: Rashes."  *Id.* Similarly, under the GI section, it shows "Yes: Within Normal Limits" but indicates diarrhea "2 - 3 times per day" and history of Hepatitis.  *Id.*  Below that "yes" section is a "no" section which shows: "No: Jaundice."  *Id.*  Other sections such as eyes, neck, and cardiovascular include only a Yes response, suggesting that the inclusion of "no" reveals a problem or abnormality.  That is no entirely clear, however, because at another point on the record Dr. Jimenez indicated there were no signs of a rash.  ECF No. 110-3 at 100.  Nevertheless, the evidence is clear that by October 15, 2018, Mr. Carrin was complaining about multiple rashes which he said had appeared earlier that year, and one rash was as long as 5 years ago.  *See* ECF No. 110-4 at 31.

the "remainder of liver enzyme levels" would be needed "to assess if treatment should start." *Id.* Dr. Jimenez requested Dr. Li, the Clinical Director for FCI/FDC Tallahassee, cosign the note and Isaiah Litton, the Pharmacist, review the note. *Id.* Dr. Li[7] signed the note that same day, *see* ECF No. 110-4 at 13, and Dr. Litton reviewed the note on the following day. *Id.* at 14.

Dr. Jimenez entered another administrative note in Mr. Carrin's record on August 31, 2018, "to notify Administration" that Mr. Carrin had "Positive recent labs" for HCV. ECF No. 110-4 at 20. He noted Mr. Carrin denied symptoms, but he "appeared pale" although he was not jaundiced. *Id.* Dr. Jimenez advised that Mr. Carrin needed to "start Treatment ASAP."[8] *Id.* Dr. Ortiz, the medical director, cosigned the note, and Pharmacist Litton reviewed it. *Id.* at 21-22.

Dr. Litton evaluated Mr. Carrin the same day he reviewed Dr. Jimenez's note. ECF No. 110-4 at 15. Dr. Litton noted Mr. Carrin was

---

[7] Dr. Li was the Clinical Director at FDC beginning in mid-2018. ECF No. 113-11 at 3. He did not personally see or assess Mr. Carrin until 2019 after he had been admitted to the hospital. *Id.* at 4. Dr. Li said he "went to see him a couple of times in the hospital." *Id.* He saw Mr. Carrin "one time in the prison." *Id.*

[8] According to the Bureau of Prison's Clinical Guidance concerning HCV, "[a]ll sentenced inmates are eligible for consideration of treatment for chronic HCV infection." ECF No. 113-2 at 5.

43 years of age and had been diagnosed with Hepatitis C "approximately 7 years ago at a community clinic." *Id.* Mr. Carrin indicated he had noticed spots on his legs and was consuming large amounts of alcohol. *Id.* At that time, Mr. Carrin had no "knowledge of genotyping," and he did not follow-up with the clinic and did not pursue treatment. *Id.* Mr. Carrin admitted a history of IV drug use approximately 20 years ago, but said there had been "none recently." *Id.* He received tattoos at a friend's house in that past, and had a blood transfusion in 2001 after severe bleeding from a laceration to his hand. *Id.* Dr. Litton noted Mr. Carrin's desire to seek treatment for HCV. *Id.*

Dr. Litton also noted Mr. Carrin was a pre-trial inmate "housed at the FDC to stand trial at local federal court." ECF No. 110-4 at 16. The medical record noted he would likely be at the facility for "at least 4 to 5 months."[9] *Id.* Dr. Litton ordered labs "to obtain necessary info for NFR[10] submission," and he noted that "genotype and Hep B serology" was still needed. ECF No. 110-4 at 16. Dr. Litton said that he would submit a

---

[9] In his deposition, Dr. Litton testified that "typically, in four to five months, you could complete the treatment." ECF No. 108-8 at 11.

[10] NFR stands for non-formulary request.

non-formulary request for the approval of Hepatitis C treatment after the lab results were obtained.  *Id.*  Dr. Li cosigned the note and Dr. Jimenez reviewed the record.  *Id.* at 32-33.

A "formulary is a list of medications that a health care system" uses, and medication on the formulary "means you can use these with little to no restriction."  ECF No. 110-6 at 3 (Klang Deposition, Ex. C).  Any medication not on the formulary is a non-formulary medication.  *Id.*  All Hepatitis C medications (direct-acting antivirals) "are non-formulary," so a practitioner must submit a "non-formulary request form."  *Id.*  The request goes through a four-level process for approval: from the institution's chief pharmacist to the institution's clinical director, then to the central office pharmacist, and finally the central office physician.  *Id.* at 4.

On September 4, 2018, Dr. Jimenez entered an administrative note to document Mr. Carrin's viral load and "Log HEP-C."  ECF No. 110-4 at 23.  Dr. Jimenez also had a follow up visit with Mr. Carrin regarding the "abnormal labs."  ECF No. 110-4 at 25.  Dr. Jimenez noted: "Await Regional Non-Formulary Approval Treatment," *id.* at 25, and stated "acute" HCV.  *Id.* at 27.  He further noted that Mr. Carrin had a large abdomen that was pale with a "very small thin vein observed," but no edema.  *Id.* at 26.

Mr. Carrin was placed on restricted duty status with "no standing or working in kitchen." *Id.* Dr. Jimenez advised Mr. Carrin to follow-up as necessary at sick call and ensured he knew how to access care. *Id.* at 27.

Lab results were returned on September 12th, confirming that Mr. Carrin had Hepatitis C Genotype 1a. ECF No. 110-4 at 28. Dr. Litton made an administrative note stating he would enter a non-formulary request for Hepatitis C treatment algorithm.[11] *Id.* The algorithm worksheet was filled out to be sent to medical records for scanning. *Id.* Dr. Litton noted that Mr. Carrin was a "pre-trial inmate, so unable to place on medical hold."[12] *Id.* Dr. Litton further noted that Mr. Carrin would likely be housed at FDC "at least 4 to 5 months" awaiting trial. *Id.*

Dr. Litton inadvertently requested Hepatitis B treatment instead of Hepatitis C. ECF No. 111-2 at 2, 4. The mistake was corrected a few days later, and Dr. Litton entered a second request - this time for Hepatitis C - on September 18th. *Id.* at 2, 6-7. A comment on the request form stated:

---

[11] An algorithm request is an initial request for HCV treatment which must include necessary documentation for reviewers to evaluate the request. ECF No. 110-7 at 3. If the algorithm request is approved, then a second request must be submitted for the non-formulary medication. *Id.*; *see also* ECF No. 111-7 at 3-4.

[12] A "medical hold" means that the inmate is not going to be transferred. ECF No. 113-11 at 17.

"Appears to be Priorty [sic] level 1." *Id.* at 6. If approved, the request was

for "Harvoni plus low dose RBV for 12 weeks." *Id.* The Clinical Director,

Dr. Li, agreed with Dr. Litton's request and directed "refer up." *Id.*

However, on September 28, 2018, Dr. Katrina Klang, the Central Office

Pharmacist, deferred the request and directed Dr. Litton to resubmit it "with

all required documentation attached." *Id.* at 6-7.

Dr. Litton submitted a third HCV treatment request on October 1,

2018. *Id.* at 9-10. That request included a diagnosis of "HCV - Genotype

1a - Decompensated Cirrhosis (CTP = 7). *Id.* at 9. Again, the request

advised that Mr. Carrin was a "pre-trial inmate," a medical hold could not be

placed, but he would "likely be [at FDC] at least 4 to 5 months." *Id.*

Dr. Litton's request was approved by Dr. Li on October 2, 2018, and

referred to the Central Office Pharmacist, Dr. Mell. ECF No. 111-2 at 9-10.

Dr. Mell approved the non-formulary drug authorization request on October

15, 2018. *Id.* at 9. Dr. Mell noted the complicating factor[13] that Mr. Carrin's

---

[13] The evidence reveals that DAA treatment involves "twelve weeks of closely monitored treatment." ECF No. 113-2 at 9. In cases of inmates with "pre-trial status, it would be difficult to ensure consistency of housing to provide the medications daily for twelve weeks, and to complete all required monitoring during this treatment." *Id.* "Inmates who are sentenced can have a medical hold placed on them, while inmates who are pre-sentence or going out on writ, cannot have a hold placed." *Id.* Although Dr. Jimenez argues it is "procedurally unfair" to use interrogatories responded to by the United States while it was still a party in this litigation, *see* ECF No. 117 at 10, there is

status was "pre-sentencing," but would likely remain at FDC for 4-5 months.  *Id.* at 10.  Another comment identified Mr. Carrin as "priority level 1 due to APRI>2."  Dr. Mell recommended "Epclusa plus weight-based ribavirin for 12 weeks, or Harvoni plus initial low-dose ribavirin . . . . increase as tolerated for 12 weeks."  *Id.*  Dr. Mell[14] concluded: "Please submit an NFR for the medication regimen, and ensure medical hold is placed in BEMR[15] and Sentry."  *Id.*  That form does not include approval from the fourth step in the process - the Central Office Physician - as that section is blank.  *Id.*

It appears that after approval of what was essentially an "algorithm request," Dr. Mell selected a treatment for Mr. Carrin and directed the requesting official to "submit an NFR for the medication regimen."  ECF No.

---

nothing improper about submitting evidence obtained during discovery and pointing to that evidence to support a fact.

[14] Dr. Mell also recommended "abdominal imaging to determine if cirrhosis [was] present and to screen for hepatocellular carcinoma."  ECF No. 111-2 at 10.  It was suggested that they consider an "EGD to screen for varices" - dilated veins in the esophagus caused by cirrhosis.  *Id.*  The efficacy of Hepatitis C treatment regimens are decreased if the patient has cirrhosis, so you must "pick a more robust regimen."  ECF No. 111-7 at 5.

[15] BEMR is the electronic medical records system.  ECF No. 108-8 at 14.  BEMR includes a notification system that sends a notification whenever "the final action" is taken on a non-formulary request.  *Id.* at 21.  When logging onto the system, "that notification is one of the first things that pop up," so a doctor would see it each time he or she logged on to BEMR.  *Id.*

111-6 at 6. The form then goes back to the institution to "redo the whole thing again," this time, specifying the medication. *Id.*

On October 18, 2018, Dr. Litton submitted two nonformulary drug requests for Ribavirin 200 MG CAP and Ledipasvir/Sofosbuvir (Harvoni) 90-400 MG Tab. ECF No. 111-2 at 29-30. Both treatments were to be given over the course of 12 weeks. *Id.* Dr. Litton's requests were directed to the Institutional Clinical Director, Dr. Ortiz, who referred the request on October 23, 2018, to the Central Office Pharmacist. *Id.* Dr. Rodriguez, the Chief Pharmacist, approved the requests on October 25, 2018. *Id.*

Notably, Dr. Rodriguez commented that this was a "priority level 1"[16] and to "ensure medical hold is placed in BEMR and Sentry." *Id.* at 29-30. She also noted that the "[p]rovider ha[d] been contacted regarding recommendations for imaging/consultation with liver specialist." *Id.*

On October 24, 2018, Dr. Jimenez entered an administrative note to schedule Mr. Carrin "to see a local GI specialist and assess his Hepatitis Condition." ECF No. 110-4 at 36. Dr. Jimenez requested Mr. Carrin be evaluated and recommendations given "for Treatment or Plan of Care." *Id.* Dr. Jimenez designated the request with a priority of "routine." *Id.*

---

[16] Prior level 1 is the "highest priority." ECF No. 108-8 at 19.

Requests for outside medical consults or procedures require approval by the institution's Utilization Review Committee ("URC").  ECF No. 111-10 at 3.  No evidence has been presented to show that any action was taken on that consult request until January 9, 2019.  On that date, the GI consult request for Mr. Carrin was "deferred" by the URC.[17]  ECF No. 110-8 at 10. Notes made on the report form acknowledge that although Mr. Carrin met the criteria, he was "a pre-sentence inmate awaiting designation."[18]  *Id.* Another notation below the request noted the level of care was "medically necessary - non-emergent," and that it was a "routine" request.  *Id.*  Just a week later, on January 15, 2019, United States District Judge Robert Hinkle sentenced Mr. Carrin to a term of 120 months.  ECF No. 111-1 at 5. There is no evidence that the GI request was brought up again at a

---

[17] Dr. Jimenez' summary judgment motion asserted that "Dr. Li, as Clinical Director and Chair of the URC, deferred Dr. Jimenez's GI consult request for Mr. Carrin . . . ."  ECF No. 110 at 7 (no citation included).  Notably, the URC meeting notes were provided with Defendant Smiledge's declaration, ECF No. 110-8 at 6-13.  The January 9th report confirms the GI request was deferred, but it does not reveal who made the decision to defer the consult.  *Id.* at 10.

[18] Mr. Carrin had entered a plea on October 30, 2018, but was awaiting sentencing as of January 9th.

Case No. 4:21cv486-MW-MAF

subsequent URC meeting[19] or that Dr. Jimenez made another request after Mr. Carrin was sentenced.

Importantly, Defendant Rolston[20] saw Mr. Carrin on October 15, 2018, and on January 9, 2019, both of which were to address Mr. Carrin's complaints of a rash.  ECF No. 110-4 at 31, 37.  In the first encounter, Defendant Rolston noted that Mr. Carrin was complaining of a rash on his lower right abdomen near an appendectomy site which he said had been present for five years.  ECF No. 110-4 at 31.  There were two additional sites that he said had appeared "this year" on his right and left inner biceps. *Id.*  Defendant Rolston noted Mr. Carrin had been using an anti-fungal cream since September 12th which did not resolve the problem.  *Id.*  For the past two weeks, he had also tried a hydrocortisone cream without any improvement.  *Id.*  Defendant Rolston noted he would refer the "rash to MDs," as he was unsure of what cream would help the "HEP C related abdominal rash."  *Id.*  In the meantime, Defendant Rolston advised Mr. Carrin to "use anti biotic ointment on belly rash for 12 days and use anti

_____

[19] The URC met every weeks.  ECF No. 115-5 at 16.

[20] Defendant Rolston is a physician assistant who has worked at FDC since January 2015.  ECF No. 111-9 at 2-3.

fungal [cream] on inner arm rashes." *Id.* at 31-33.  Notably, Mr. Carrin

denied any "symptoms related to Hepatitis," but Defendant Rolston noted

the rash appeared similar to Hepatitis C associated rashes.  ECF No. 110-

4 at 31.

Defendant Rolston requested Dr. Jimenez cosign the record and

Dr. Li review the record.  *Id.*  Dr. Jimenez did so on October 16, 2018, and

Dr. Li reviewed the note on November 5, 2018.  *Id.* at 34-35.  Defendant

Rolston routinely made requests for "Mr. Carrin's primary care providers

and/or the clinical director to cosign or review the records . . . to ensure

these providers were aware of [his] care for [Mr. Carrin] and the status of

his health."  ECF No. 111-9 at 4.

Defendant Rolston next saw Mr. Carrin 12 weeks later on January 9,

2019, when he again complained about the rash.  ECF No. 110-4 at 37.

The notes from that encounter state that the rash appeared to be

"associated with liver disease" and was "probably related to his liver

disease."  *Id.*  Mr. Carrin said he had been "scrubbing the lesions in an

attempt to remove them," but Defendant Rolston advised him to stop doing

that as it was making "the raised patches-discolored area more prominent."

*Id.*  Defendant Rolston noted the rash had "not spread since the last visit"

and said that Mr. Carrin had "not adhered to medical advice." *Id.*

Specifically, Defendant Rolston stated that Mr. Carrin had been "told to buy selenium sulfide off the commissary and apply that and use it but chose not to." ECF No. 110-4 at 37. Defendant Rolston prescribed a topical zinc oxide ointment to be applied 2 times a day for 180 days, and prescribed hydrochlorothiazide oral tablets, 12.5 mg, to be taken daily. *Id.* at 38. Mr. Carrin was also told to "purchase selenium sulfide" and advised that a "long term solution" would come from HCV treatment. *Id.* at 39. There was no cosign required of that visit. *Id.*

However, Mr. Carrin was also seen by Defendant Rolston on that same day as a "Chronic Care" patient.[21] ECF No. 110-4 at 40. The notes indicate his HCV symptoms were "unchanged" and that Mr. Carrin was "interested in starting treatment and hope[d] to be designated soon." *Id.*

Despite noting unchanged symptoms, the record reflects that Mr. Carrin said "his legs [had] been swelling more lately." *Id.* He also said he was "having some symptoms that he wanted to discuss" and felt they

---

[21] The Clinical Encounter notes that Mr. Carrin had a "health services" visit with Defendant Rolston at 2:21 pm on January 9, 2019, *see* ECF No. 110-4 at 37, and then a "Chronic Care" visit, also with Defendant Rolston, at 2:46 pm on January 9, 2019. ECF No. 110-4 at 40.

were HCV "related." *Id.* He complained of back pain over the past year, which he described as "cramping in his sides," and thought it was because his kidneys were "being effected by his liver." *Id.* He had never had a kidney issue before. *Id.* He also complained of leg cramps which were "intermittent" and worse after exercising a lot. *Id.* That pain was associated "often with leg fluid." *Id.* He had edema bilaterally for 2-3 years. *Id.* Defendant Rolston noted there was "pitting edema to mid shin 2+, feet warm, with sensation and mobile." *Id.* at 41. Defendant Rolston noted the new prescription given for the rash (Hydrochlorothiazide) and medications renewed for hypertension and anxiety disorder. *Id.* at 42. They discussed "potential HCV treatment," the new medication, and Defendant Rolston directed Mr. Carrin to "follow-up at Sick Call as Needed." *Id.* Defendant Rolston requested Dr. Jimenez co-sign the record, which he did the following day (January 10th). *Id.* at 43-44.

On January 24, 2019, Mr. Carrin inquired about his treatment, and was informed that it would begin when he got to his parent institution. ECF No. 113-2 at 4.

From February 1, 2019, through February 13, 2019, Mr. Carrin was "in transit" and not at FDC. ECF No. 111-1 at 8. He was returned to FDC

for several weeks, but then moved to Atlanta on March 27, 2019.  *Id.*  He

returned again to FDC Tallahassee on April 4, 2019.[22]  *Id.*

Prior to his transfer to Atlanta, Dr. Jimenez entered an administrative

note on March 15, 2019, to renew medications for Mr. Carrin.  ECF No.

110-4 at 45.  Those medications were for hypertension and anxiety, but not

for HCV.  *Id.*  Then on March 26, 2019, the day before he was transferred

to Atlanta, Dr. Jimenez examined Mr. Carrin in the Chronic Care Clinic.

ECF No. 110-4 at 46.  He noted Mr. Carrin appeared jaundiced, obese, and

Mr. Carrin reported retaining fluid.  *Id.*  He also reported pressure in his

abdomen.  *Id.*

The notes entered by Dr. Jimenez reflect that Mr. Carrin had striae,

dilated veins, ascites, and distension, where were "stigmata of liver

disease."  *Id.* at 48.  He confirmed Mr. Carrin's enlarged abdomen as well

as a rash and another "nonspecific skin eruption."  *Id.*  Dr. Jimenez

provided him with several prescriptions.  *Id.* at 48-49.  The notations state

---

[22] The evidence reveals Mr. Carrin was "designated to FCC Coleman."  ECF No. 113-2 at 9.  He was held in Atlanta before going to his designated facility, but "[t]he USAO for the Northern District of Florida requested a hold on [Mr. Carrin's] transfer for another case he was involved in as a witness."  *Id.*  Mr. Carrin was returned to FDC Tallahassee "for that purpose and not sent to his designated institution."  *Id.*

that Mr. Carrin needed HCV treatment and was awaiting "court and facility

assignment" for his treatment to start.  *Id.*

Mr. Carrin was transferred the following day and examined by

Dr. Martin.  ECF No. 110-4 at 50.  It was recommended that Mr. Carrin be

evaluated at the ER.  *Id.*  Mr. Carrin was admitted to Grady Hospital.  *Id.* at

55, 58.  He remained there until April 2, 2019.  *Id.* at 56.

Upon his release, Mr. Carrin was evaluated by Dr. Winston on April

3, 2019.  ECF No. 110-4 at 58.  Dr. Winston noted Mr. Carrin had "hepatic

cirrhosis accompanied by abdominal ascites, [and] leg edema."  *Id.*  The

record shows Mr. Carrin had "3+ pitting edema."  *Id.* at 59.  Mr. Carrin was

returned to FDC Tallahassee on April 4, 2019.  ECF No. 111-1 at 8.

It appears that Dr. Jimenez did not see Mr. Carrin again until June 6,

2019.  ECF No. 110-4 at 63.  Prior to that examination, Mr. Carrin was first

seen by Defendant Rolston who noted that Mr. Carrin had "obvious ascites,

peripheral edema of limbs and" Mr. Carrin reported "edema of his testicles."

ECF No. 111-3 at 77.  He noted Mr. Carrin met "conditions to be qualified

for the HEP C treatment program once he reaches his designated prison

location."  *Id.*  He requested labs, recommended treatment for Hepatitis C

and a "move to permanent facility so" for treatment, and noted Mr. Carrin

might "qualify to be care level 3."  *Id.* at 80.  Defendant Rolston requested

Dr. Jimenez cosign the record and Dr. Li review it.  *Id.*  They did so on June

6th and June 7th, respectively.  *Id.* at 81-82.

Also on June 6th, Dr. Li refilled Mr. Carrin's medications, and an

administrative note was entered by Dr. Jimenez.  ECF No. 110-4 at 69-70.

The noted stated: "Patient has been subject on URC and needs effective

treatment plan approach.  Please advise how we should proceed at this

time in lieu of medical status."  *Id.* at 84.  He requested Dr. Li cosign the

note and Defendant Rolston, the P.A., review the note.  *Id.*  Mr. Rolston did

so on June 10th, and Dr. Li cosigned the note on July 3rd.  *Id.* at 85-86.

Dr. Jimenez examined Mr. Carrin again on June 7, 2019.  ECF No.

110-4 at 73.  He noted "Advanced Stage" Hepatitis C and

"Decompensating of Cirrhosis and Ascites."  *Id.*  Mr. Carrin reported "pain

on Testicles, Lower extremities, [and] difficulty resting."  *Id.*  The medical

record shows Mr. Carrin had a swollen and painful scrotum, and "Lower

Extremity edema x 3."  *Id.*  Mr. Carrin was given Lasix.  *Id.*

Dr. Jimenez saw Mr. Carrin four days later (on June 11th) for

urination issues.  ECF No. 110-4 at 78.  The record notes his lower

extremities had "reduced in size," but "his scrotum remain[ed] swollen

significantly although less so than 4 days ago as well." *Id.*  Mr. Carrin also

complained of pain and burning, and he was unable to provide "a urine

sample due to swelling." *Id.*  He had "difficulty ambulating due to Edema."

*Id.* at 79.  Dr. Jimenez entered the following plan: "Prepare Consult have

inmate sent to local Hospital for assessment and stabilization of scrotal

edema." *Id.* at 78.  The emergency room consult was listed as "urgent." *Id.*

at 79.  Mr. Carrin was taken to the hospital where he remained until June

25, 2019.  ECF No. 111-1 at 7.

Dr. Jimenez made several administrative notes in the medical

records while Mr. Carrin was admitted to the hospital.  On June 17th, he

documented that Mr. Carrin had undergone a liver biopsy the day before,

and had a bone marrow biopsy that day.  ECF No. 110-4 at 82.  By June

20th, the hospital had reported that Mr. Carrin's swelling had "reduced

significantly" and abdomen no longer required draining.  *Id.* at 83.

Defendant Rolston saw Mr. Carrin on June 25, 2019, upon his

release from the hospital.  ECF No. 110-4 at 84-86.  He noted that

Mr. Carrin had been "urgently sent" for emergency care "regarding

complications related to untreated viral hepatitis C." *Id.* at 84.  Mr. Carrin

had obvious "ascetic fluid in his abdomen" and "severe edema" which could

not be managed at the institution "with medicine."  *Id.*  The diagnosis from the hospital was "scrotal edema, cellulitis of scrotum, anasarca, liver cirrhosis, HEP C an thrombocytopenia."  *Id.*  Defendant Rolston stated that it was obvious from his physical examination that Mr. Carrin "had ascetic fluid in his abdomen."  *Id.*  Defendant Rolston noted in the record that it had been emphasized "that he needs immediate treatment of his HEP C."  ECF No. 110-4 at 84.  Further, he reported that Mr. Carrin had said that he "was placed on the transplant list for 'liver transplant'" but Defendant Rolston said that information "was not in the note."  *Id.*

Defendant Rolston's own examination of Mr. Carrin revealed a "bulging" waist, "severe edema," an unspecified disorder "of male genital organs" with testicular edema, and "unspecified cirrhosis of liver."  *Id.* at 86. Defendant Rolston noted that Mr. Carrin was a "[s]eriously ill patient" and he urgently needed HCV treatment.  *Id.*  He requested Dr. Jimenez cosign the record and Dr. Li review the record.  *Id.* at 87.  Dr. Li reviewed the record on July 8th and Dr. Jimenez cosigned the record a month later on July 25th.  *Id.* at 88-89.

On July 2, 2019, Dr. Li evaluated Mr. Carrin at Health Services for his gastrointestinal complaints.  ECF No. 110-4 at 95.  It was noted that

Mr. Carrin had constant pain of a "9/10." *Id.* His edema was 3+ and the scrotum had "severe edema, tender to touch." *Id.* Dr. Li determined Mr. Carrin needed "immediate treatment" for HCV. *Id.*

On July 3rd, Dr. Litton reviewed Mr. Carrin's records and noted his previous "algorithm [was] approved for Harvoni plus low dose ribavirin" but had "now expired." ECF No. 110-4 at 97. He noted Mr. Carrin had been sentenced and his "Sentry designation reads 'Awaiting Med Designation.'" *Id.* Dr. Litton found that Mr. Carrin was still a "priority level 1" and recommended the same treatment. *Id.* at 97-98. He entered "the NFR" request for the medication regimen, and recommended "referral to practitioner with expertise, ideally a liver transplant center to evaluate the need for a transplant vs DAA therapy." *Id.* at 98.

On that same day, Dr. Litton referred the "Non-Formulary Drug Authorization" request for "Harvoni plus Ribavirin" treatment to the Clinical Director, Dr. Li, who referred it on to the Central Office Pharmacist, Dr. Mell, on July 8, 2019. ECF No. 111-2 at 33-34. Dr. Mell approved the NFR request on July 12, 2019. *Id.* at 34. Dr. Mell noted that no medical hold had yet been "placed in Sentry," and requested that be done "prior to starting HCV" treatment. *Id.*

Ironically, Defendant Rolston made an administrative note on July 9,

2019, just prior to Dr. Mell's approval of the treatment, stating that

Mr. Carrin was approved for HCV treatment and was "awaiting medical

hold."  ECF No. 110-4 at 100.  Defendant Rolston stated: "Placing Med

Hold now."  *Id.*[23]  He further noted that Mr. Carrin would need "consultant

approval prior to initiation of" the treatment.  *Id.*  He also contacted the

Health Services Administrator, Defendant Smiledge, about the possibility of

providing Mr. Carrin with a different size "briefs to reduce symptoms of

scrotal edema and XXL compression stockings to help with peripheral

edema."  *Id.*  That note was cosigned by Dr. Li on July 9th, and reviewed

by Dr. Jimenez on July 25th.  ECF No. 110-5 at 1-2.

On July 11th, Defendant Rolston entered another administrative note,

advising that a GI consult had been placed.  ECF No. 110-5 at 3.  He again

emphasized that Mr. Carrin needed "immediate treatment of his HEP C."

*Id.*

On July 13, 2019, an officer found Mr. Carrin "weak and pale" in his

cell and called for medical.  ECF No. 110-5 at 6.  Nurse Paynter arrived in

---

[23] Dr. Jimenez as well as Defendant Rolston had "authority to place a medical hold on Raymond Carrin to ensure that he remained at FDC to complete treatment." ECF No. 115-11 at 18; ECF No. 113-11 at 18.

the housing unit and found Mr. Carrin "pale with ashy appearance," and

with a "blank stare." *Id.* She said he was in obvious distress and "almost

unresponsive" when she first entered the room. ECF No. 108-9 at 4-5.

Nurse Paynter was finally able to verbally arouse Mr. Carrin enough to get

him to respond to her. *Id.* at 5. Mr. Carrin said he was cold and could not

get warm. ECF No. 110-5 at 6. He complained that he was "in a lot of

pain," which he described as "throbbing," and rated it a "10." *Id.* at 5-6. He

said he felt like he needed "to go to the hospital," and Nurse Paynter

contacted the doctor who verbally ordered Mr. Carrin be taken to the

hospital via ambulance. *Id.* at 6. Mr. Carrin was admitted to the ICU. *Id.* at

8.

Mr. Carrin had an extended stay in the hospital, lasting from July 13,

2019, through September 10, 2019. ECF No. 111-1 at 7. Defendant

Rolston monitored Mr. Carrin's care during his hospitalization and made

notes in the BOP's medical records. ECF No. 111-3 at 124, 127, 129, 131,

136, and 139. On or about July 24th, Mr. Carrin was moved from "ICU to

the step down clinic." *Id.* at 136. The hospitalist advised that Mr. Carrin

would "continue to be at a risk of hepatic encephalopathy" and would "need

'intensive medical, clinical and nursing follow up'" after his discharge from

the hospital.  ECF No. 1110-5 at 22.  Notably, the medical record also stated: "He is expected to continue to worsen."  *Id.*

The hospitalist also said that Mr. Carrin would "be able to start HEP C treatment with Harvoni and Riboflavin at the doses which were prescribed by BOP."  *Id.*  It was expected that Mr. Carrin would be released in approximately a week.  *Id.*

However, on July 25th Mr. Carrin's condition took a turn for the worse "with notable increasing jaundice."  ECF No. 110-5 at 25.  He had 4+ increasing edema and critically high Potassium.  *Id.*  An ultrasound showed cirrhosis and ascites, but he was reported as "stable."  *Id.*

On July 28th, Nurse Paynter received a verbal report from Mr. Carrin's attending nurse.  ECF No. 110-5 at 31.  He was "still having overall 4+ body edema with weeping of lower extremities."  *Id.*  He had difficulty ambulating, needed assistance, and was jaundiced.  *Id.*  The attending nurse indicated Mr. Carrin would be discharged that day, but Nurse Paynter advised that he was "not appropriate for discharge to"

FDC.[24]  *Id.*  It was requested that his discharge be placed on hold until further notice.  *Id.*

On July 29th, it was arranged for Mr. Carrin to be discharged from the community hospital and transferred to "Select Hospital."  ECF No. 110-5 at 34.  He remained in "Select Hospital" throughout August 2019 and was not discharged until September 10, 2019. ECF No. 110-5  at 52.

On September 11th, Dr. Jimenez saw Mr. Carrin for the last time. ECF No. 110-5 at 52.  Dr. Jimenez noted he was assessing Mr. Carrin after a "lengthy hospitalization," and he noted that Mr. Carrin received diuresis in the hospital, blood products to increase his platelet count, and lactulose for ammonia levels.  *Id.*  Dr. Jimenez recommended placing Mr. Carrin on "light duty" and "non strenuous greater than 30 min."  *Id.*

On September 11, 2019, Mr. Carrin was transferred out of FCI/FDC Tallahassee to a medical center in Lexington, Kentucky.  ECF No. 111-1 at 7.  In late October 2019, a specialist at the Hepatology Clinic determined that HCV treatment should not be provided "due to his decompensated

---

[24] Dr. Jimenez explained in his deposition that FDC was a "level two" care facility" and if an inmate could not ambulate or care for themselves, "the administration at some level would find the proper accommodation for that patient."  ECF NO. 113-10 at 6.

status."  ECF No. 113-2 at 9-10.  Mr. Carrin was once again hospitalized on

November 13, 2019, and passed away on December 5, 2019.  *Id.* at 10.

Dr. Donald Kern[25] is a physician, board certified in Internal Medicine

and in Public Health and General Preventive Medicine.  ECF No. 113-8 at

2.  He states that "direct acting antiviral medication such as Harvoni and

Epclusa" have HCV treatment "cure rates in excess of 95%."  *Id.* at 4.

Curing an HCV "infection does not reverse existing damage to the liver,"

but "no further damage would occur."  *Id.*  Dr. Kern opines that, upon his

review of Mr. Carrin's medical records, "Mr. Carrin was clinically stable" as

of October 2018 when treatment was initially approved.  *Id.*  He further

opined that "had Mr. Carrin received treatment for the Hepatitis C infection

beginning in October 2018, he would not have died from liver failure the

following year."  *Id.*

Dr. Rosaline Vasquez is Defendants' expert.  ECF No. 114 at 27.

Her affidavit, ECF No. 114-1, contains her opinion that "Mr. Carrin had

clinically evident liver cirrhosis since at least [January 2018] and most likely

significantly before that."  ECF No. 114-1 at 6.  She states that by the time

---

[25] Dr. Kern is Plaintiff's retained expert discussed on pages 2-3 of this Report and Recommendation.  Defendants opposes consideration of Dr. Kern's opinion for several reasons, ECF No. 114 at 26-27, which have been considered.

he was transferred to FDC from the Leon County Jail, his "liver abnormalities and signs of cirrhosis were already quite advanced with a calculated MELD score of 12." *Id.* "Patients with a MELD score of greater than 1- are recommended to not start antiviral medications for hepatitis C prior to the consideration of transplantation." *Id.* at 6-7. She advises that when Mr. Carrin was at Grady Hospital, his "MELD score" was 17 and "indicated a6% risk of mortality in 3 months." *Id.* at 7. She opined that the "opportunity to start antiviral medication was very short before his significant decompensation." *Id.* at 8. Dr. Vasquez states that even if "therapy had been started on 10/25/18, Mr. Carrin's disease was so quickly deteriorating that it would not have allowed for the effect of a therapy of 12 to 24 weeks duration." *Id.* at 9.

Dr. Jimenez testified in his deposition that "Hepatitis C is manageable." ECF No. 113-10 at 17. When asked who at FDC would be responsible for ensuring that Mr. Carrin got direct acting antiviral medications to treat his Hepatitis C, he responded, "I don't know that." *Id.* at 22. Dr. Jimenez said, "I was just responsible to see this patient a couple of times while he was there." *Id.* at 25.

Case No. 4:21cv486-MW-MAF

Additional evidence comes from an affidavit submitted by Dale

Folsom.  He was housed at FDC in the same dormitory with Mr. Carrin and

has "first-hand knowledge of the physical deterioration" experienced by

Mr. Carrin.  ECF No. 113-12 at 2.  Mr. Folsom said that Ms. Smiledge, the

"Health Services Manager," spoke with Mr. Carrin "during her weekly

rounds" and told him that he could not receive the HCV treatment "until

after he was sentenced."  *Id.*  Mr. Folsom said Mr. Carrin rushed to enter a

plea and be sentenced "in order to become 'eligible' to use Ms. Smiledge's

word, for treatment."  *Id.* at 3.

At some point, Defendant Rolston told Mr. Carrin "that he would

receive his approved treatment once he arrived at his camp of final

destination."  ECF No. 113-12 at 3.  Mr. Folsom explained that Mr. Carrin

"was concerned" upon hearing that news from Defendant Rolston "because

the US Attorney we were cooperating with had placed a Marshal's hold on

us."  *Id.*  Both Mr. Carrin and Mr. Folsom "were supposed to remain at FDC

Tallahassee for trial preparation" so they could testify in an upcoming trial.

*Id.*  Mr. Folsom said that when Mr. Carrin "expressed his concern to

Rolston, Rolston told him that he was going to be transported to Butner so

that he could receive his treatment, and that they would then transport him

back to FDC Tallahassee after that." *Id.*  Mr. Folsom heard Defendant

Rolston tell Mr. Carrin, "don't worry, we're going to take care of you."  ECF

No. 113-12 at 3.

Mr. Folsom said that he and other inmates witnessed Plaintiff's

"deterioration" and were "mad" when they heard Defendant Rolston tell

Mr. Carrin that he could not get treatment until he was transported to his

"final destination."  *Id.* at 3.  Mr. Folsom said that is not true because he

and other inmates knew of another inmate at FDC Tallahassee "at that very

time who had been diagnosed with Hep C and received the treatment *while*

*he was there at FDC Tallahassee."  Id.*  Mr. Folsom said that it seemed like

Defendant Rolston "actually cared" that Mr. Folsom "was in such bad

shape, but just kept saying that there was nothing they could do until

[Mr. Carrin] got to a permanent camp."  *Id.*  Notably, Dr. Li testified in his

deposition that inmates at FDC Tallahassee could receive treatment for

Hepatitis C."  ECF No. 113-11 at 7.

Mr. Folsom stated in his affidavit that Mr. Carrin's condition was

obvious and "rapidly worsened" while waiting for treatment.  ECF No. 113-

12 at 3.  He said Mr. Carrin's "feet were as big as footballs and he couldn't

even get his feet in his shoes."  *Id.*  Mr. Carrin could not stand on his own,

so Mr. Folsom and other inmates would carry Mr. Carrin to the restroom and "hold him up by the toilet so he could try to urinate." *Id.* He said Mr. Carrin "would just sob and sob because he was in so much pain." *Id.* Inmates requested a wheelchair for him, "but it took a month just to get that." *Id.* The inmates also kept a "mop handy because [they] had to clean up after" Mr. Carrin; anytime he sat down in the dormitory, "his skin was leaking and he would leave puddles and wet spots everywhere he sat." *Id.* at 4.

Mr. Folsom said that he and the other inmates saw Mr. Carrin's deterioration; he said "it was apparent to everyone [Mr. Carrin] was dying." *Id.* Even the officers bemoaned "the fact that [Mr. Carrin] was going to die" and were worried that the medical staff would "blame them for it." *Id.* Further, Mr. Folsom said that "Counselor Arnold yelled at the medical staff about [Mr. Carrin's] condition on more than one occasion, accusing [Defendants] Jimenez and Rolston of putting 'band-aids on bullet holes' and saying that he wasn't going to let 'Mr. Carrin] just lay there and die on his watch." *Id.* Mr. Folsom said that he and other inmates got mad and "combative" with both Defendants Rolston and Jimenez because of the lack of treatment for Mr. Carrin. *Id.*

Plaintiff Sandra Garrin also submitted a sworn affidavit.  ECF No.

113-13.  She states that she had several conversation with Dr. Jimenez

concerning the delay in Mr. Carrin's treatment.  *Id.* at 2.  Dr. Jimenez told

Plaintiff that he did not know why Mr. Carrin "had not received the

prescribed treatment, because he knew it had been ordered."  ECF No.

113-13 at 2.  She said that Dr. Jimenez told her "he would look into the

delay and get back with" her, "but he never did."  *Id.*  Eventually, he told

Plaintiff to follow up with Ms. Smiledge "to get more information about when

the treatment might begin."  *Id.*

Plaintiff said she spoke with Ms. Smiledge "on multiple occasions."

*Id.*  She told Plaintiff that Mr. Carrin "was not eligible to receive the

prescribed medication until after he was sentenced, because pre-trial

detainees could not receive lengthy or expensive treatments."  *Id.*  Based

on that information, counsel for Mr. Carrin was requested to "expedite his

sentencing" so he could begin treatment.  *Id.*  She and Mr. Carrin assumed

"that he would begin treatment immediately after he was sentenced, but . . .

Raymond received no treatment despite continuing to get more sick."  *Id.* at

2-3.  After Mr. Carrin's sentencing on January 15, 2019, Ms. Smiledge told

her that he could not receive the treatment because "FDC was a transitory

facility" and he "would have to wait until he arrived at his permanent camp to receive treatment."  *Id.* at 3.  Plaintiff advised that he would not be moved anytime soon because of his witness testimony in an ongoing case, but Ms. Smiledge assured her Mr. Carrin "was going to receive the treatment eventually . . . ."  ECF No. 113-13 at 3.

**Analysis**

The Eighth Amendment governs the conditions under which convicted prisoners are confined and the medical treatment they receive while in prison.  Farmer v. Brennan, 511 U.S. 825, 832, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994).  The Eighth Amendment guarantees that prisoners will not be "deprive[d] ... of the minimal civilized measure of life's necessities."  Rhodes v. Chapman, 452 U.S. 337, 347, 101 S. Ct. 2392, 2399, 69 L. Ed. 2d 59 (1981) (quoted in Chandler v. Crosby, 379 F.3d 1278, 1289 (11th Cir. 2004)).  Those necessities include food, clothing, and medical care.  Harris v. Thigpen, 941 F.2d 1495, 1511 (11th Cir. 1991); *see also* Collins v. Homestead Corr. Inst., 452 F. App'x 848, 850-851 (11th Cir. 2011).

The Eighth Amendment establishes "the government's obligation to provide medical care for those whom it is punishing by incarceration."

Estelle v. Gamble, 429 U.S. 97, 103, 97 S. Ct. 285, 290, 50 L. Ed. 2d 251 (1976).  That obligation exists on both the "[f]ederal and state governments . . . to provide minimally adequate medical care . . . ."  Harris, 941 F.2d at 1504 (quoted in Hoffer v. Sec'y, Fla. Dep't of Corr., 973 F.3d 1263, 1270 (11th Cir. 2020)).

Mr. Carrin was both a pretrial detainee and a convicted prisoner during the events at issue in this case.  Pretrial detainees have the same right to medical care as do convicted prisoners.  However, a pretrial detainee's right to medical care is protected by the Due Process Clause of the Fifth Amendment rather than the Eighth Amendment.  Jordan v. Doe, 38 F.3d 1559, 1564 (11th Cir. 1994).  The Due Process Clause "require[s] the responsible government or governmental agency to provide medical care to persons" who have not yet been convicted of a crime.  City of Revere v. Massachusetts Gen. Hospital., 463 U.S. 239, 244, 103 S. Ct. 2979, 2983, 77 L. Ed. 2d 605 (1983) (noting "the due process rights . . . are at least as great as the Eighth Amendment protections available to a convicted prisoner").  Nevertheless, the standard of review for a denial of medical care claim is the same, whether based on the Fifth or Eighth Amendment.  Jordan, 38 F.3d at 1565.  "[D]eliberate indifference to serious

medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' and violates the Constitution.  Estelle, 429 U.S. at 104, 97 S. Ct. at 291.

Mr. Carrin had a clearly established constitutional right to medical care and was dependent upon the actions of prison officials to receive that care.  Estelle, 429 U.S. at 103, 97 S. Ct. at 290 ("An inmate must rely on prison authorities to treat his medical needs; if the authorities fail to do so, those needs will not be met").  The Constitution is violated when prison officials - whether prison doctors or prison guards - are deliberately indifferent to a prisoner's "serious medical needs."  429 U.S. at 104, 97 S. Ct. at 291.

To "prove a claim for deliberate indifference," a plaintiff must show: (1) a "serious medical need (the objective component)"; (2) a prison official's "deliberate indifference to that serious medical need (the subjective component); and (3) the official's wrongful conduct caused the injury."  Fischer v. Fed. Bureau of Prisons, 349 F. App'x 372, 374 (11th Cir. 2009) (citing to Goebert v. Lee Cnty., 510 F.3d 1312, 1326 (11th Cir. 2007)).  "To satisfy the subjective component, the plaintiff must prove the prison official subjectively knew of a risk of serious harm, the official

disregarded that risk, and the official's conduct was more than gross

negligence." Fischer, 349 F. App'x at 374 (citation omitted).[26]

As for the first element, the evidence is undisputed that Mr. Carrin

had a serious medical need. Black v. Alabama Dep't of Corr., 578 F. App'x

794, 795 (11th Cir. 2014) ("Hepatitis C is a serious medical need"); *see,*

*e.g.,* Roe v. Elyea, 631 F.3d 843, 862 (7th Cir. 2011)*;* Hoffer, 973 F.3d at

1270; Gordon v. Schilling, 937 F.3d 348, 356 (4th Cir. 2019); Woodcock v.

Correct Care Sols., 861 F. App'x 654, 659 (6th Cir. 2021).

The second element, however, is disputed. Dr. Jimenez argues that

the evidence shows he was not deliberately indifferent to Mr. Carrin's

medical needs. Plaintiff says it does.

Dr. Jimenez points out that in all six encounters he had with

Mr. Carrin, he evaluated his condition, documented it, and followed up by

---

[26] The Court notes that there has been debate within the Eleventh Circuit as to whether this claim requires a showing of "more than gross negligence" or "more than mere negligence." *See* Wade v. McDade, 67 F.4th 1363, 1372 (11th Cir.), reh'g en banc granted, opinion vacated sub nom. Wade v. Georgia Corr. Health, LLC, 83 F.4th 1332 (11th Cir. 2023). That debate may ultimately be considered a matter of semantics because the standard as explained by the Supreme Court ultimately requires a Plaintiff to show that a defendant was aware of a risk of serious harm, but recklessly disregarded that risk. Farmer v. Brennan, 511 U.S. 825, 836, 114 S. Ct. 1970, 1978, 128 L. Ed. 2d 811 (1994). The "reckless" standard adequately provides a framework for evaluating this claim. Farmer, 511 U.S. at 837, 114 S. Ct. at 1979 (clarifying that recklessness requires showing that an "official knows of and disregards an excessive risk to inmate health or safety").

entering administrative notes.  ECF No. 110 at 17.  Those notes include a request for an outside GI specialist and a notation that Mr. Carrin needed to start treatment ASAP.  *Id.* at 17-18.

The problem is that following up examinations with notations is not the same as following up with medical care.  The medical evidence shows that Dr. Jimenez knew as early as August 2018, that Mr. Carrin had been diagnosed with HCV and he already was displaying symptoms of the disease (despite Mr. Carrin's own non-medical opinion that he did not have symptoms).  As of August 2018, Dr. Jimenez noted he was pale, and there is a dispute upon the Court's own review of the evidence as to whether Dr. Jimenez considered him to be jaundiced and have HCV-related rashes. Nevertheless, as early as August of 2018, Dr. Jimenez knew Mr. Carrin needed to "start Treatment ASAP."  Despite that knowledge, there is no evidence that he took the necessary steps to begin the life-saving treatment he knew was needed.

It is true that he ordered labs, but those results were returned in early September 2018.  Dr. Jimenez, along with Dr. Litton, began the process of obtaining Non-Formulary Approval Treatment.  Yet that process concluded by the end of October 2018 with Mr. Carrin having received approval for

treatment.  It took two months to obtain approval, but then treatment never was given.

Much has been made of the fact that Mr. Carrin could not receive HCV treatment as a pre-trial inmate.  Yet that fact is disputed.  It is also complicated by the fact that numerous entries in Mr. Carrin's medical records point out that Mr. Carrin would likely be housed at FDC for 4 to 5 months.  That is sufficient time to complete a 12 week treatment plan. Importantly, a reasonable jury could find that Mr. Carrin could have received treatment while housed at FDC.  That is so because Dr. Jimenez was asked why Mr. Carrin's treatment had not begun, and he answered that he did not know but would look into the matter.  That suggests that Mr. Carrin could have been given treatment at FDC.  That suggestion is made stronger by testimony from Mr. Folsom that another inmate had received HCV treatment at FDC.

Moreover, Dr. Jimenez argues that HCV treatment still could not begin until a GI consult occurred, and that the URC had to approve such requests.  Defendant Smiledge testified that the URC met every two weeks, but it did not consider Dr. Jimenez' October 2018 request until January 9, 2019.  That delay is troubling.

Case No. 4:21cv486-MW-MAF

Also troubling is the fact that after the request was deferred on January 9th, there is no evidence that Dr. Jimenez ever resubmitted the request. Mr. Carrin became a sentenced inmate just a week later. At that point, it is undisputed that pursuant to B.O.P. policy, he could be provided HCV treatment, and Mr. Carrin repeatedly requested treatment - which should have prompted Dr. Jimenez to take action. No action was taken to provide Mr. Carrin with medical treatment to which he was eligible and entitled.

The evidence reveals that Mr. Carrin's physician knew his patient needed treatment ASAP, he knew the process for obtaining that treatment, and yet did nothing while valuable time passed. Dr. Jimenez did not even place a "medical hold" for Mr. Carrin, despite that guidance and reminder from Dr. Mell in October 2018. If a patient cannot rely on his physician to chart the course for his treatment, it will not happen. Indeed, HCV treatment never happened, despite the fact that it was approved. The lack of medical treatment provided to Mr. Carrin by his physician, Dr. Jimenez, could reasonably be deemed to be deliberate indifference by a jury.

Mr. Carin's medical records list him as a "priority level 1" in October 2018, but there is no evidence that he was a priority to Dr. Jimenez.

Indeed, the GI specialist request was marked by Dr. Jimenez as only "routine." *Id.*

Dr. Jimenez was authorized to place a medical hold for Mr. Carrin to remain at FDC so he could receive HCV treatment. That did not happen, and because the hold was not placed, Mr. Carrin was unnecessarily transferred away from FDC, again delaying his medical care. The length of the delay in his care ultimately amounted to a denial of care. At some point Mr. Carrin could no longer benefit from or receive HCV treatment. As his physician, Dr. Jimenez knew that. Yet despite that knowledge, no treatment was provided, even though it had been approved for many months.

It is disputed whether Dr. Jimenez could have provided HCV treatment to Mr. Carrin at FDC. It is disputed whether a pre-trial detainee could have received HCV treatment, even though the Constitution requires that pre-trial detainees be provided necessary medical care. Those facts require denying the motion for summary judgment filed by Dr. Jimenez.

## **RECOMMENDATION**

In light of the foregoing, it is respectfully **RECOMMENDED** that the

motion for summary judgment, ECF No. 110, filed by Defendant Jimenez

be **DENIED** because genuine issues of material fact exist.

**IN CHAMBERS** at Tallahassee, Florida, on February 27, 2024.


S/    Martin A. Fitzpatrick
**MARTIN A. FITZPATRICK**
**UNITED STATES MAGISTRATE JUDGE**



## NOTICE TO THE PARTIES

**Within fourteen (14) days after being served with a copy of this Report and Recommendation, a party may serve and file specific written objections to these proposed findings and recommendations. Fed. R. Civ. P. 72(b)(2). A copy of the objections shall be served upon all other parties. A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof. Fed. R. Civ. P. 72(b)(2). Any different deadline that may appear on the electronic docket is for the Court's internal use only and does not control. If a party fails to object to the Magistrate Judge's findings or recommendations as to any particular claim or issue contained in this Report and Recommendation, that party waives the right to challenge on appeal the District Court's order based on the unobjected-to factual and legal conclusions. See 11th Cir. Rule 3-1; 28 U.S.C. § 636.**