## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

**SANDRA GAIL CARRIN,**
**as the Personal Representative**
**of the Estate of**
**RAYMOND MARSHALL CARRIN,**

     **Plaintiff,**

**vs.**                     **Case No. 4:21cv486-MW-MAF**

**SHAUNA MARIE SMILEDGE,**
**JOSEPH JIMENEZ, MD,**
**and PAUL ROLSTON,**

     **Defendants.**
_____/

## FIFTH REPORT AND RECOMMENDATION[1]

This is a civil rights case brought pursuant to 28 U.S.C. § 1331, 1343,

and 2201, and Bivens v. Six Unknown Fed. Narcotics Agents, 403 U.S.

388, 91 S. Ct. 1999, 29 L. Ed. 2d 619 (1971).  Plaintiff challenges the

---

[1] A first Report and Recommendation, ECF No. 97, was entered in April 2023, concerning Defendants' motion to dismiss.  The motion was denied without objection. ECF No. 98.  The Second Report and Recommendation, ECF No. 129, was entered on February 14, 2024, regarding Defendant Smiledge's summary judgment motion, ECF No. 109.  The Third Report and Recommendation, ECF No. 130, entered on February 26, 2024, concerns Defendant Rolston's summary judgment motion, and the fourth Report and Recommendation, ECF No. 131, was recently entered on the motion for summary judgment filed by Defendant Jimenez, ECF No. 110.

medical care provided to Raymond Marshall Carrin during his detention in the Federal Detention Center in Tallahassee and his subsequent imprisonment within the Bureau of Prisons (BOP).  Plaintiff is the mother of Mr. Carrin, who passed away on December 5, 2019, having never received DAA medications for the Hepatitis C Virus [HCV].  ECF No. 64 at 39.

The parties filed four motions for summary judgment, ECF Nos. 108-111, on August 14, 2023.  Responses were timely filed, ECF No. 113-115, as were the replies, ECF Nos. 116-118.  This Report and Recommendation deals only with the motion for partial summary judgment filed by Plaintiff, ECF No. 108.  Defendants filed a response, ECF No. 114, in opposition to that motion.  Plaintiff did not file a reply.

Although Defendants filed a motion to strike Plaintiff's expert witness opinion which was submitted with Plaintiff's motion for partial summary judgment, ECF No. 119, the motion was denied.  ECF No. 126.  Although Plaintiff failed to supplement the expert opinion of Dr. Donald Kern as required by Rule 26, the report was not stricken because there was no showing that Defendants were substantially prejudiced or harmed by Plaintiff's failure.  *Id.*  Nevertheless, Defendants were offered the opportunity to engage in a 60-day supplemental discovery period to

properly prepare opposition to Dr. Kern's opinion and they were advised that the Court would delay consideration of the pending summary judgment motions during that process.  *Id.*  Defendants declined that opportunity and consented to ruling on the motions as filed.  ECF No. 127.

**Legal standards governing a motion for summary judgment**

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  Thus, summary judgment is proper "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986).  The "party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."  Celotex Corp., 477 U.S. at 323, 106 S. Ct. at 2553.  The non-moving party must

then show[2] the court "that there is an absence of evidence to support the

nonmoving party's case." *Id.* at 325, 106 S. Ct. at 2554.

An issue of fact is "material" if it could affect the outcome of the case.

Hickson Corp. v. Northern Crossarm Co., Inc., 357 F.3d 1256, 1259 (11th

Cir. 2004) (citations omitted).  A party must show more than the existence

of a "metaphysical doubt" regarding the material facts, Matsushita Elec.

Indus. Co., LTD. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct.

1348, 1356, 89 L. Ed. 2d 538 (1986), and a "scintilla" of evidence is

insufficient.  The court must decide "whether the evidence presents a

sufficient disagreement to require submission to a jury or whether it is so

one-sided that one party must prevail as a matter of law."  Hickson Corp.,

357 F.3d at 1260 (quoting Anderson v. Liberty Lobby, 477 U.S. 242, 252,

106 S. Ct. 2505, 2505, 91 L. Ed. 2d 202 (1986)).

---

[2] "Rule 56(e) . . . requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'"  Owen v. Wille, 117 F.3d 1235, 1236 (11th Cir. 1997), *cert. denied* 522 U.S. 1126 (1998) (quoting Celotex, 477 U.S. at 324, 106 S. Ct. at 2553) (quoting Fed. R. Civ. P. 56(c), (e))).  The nonmoving party need not produce evidence in a form that would be admissible as Rule 56(e) permits opposition to a summary judgment motion by any of the kinds of evidentiary materials listed in Rule 56(c).  Owen, 117 F.3d at 1236; Celotex, 477 U.S. at 324, 106 S. Ct. at 2553.

"Summary judgment is not a time for fact-finding; that task is reserved for trial."  Sconiers v. Lockhart, 946 F.3d 1256, 1263 (11th Cir. 2020) (citing Tolan v. Cotton, 572 U.S. 650, 655-57, 134 S. Ct. 1861, 188 L. Ed. 2d 895 (2014)).  Further, "when competing narratives emerge on key events, courts are not at liberty to pick which side they think is more credible." Sconiers, 946 F.3d at 1263.  On the other hand, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial."  Matsushita Elec., 475 U.S. at 587 (internal quotation marks omitted) (quoted in Ricci v. DeStefano, 557 U.S. 557, 586, 129 S. Ct. 2658, 2677, 174 L. Ed. 2d 490 (2009)).

"Cross motions for summary judgment do not change the standard." Latin Am. Music Co. v. Archdiocese of San Juan of the Roman Catholic & Apostolic Church, 499 F.3d 32, 38 (1st Cir. 2007) (quoted in Ernie Haire Ford, Inc. v. Universal Underwriters Ins. Co., 541 F. Supp. 2d 1295, 1297 (M.D. Fla. 2008)).  "'Cross motions for summary judgment are to be treated separately; the denial of one does not require the grant of another.'" Christian Heritage Acad. v. Okla. Secondary Sch. Activities Ass'n, 483 F.3d 1025, 1030 (10th Cir. 2007) (quoting Buell Cabinet Co. v. Sudduth, 608 F.2d 431, 433 (10th Cir. 1979)) (quoted in Ernie Haire Ford, 541 F. Supp.

2d at 1297-98)).  Accordingly, each of the four motions for summary judgment in this case have been separately evaluated.  Although recommendations have been made to deny the summary judgment motions filed by Defendants Jimenez and Smiledge, it does not require that Plaintiff's motion for partial summary judgment, ECF No. 108, be granted.[3]

**Rule 56 Evidence[4]**

Defendant Jimenez is a physician who worked at the Federal Detention Center [FDC] in Tallahassee between November 28, 2016, and April 16, 2020.  ECF No. 113-10 at 4, 14.  He provided medical care to Mr. Carrin and, indeed, acknowledges a duty to provide reasonable medical care.  ECF No. 113-6 at 7.  Dr. Jimenez was the only doctor on duty at the facility.  ECF No. 113-10 at 15.

---

[3] Plaintiff's motion seeks summary judgment only as to Defendants' liability.  ECF No. 108 at 1.

[4] Plaintiff has frequently cited to evidence which does not support the fact asserted.  For example, Plaintiff states that Defendants admit that Mr. Carrin was denied compassionate release because he did not satisfy certain medical components.  ECF No. 108 at 21.  The citation to Defendants' answer, ECF No. 107 at ¶ 249 does not support the assertion.  The answer states only that Defendants admit "any excerpts from Inmate Carrin's medical record speak for themselves and the record taken in its entirety is the best evidence of its contents."  ECF No. 107 at 25, ¶249.  Plaintiff did not provide that portion of the medical record.  Additionally, Plaintiff often cites to of emails sent by Mr. Carrin and replies thereto.  *See, e.g.*, ECF No. 108 at 6.  Again, the citations do not support the assertions and Mr. Carrin's emails were not submitted as evidence.  Facts which are not properly supported are not accepted as Rule 56 evidence.

Mr. Carrin was indicted in the United States District Court for the Northern District of Florida in case number 4:18-cr-43.  ECF No. 110-1 (Ex. A).[5]  He was admitted to FDC as a pre-trial detainee on August 9, 2018.  *Id.* at 8.  At the time of his detention, a "health screen" was conducted, noting that Mr. Carrin had been diagnosed with Hepatitis C in 2018.  ECF No. 108-1 at 3.  He was not jaundiced at that time.  *Id.*

Dr. Jimenez was requested to cosign the health screen, ensuring he was aware of Mr. Carrin's condition.  *Id.* at 6-7.  Dr. Jimenez then examined Mr. Carrin on August 21, 2018, at the Chronic Care Clinic.  *Id.* at 8.  Mr. Carrin was evaluated for three complaints: Hepatitis C, hypertension, and anxiety.  *Id.*  Dr. Jimenez documented Mr. Carrin's Hepatitis C as "asymptomatic" and noted that "no prescriptions" were "currently assigned for [that] specific condition."  *Id.*  Mr. Carrin denied Hepatic tenderness, jaundice, recent weight/loss gain, bruising, bleeding, and digestive problems.  ECF No. 110-3 at 93.

---

[5] For the sake of efficiency, not all cited facts are from Plaintiff's motion, ECF No. 108, or Defendants' response, ECF No. 114.  Some facts are taken from the parties' prior summary judgment motions.  Pursuant to Rule 56(c), the Court is not limited to consideration of "the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3).

During Dr. Jimenez's physical examination, he appears to have noted that Mr. Carrin had "Rashes." *Id.* It also appears that he found Mr. Carrin to have some jaundice and a pale appearance.[6] *Id.* at 93, 95. Prescriptions for Citalopram (indicated for anxiety) and Lisinopril (indicated for hypertension) were renewed, and he ordered various labs. *Id.* at 93. Dr. Jimenez documented a plan to renew medications, await labs, and "follow closely for Symptoms of conditions with serial LFTS." *Id.* He also counseled Mr. Carrin in "how to obtain medical, dental, and mental health care." ECF No. 110-3 at 96.

On August 30, 2018, Dr. Jimenez entered an administrative note in Mr. Carrin's medical record to schedule a follow-up encounter with him on

---

[6] The medical record could be subject to multiple interpretations, but the Court finds it reasonable to conclude that Mr. Carrin had rashes at the time and appeared to be at least somewhat jaundiced. ECF No. 110-3 at 93; *see also* ECF No. 108-1 at 8. The medical record lists "Skin" and has both a "Yes" and "No" section. For yes, there is a notation of "Within Normal Limits." *Id.* Below the "yes" section is a "no" section which shows: "No: Rashes." *Id.* Similarly, under the GI section, it shows "Yes: Within Normal Limits" but indicates diarrhea "2 - 3 times per day" and history of Hepatitis. *Id.* Below that "yes" section is a "no" section which shows: "No: Jaundice." *Id.* Other sections such as eyes, neck, and cardiovascular include only a Yes response, suggesting that the inclusion of "no" reveals a problem or abnormality. That is no entirely clear, however, because at another point on the record Dr. Jimenez indicated there were no signs of a rash. ECF No. 110-3 at 100. Nevertheless, the evidence is clear that by October 15, 2018, Mr. Carrin was complaining about multiple rashes which he said had appeared earlier that year, and one rash was present as long as 5 years ago. *See* ECF No. 110-4 at 31.

September 4, 2018, after receipt of his Hepatitis C labs.  ECF No. 110-4 at

12.  The administrative note included a notation of "Initial PT/INR elevated"

and that Mr. Carrin had a "pale" skin coloring.  *Id.*  Dr. Jimenez noted that

the "remainder of liver enzyme levels" would be needed "to assess if

treatment should start."  *Id.*  Dr. Jimenez requested Dr. Li, the Clinical

Director for FCI/FDC Tallahassee, cosign the note and Isaiah Litton, the

Pharmacist, review the note.  *Id.*  Dr. Li[7] signed the note that same day,

*see* ECF No. 110-4 at 13, and Dr. Litton reviewed the note on the following

day.  *Id.* at 14.

Dr. Jimenez entered another administrative note in Mr. Carrin's

record on August 31, 2018, "to notify Administration" that Mr. Carrin had

"Positive recent labs" for HCV.  ECF No. 108-1 at 35.  He noted Mr. Carrin

denied symptoms, but he "appeared pale" although he was not jaundiced.

*Id.*  Dr. Jimenez advised that Mr. Carrin needed to "start Treatment

ASAP."[8]  *Id.*  Additionally, Dr. Jimenez submitted a request for an

---

[7] Dr. Li was the Clinical Director at FDC beginning in mid-2018.  ECF No. 113-11 at 3.  He did not personally see or assess Mr. Carrin until 2019 after he had been admitted to the hospital.  *Id.* at 4.  Dr. Li said he "went to see him a couple of times in the hospital."  *Id.*  He saw Mr. Carrin "one time in the prison."  *Id.*

[8] According to the Bureau of Prison's Clinical Guidance concerning HCV, "[a]ll sentenced inmates are eligible for consideration of treatment for chronic HCV infection." ECF No. 113-2 at 5.

"antiretroviral therapy consult" for Mr. Carrin's "chronic HEP-C."  *Id.*  The request was marked as "urgent" and stated: "Please assess treatment protocol for Hepatitis C."  *Id.*  Dr. Ortiz, the medical director, cosigned the note, and Pharmacist Litton reviewed it on that same day.  *Id.* at 36-37.

Dr. Litton also evaluated Mr. Carrin the same day he reviewed Dr. Jimenez's note.  ECF No. 108-1 at 30.  Dr. Litton noted Mr. Carrin was 43 years of age and had been diagnosed with Hepatitis C "approximately 7 years ago at a community clinic."  *Id.*  Mr. Carrin indicated he had noticed spots on his legs and was consuming large amounts of alcohol.  *Id.* Mr. Carrin had no "knowledge of genotyping at that time," and he did not follow-up with the clinic or pursue treatment.  *Id.*  Mr. Carrin admitted a history of IV drug use approximately 20 years ago, but said there had been "none recently."  *Id.*  He received tattoos at a friend's house in that past, and had a blood transfusion in 2001 after severe bleeding from a laceration to his hand.  *Id.*  Dr. Litton noted Mr. Carrin's desire to seek treatment for HCV.  *Id.*

Dr. Litton also noted Mr. Carrin was a pre-trial inmate "housed at the FDC to stand trial at local federal court."  ECF No. 108-1 at 31.  The medical record noted Dr. Litton had contacted the "unit team" who indicated

Mr. Carrin would likely be at FDC for "at least 4 to 5 months."[9]  *Id.*

Dr. Litton ordered labs "to obtain necessary info for NFR[10] submission," and

he noted that "genotype and Hep B serology" was needed.  *Id.*  Dr. Litton

said he would submit a non-formulary request for Hepatitis C treatment

after the lab results were obtained.  *Id.*  Dr. Li cosigned the note and Dr.

Jimenez reviewed the record.  *Id.* at 32-33.

A "formulary is a list of medications that a health care system" uses;

medications on the formulary means they can be used "with little to no

restriction."  ECF No. 110-6 at 3 (Klang Deposition, Ex. C).  Any medication

not on the formulary is a non-formulary medication.  *Id.*  All Hepatitis C

medications (direct-acting antivirals) "are non-formulary," so a practitioner

must submit a "non-formulary request form."  *Id.*  The request goes through

a four-level process for approval: from the institution's chief pharmacist to

the institution's clinical director, then to the central office pharmacist, and

finally the central office physician.  *Id.* at 4.

---

[9] In his deposition, Dr. Litton testified that "typically, in four to five months, you could complete the treatment."  ECF No. 108-8 at 11.

[10] NFR stands for non-formulary request.

On September 4, 2018, Dr. Jimenez entered an administrative note to document Mr. Carrin's viral load and "Log HEP-C."  ECF No. 108-1 at 38.  Dr. Jimenez also had a follow up visit with Mr. Carrin on that day regarding his "abnormal labs."  ECF No. 108-1 at 40.  Dr. Jimenez noted Mr. Carrin was asymptomic and denied having hepatic tenderness, jaundice, weight loss/gain, bruising, bleeding, or digestive problems.  *Id.* He also noted: "Awaiting treatment possibility since inmate in transition," and documented: HEP-C. Acute." *Id.* at 42.  His notes reflect that Mr. Carrin had a large abdomen that was pale with a "very small thin vein observed," but no edema.  *Id.* at 41.  Mr. Carrin was placed on restricted duty status with "no standing or working in kitchen." *Id.*  Dr. Jimenez advised Mr. Carrin to follow-up as necessary at sick call and ensured he knew how to access care. *Id.* at 42.

Lab results were returned on September 12th, confirming that Mr. Carrin had Hepatitis C Genotype 1a.  ECF No. 110-4 at 28.  Dr. Litton made an administrative note which confirms he had reviewed the results, and he stated he would enter a non-formulary request for Hepatitis C

treatment algorithm.[11]  *Id.*  The algorithm worksheet was completed with Dr. Litton noting that Mr. Carrin was a "pre-trial inmate, so unable to place on medical hold."[12]  *Id.*  Nevertheless, Dr. Litton specifically noted that Mr. Carrin would likely be housed at FDC "at least 4 to 5 months" awaiting trial.  *Id.*

Dr. Litton inadvertently requested Hepatitis B treatment instead of Hepatitis C.  ECF No. 111-2 at 2, 4.  The mistake was corrected a few days later, and Dr. Litton entered a second request - this time for Hepatitis C - on September 18th.  *Id.* at 2, 6-7.  The request included a comment indicating it is a Priority "level 1" request.[13]  *Id.* at 6.  If approved, the request was for "Harvoni plus low dose RBV for 12 weeks."  *Id.*  Dr. Li, the Clinical Director, agreed with Dr. Litton's request and directed "refer up."  *Id.*  On September 28, 2018, Dr. Katrina Klang, the Central Office Pharmacist, deferred the

---

[11] An algorithm request is an initial request for HCV treatment which must include necessary documentation for reviewers to evaluate the request.  ECF No. 110-7 at 3.  If the algorithm request is approved, then a second request must be submitted for the non-formulary medication.  *Id.*; *see also* ECF No. 111-7 at 3-4.

[12] A "medical hold" means the inmate will not be transferred.  ECF No. 113-11 at 17.

[13] Prior level 1 is the "highest priority."  ECF No. 108-8 at 19.

request, directed Dr. Litton to resubmit it "with all required documentation attached."  *Id.* at 6-7.

Dr. Litton submitted a third HCV treatment request on October 1, 2018.  *Id.* at 9-10. That request included a diagnosis of "HCV - Genotype 1a - Decompensated Cirrhosis (CTP = 7).  *Id.* at 9.  Again, the request advised that Mr. Carrin was a "pre-trial inmate," a medical hold could not be placed, but he would "likely be [at FDC] at least 4 to 5 months."[14]  *Id.*

Dr. Litton's request was approved by Dr. Li on October 2, 2018, and referred to the Central Office Pharmacist, Dr. Mell.  ECF No. 111-2 at 9-10.  Dr. Mell approved the non-formulary drug authorization request on October 15, 2018.  *Id.* at 9.  Dr. Mell noted the complicating factor[15] that Mr. Carrin's status was "pre-sentencing," but would likely remain at FDC for 4-5

_____

[14] Dr. Litton said that treatment could be completed in four to five months.  ECF No. 108-8 at 11.

[15] The evidence reveals that DAA treatment involves "twelve weeks of closely monitored treatment."  ECF No. 113-2 at 9.  In cases of inmates with "pre-trial status, it would be difficult to ensure consistency of housing to provide the medications daily for twelve weeks, and to complete all required monitoring during this treatment."  *Id.* "Inmates who are sentenced can have a medical hold placed on them, while inmates who are pre-sentence or going out on writ, cannot have a hold placed."  *Id.*  Although Dr. Jimenez argues it is "procedurally unfair" to use interrogatories responded to by the United States while it was still a party in this litigation, *see* ECF No. 117 at 10, there is nothing improper about submitting evidence obtained during discovery and pointing to that evidence to support a fact.

months.  *Id.* at 10.  Again, Mr. Carrin was identified as "priority level 1 due to APRI>2."  Dr. Mell recommended "Epclusa plus weight-based ribavirin for 12 weeks, or Harvoni plus initial low-dose ribavirin . . . . increase as tolerated for 12 weeks."  *Id.*  Dr. Mell[16] concluded: "Please submit an NFR for the medication regimen, and ensure medical hold is placed in BEMR[17] and Sentry."  *Id.*  The form did not include approval from the fourth step in the process - the Central Office Physician - as that section is blank.  *Id.*

It appears that after approval of an "algorithm request," Dr. Mell selected a treatment for Mr. Carrin and directed the requesting official to "submit an NFR for the medication regimen."  ECF No. 111-6 at 6.  The form is then returned to the institution to "redo the whole thing again," this time, specifying the medication.  *Id.*

---

[16] Dr. Mell also recommended "abdominal imaging to determine if cirrhosis [was] present and to screen for hepatocellular carcinoma."  ECF No. 111-2 at 10.  It was suggested that they consider an "EGD to screen for varices" - dilated veins in the esophagus caused by cirrhosis.  *Id.*  The efficacy of Hepatitis C treatment regimens are decreased if the patient has cirrhosis, so you must "pick a more robust regimen."  ECF No. 111-7 at 5.

[17] BEMR is the electronic medical records system.  ECF No. 108-8 at 14.  BEMR includes a notification system that sends a notification whenever "the final action" is taken on a non-formulary request.  *Id.* at 21.  When logging onto the system, "that notification is one of the first things that pop up," so a doctor would see it each time he or she logged on to BEMR.  *Id.*

On October 18, 2018, Dr. Litton submitted two nonformulary drug requests for Ribavirin 200 MG CAP and Ledipasvir/Sofosbuvir (Harvoni) 90-400 MG Tab.  ECF No. 111-2 at 29-30.  Both treatments were to be given over the course of 12 weeks.  *Id.*  Dr. Litton's requests were directed to the Institutional Clinical Director, Dr. Ortiz, who referred the request on October 23, 2018, to the Central Office Pharmacist.  *Id.*  Dr. Rodriguez, the Chief Pharmacist, approved the requests on October 25, 2018.  *Id.*

Notably, Dr. Rodriguez commented that this was a "priority level 1" and to "ensure medical hold is placed in BEMR and Sentry."  *Id.* at 29-30.  She also noted that the "[p]rovider ha[d] been contacted regarding recommendations for imaging/consultation with liver specialist."  *Id.*

While the NFR request was pending, Defendant Rolston evaluated Mr. Carrin on October 15th.  ECF No. 108-1 at 46.  Mr. Rolston is a physician assistant who has worked at FDC since January 2015.  ECF No. 111-9 at 2-3.  Mr. Rolston saw Mr. Carrin for his complaints about a rash on his lower right abdomen near an appendectomy site which he said had been present for five years.  *Id.*  ECF No. 108-1 at 46.  There were two additional sites that he said had appeared "this year" on his right and left inner biceps.  *Id.*  Mr. Rolston noted Mr. Carrin had been using an anti-

fungal cream since September 12th which had not resolved the problem.

*Id.* For the past two weeks, he had also tried a hydrocortisone cream

without any improvement. *Id.* Mr. Rolston noted he would refer the "rash

to MDs," as he was unsure of what cream would help the "HEP C related

abdominal rash." *Id.* In the meantime, Mr. Rolston advised Mr. Carrin to

"use anti biotic ointment on belly rash for 12 days and use anti fungal

[cream] on inner arm rashes." *Id.* at 46-48. Notably, Mr. Carrin denied any

"symptoms related to Hepatitis," but Mr. Rolston noted the rash appeared

similar to Hepatitis C associated rashes. *Id.*

Mr. Rolston requested Dr. Jimenez cosign the record and Dr. Li

review the record. *Id.* at 48. Dr. Jimenez did so on October 16th, and

Dr. Li reviewed the note on November 5th. *Id.* at 49-50. Mr. Rolston

explained in his declaration that he routinely made those requests to

ensure Mr. Carrin's physicians were aware of his care for Mr. Carrin "and

the status of his health." ECF No. 111-9 at 4.

On October 24, 2018, Dr. Jimenez entered an administrative note to

schedule Mr. Carrin "to see a local GI specialist and assess his Hepatitis

Condition." ECF No. 110-4 at 36. Dr. Jimenez requested Mr. Carrin be

evaluated and recommendations given "for Treatment or Plan of Care."  *Id.*

Dr. Jimenez designated the request with a priority of "routine."  *Id.*

Requests for outside medical consults or procedures require approval

by the institution's Utilization Review Committee ("URC").  ECF No. 111-10

at 3.  Although the request was initiated on October 24, 2018, there is no

evidence that any action was taken on that consult request until January 9,

2019.  On that date, the GI consult request for Mr. Carrin was "deferred" by

the URC.[18]  ECF No. 110-8 at 10.  Notes made on the URC report form

acknowledge that although Mr. Carrin met the criteria, he was "a pre-

sentence inmate awaiting designation."[19]  *Id.*  Another notation below the

request noted the level of care was "medically necessary - non-emergent,"

and that it was a "routine" request.  *Id.*  Just a week later, on January 15,

2019, United States District Judge Robert Hinkle sentenced Mr. Carrin to a

term of 120 months.  ECF No. 111-1 at 5.  There is no evidence that the GI

---

[18]  The URC meeting notes were provided with Defendant Smiledge's declaration, ECF No. 110-8 at 6-13.  The January 9th meeting report confirms the GI request was deferred, but the document does not reveal that a specific person made the decision to defer the consult as opposed to it being a URC decision.  *Id.* at 10.

[19]  Mr. Carrin had entered a plea on October 30, 2018, but was awaiting sentencing as of January 9th.

request was brought up again at a subsequent URC meeting[20] or that

Dr. Jimenez made another request after Mr. Carrin was sentenced.

Mr. Rolston next saw Mr. Carrin 12 weeks later on January 9, 2019,

when he again complained about the rash.  ECF No. 110-4 at 37.  The

notes from that encounter state that the rash was "probably related to his

liver disease."  *Id.*  Mr. Carrin said he had been "scrubbing the lesions in an

attempt to remove them," but Mr. Rolston advised him to stop doing that as

it was making "the raised patches-discolored area more prominent."  *Id.*

Mr. Rolston noted the rash had "not spread since the last visit" and said

that Mr. Carrin had "not adhered to medical advice."  *Id.*  Specifically, he

said that Mr. Carrin had been "told to buy selenium sulfide off the

commissary and apply that and use it but chose not to."  *Id.*  Mr. Rolston

prescribed a topical zinc oxide ointment to be applied 2 times a day for 180

days, and prescribed hydrochlorothiazide oral tablets, 12.5 mg, to be taken

daily.  *Id.* at 38.  Mr. Carrin was also told to "purchase selenium sulfide"

and advised that a "long term solution" would come from HCV treatment.

*Id.* at 39.

---

[20] The URC met every weeks.  ECF No. 115-5 at 16.

Case No. 4:21cv486-MW-MAF

There was no cosign required of that visit, *id.,* however, Mr. Carrin

was also seen by Mr. Rolston on that same day as a "Chronic Care"

patient.[21]  ECF No. 110-4 at 40.  The notes indicate his HCV symptoms

were "unchanged" and that  Mr. Carrin was  "interested in starting

treatment and hope[d] to be designated soon."  *Id.*

Despite noting unchanged symptoms, the record reflects that

Mr. Carrin said "his legs [had] been swelling more lately."  *Id.*  He also said

he was "having some symptoms that he wanted to discuss" and felt they

were HCV "related."  *Id.*  He complained of back pain over the past year,

which he described as "cramping in his sides," and thought it was because

his kidneys were "being effected by his liver."  *Id.*  He had never had a

kidney issue before.  *Id.*  He also complained of leg cramps which were

"intermittent" and worse after exercising a lot.  *Id.*  That pain was

associated "often with leg fluid."  *Id.*  He had edema bilaterally for 2-3

years.  *Id.*  Mr. Rolston noted there was "pitting edema to mid shin 2+, feet

warm, with sensation and mobile."  *Id.* at 41.  He entered in the medical

record a new prescription given for the rash (Hydrochlorothiazide) and

---

[21] The Clinical Encounter notes that Mr. Carrin had a "health services" visit with Mr. Rolston at 2:21 pm on January 9, 2019, *see* ECF No. 110-4 at 37, and then a "Chronic Care" visit, also with Mr. Rolston, at 2:46 pm on January 9, 2019.  *Id.* at 40.

medications which were renewed for hypertension and anxiety disorder.

*Id.* at 42.  They discussed "potential HCV treatment," the new medication, and Mr. Rolston directed Mr. Carrin to "follow-up at Sick Call as Needed." *Id.*  Dr. Jimenez was requested to co-sign the record, which he did the following day, January 10th.  *Id.* at 43-44.

On January 24, 2019, Mr. Carrin inquired about his treatment, and was informed that it would begin when he got to his parent institution.  ECF No. 113-2 at 4.  From February 1st through February 13th, Mr. Carrin was "in transit" and not at FDC.  ECF No. 111-1 at 8.  He was returned to FDC for several weeks, but then moved to Atlanta on March 27, 2019.  *Id.*  He returned again to FDC Tallahassee on April 4, 2019.[22]  *Id.*

Prior to his transfer to Atlanta, Dr. Jimenez entered an administrative note on March 15, 2019, to renew medications for Mr. Carrin.  ECF No. 110-4 at 45.  Those medications were for hypertension and anxiety, but not for HCV.  *Id.*

---

[22] The evidence reveals Mr. Carrin was "designated to FCC Coleman."  ECF No. 113-2 at 9.  He was held in Atlanta before going to his designated facility, but "[t]he USAO for the Northern District of Florida requested a hold on [Mr. Carrin's] transfer for another case he was involved in as a witness."  *Id.*  Mr. Carrin was returned to FDC Tallahassee "for that purpose and not sent to his designated institution."  *Id.*

On March 26th, the day before Mr. Carrin was transferred to Atlanta, Dr. Jimenez examined him in the Chronic Care Clinic.  ECF No. 110-4 at 46.  He noted Mr. Carrin appeared jaundiced, obese, and Mr. Carrin reported retaining fluid and having pressure in his abdomen.  *Id.*

The notes entered by Dr. Jimenez reflect that Mr. Carrin had striae, dilated veins, ascites, and distension, where were "stigmata of liver disease."  ECF No. 110-4 at 48.  He confirmed Mr. Carrin's enlarged abdomen as well as a rash and another "nonspecific skin eruption."  *Id.* Dr. Jimenez noted that Mr. Carrin needed HCV treatment and was awaiting "court and facility assignment" for his treatment to start.  *Id.* at 48-49.

Mr. Carrin was transferred to a BOP facility in Atlanta the following day and examined by Dr. Martin.  ECF No. 110-4 at 50.  It was recommended that Mr. Carrin be evaluated at the ER.  *Id.*  Mr. Carrin was admitted to Grady Hospital where he remained until April 2, 2019.  *Id.* at 55-56, 58.

 Upon his release, Mr. Carrin was evaluated by Dr. Winston on April 3, 2019.  ECF No. 110-4 at 58.  Dr. Winston noted Mr. Carrin had "hepatic cirrhosis accompanied by abdominal ascites, [and] leg edema."  *Id.*  The

record shows Mr. Carrin had "3+ pitting edema." *Id.* at 59.  Mr. Carrin was

returned to FDC Tallahassee on April 4, 2019.  ECF No. 111-1 at 8.

No evidence has been presented to show that Mr. Carrin was

evaluated, assessed, or provided any medical treatment for two months.

Mr. Carrin was seen by Mr. Rolston on June 5, 2019, for complaints of pain

and swelling.  ECF No. 108-1 at 78.  Mr. Carrin had "obvious ascites,

peripheral edema of limbs and" Mr. Carrin reported "edema of his testicles."

ECF No. 108-1 at 78.  He noted Mr. Carrin's "limbs and feet [were] swollen

to [the] point that his socks [were] indenting his skin." *Id.*

Mr. Rolston noted that Mr. Carrin met "conditions to be qualified for

the HEP C treatment program once he reaches his designated prison

location." *Id.*  He requested labs, recommended treatment for Hepatitis C

and a "move to permanent facility" so treatment could be initiated. *Id.* at

81.  He further noted Mr. Carrin might "qualify to be care level 3." *Id.*

Dr. Jimenez cosigned the record and Dr. Li reviewed it on June 6th and

June 7th, respectively. *Id.* at 82-83.

Dr. Jimenez saw Mr. Carrin again on June 6, 2019.  ECF No. 108-1

at 85.  He noted that Mr. Carrin had "been subject on URC and need[ed]

effective treatment plan approach." *Id.*  The note stated" "Please advise

how we should proceed at this time in lieu of medical status." *Id.* He

requested Dr. Li cosign the note and Mr. Rolston review it. *Id.* Mr. Rolston

did so on June 10th, and Dr. Li cosigned the note on July 3rd. *Id.* at 86-87.

Dr. Jimenez examined Mr. Carrin on the following day. ECF No. 108-

1 at 88. He noted "Advanced Stage" Hepatitis C and "Decompensating of

Cirrhosis and Ascites." *Id.* Mr. Carrin reported "pain on Testicles, Lower

extremities, [and] difficulty resting." *Id.* The record shows Mr. Carrin had a

swollen and painful scrotum, and "Lower Extremity edema x 3." *Id.*

Mr. Carrin was given Lasix. *Id.*

Dr. Jimenez saw Mr. Carrin four days later (on June 11th) for

urination issues. ECF No. 108-1 at 93. He noted Mr. Carrin's lower

extremities had "reduced in size," but "his scrotum remain[ed] swollen

significantly although less so than 4 days ago as well." *Id.* Mr. Carrin also

complained of pain and burning, and he was unable to provide "a urine

sample due to swelling." *Id.* He had "difficulty ambulating due to Edema."

*Id.* at 94. Dr. Jimenez entered the following plan: "Prepare Consult have

inmate sent to local Hospital for assessment and stabilization of scrotal

edema." *Id.* at 93. The emergency room consult was listed as "urgent." *Id.*

at 94.  Mr. Carrin was taken to the hospital where he remained until June 25, 2019.  ECF No. 111-1 at 7.

Dr. Jimenez made several administrative notes in the medical records while Mr. Carrin was admitted to the hospital.  On June 17th, he documented that Mr. Carrin had undergone a liver biopsy the day before, and had a bone marrow biopsy that day.  ECF No. 110-4 at 82.  By June 20th, the hospital had reported that Mr. Carrin's swelling had "reduced significantly" and abdomen no longer required draining.  *Id.* at 83.

Mr. Rolston saw Mr. Carrin on June 25, 2019, upon his release from the hospital.  ECF No. 110-4 at 84-86.  He noted that Mr. Carrin had been "urgently sent" for emergency care "regarding complications related to untreated viral hepatitis C."  *Id.* at 84.  Mr. Carrin had obvious "ascetic fluid in his abdomen" and "severe edema" which could not be managed at the institution "with medicine."  *Id.*  The diagnosis from the hospital was "scrotal edema, cellulitis of scrotum, anasarca, liver cirrhosis, HEP C an thrombocytopenia."  *Id.*  Mr. Rolston stated that it was obvious from his physical examination that Mr. Carrin "had ascetic fluid in his abdomen."  *Id.*  Mr. Rolston noted that it had been emphasized "that he needs immediate treatment of his HEP C."  ECF No. 110-4 at 84.  Further, he reported that

Mr. Carrin had said he had been "placed on the transplant list for 'liver transplant'" but Mr. Rolston said that information "was not in the note." *Id.*

Mr. Rolston's own examination of Mr. Carrin revealed a "bulging" waist, "severe edema," an unspecified disorder "of male genital organs" with testicular edema, and "unspecified cirrhosis of liver." *Id.* at 86.  He noted that Mr. Carrin was a "[s]eriously ill patient" and he urgently needed HCV treatment.  *Id.*  He requested Dr. Jimenez cosign the record and Dr. Li review the record.  *Id.* at 87.  Dr. Li reviewed did so on July 8th and Dr. Jimenez cosigned the record considerably later, on July 25th.  *Id.* at 88-89.

On July 2, 2019, Dr. Li evaluated Mr. Carrin at Health Services for gastrointestinal complaints.  ECF No. 108-1 at 110.  Mr. Carrin reported a constant pain of a "9/10."  *Id.*  His edema was 3+ and his scrotum had "severe edema, tender to touch."  *Id.*  Dr. Li noted Mr. Carrin needed "immediate treatment" for HCV.  *Id.*

On July 3rd, Dr. Litton reviewed Mr. Carrin's records and noted his previous "algorithm [was] approved for Harvoni plus low dose ribavirin" but had "now expired."  ECF No. 110-4 at 97.  He noted Mr. Carrin had been sentenced and his "Sentry designation reads 'Awaiting Med Designation.'"

*Id.* Dr. Litton found that Mr. Carrin was still a "priority level 1" and recommended the same treatment. *Id.* at 97-98. He entered "the NFR" request for the medication regimen, and recommended "referral to practitioner with expertise, ideally a liver transplant center to evaluate the need for a transplant vs DAA therapy." *Id.* at 98.

On that same day, Dr. Litton referred the "Non-Formulary Drug Authorization" request for "Harvoni plus Ribavirin" treatment to the Clinical Director, Dr. Li, who referred it on to the Central Office Pharmacist, Dr. Mell, on July 8, 2019. ECF No. 111-2 at 33-34. Dr. Mell approved the NFR request on July 12, 2019. *Id.* at 34. Dr. Mell noted that no medical hold had yet been "placed in Sentry," and requested that be done "prior to starting HCV" treatment. *Id.*

Mr. Rolston made an administrative note on July 9, 2019, just prior to Dr. Mell's approval of the treatment, stating that Mr. Carrin was approved for HCV treatment and was "awaiting medical hold." ECF No. 110-4 at 100. Defendant Rolston stated: "Placing Med Hold now." *Id.*[23] He further noted that Mr. Carrin would need "consultant approval prior to initiation of"

---

[23] Dr. Jimenez as well as Defendant Rolston had "authority to place a medical hold on Raymond Carrin to ensure that he remained at FDC to complete treatment." ECF No. 115-11 at 18; ECF No. 113-11 at 18.

the treatment.  *Id.*  He also contacted the Health Services Administrator,

Defendant Smiledge, about the possibility of providing Mr. Carrin with a

different size "briefs to reduce symptoms of scrotal edema and XXL

compression stockings to help with peripheral edema."  *Id.*  That note was

cosigned by Dr. Li on July 9th, and reviewed by Dr. Jimenez on July 25th.

ECF No. 110-5 at 1-2.

On July 11th, Mr. Rolston entered an administrative note which

stated that a GI consult had been placed.[24]  ECF No. 108-1 at 118.  The

request was presented as a "routine" priority request.  *Id.*  Mr. Rolston

noted that Mr. Carrin met "criteria for treatment of his HEP C and BOP

Policy requires a specialist to follow clinical course of treatment."  *Id.*  He

also noted Mr. Carrin was "doing well," but emphasized that Mr. Carrin

needed "immediate treatment of his HEP C."  *Id.*

On July 13, 2019, an officer found Mr. Carrin "weak and pale" in his

cell and called for medical.  ECF No. 110-5 at 6.  Nurse Paynter arrived in

the housing unit and found Mr. Carrin "pale with ashy appearance," and

with a "blank stare."  *Id.*  She said he was in obvious distress and "almost

---

[24] No evidence was presented to show that a GI consult request was resubmitted or approved by the URC.

unresponsive" when she first entered the room.  ECF No. 108-9 at 4-5.

Nurse Paynter was finally able to verbally arouse Mr. Carrin enough to get

him to respond to her.  *Id.* at 5.  Mr. Carrin said he was cold and could not

get warm.  ECF No. 110-5 at 6.  He complained that he was "in a lot of

pain," which he described as "throbbing," and rated it a "10."  *Id.* at 5-6.  He

said he felt like he needed "to go to the hospital," and Nurse Paynter

contacted the doctor who verbally ordered Mr. Carrin be taken to the

hospital via ambulance.  *Id.* at 6.  Mr. Carrin was admitted to the ICU.  *Id.* at

8.

Mr. Carrin had a lengthy hospitalization, lasting from July 13, 2019,

through September 10, 2019.  ECF No. 111-1 at 7.  Defendant Rolston

monitored Mr. Carrin's care during his hospitalization and made notes in

the BOP's medical records.  ECF No. 111-3 at 124, 127, 129, 131, 136,

and 139.  On or about July 24th, Mr. Carrin was moved from "ICU to the

step down clinic."  *Id.* at 136.  The hospitalist advised that Mr. Carrin would

"continue to be at a risk of hepatic encephalopathy" and would "need

'intensive medical, clinical and nursing follow up'" after his discharge from

the hospital.  ECF No. 1110-5 at 22.  Notably, the medical record also

stated: "He is expected to continue to worsen."  *Id.*

The hospitalist also said that Mr. Carrin would "be able to start HEP C treatment with Harvoni and Riboflavin at the doses which were prescribed by BOP." *Id.* It was expected that Mr. Carrin would be released in approximately a week. *Id.* However, on July 25th Mr. Carrin's condition took a turn for the worse "with notable increasing jaundice." ECF No. 110-5 at 25. He had 4+ increasing edema and critically high Potassium. *Id.* An ultrasound showed cirrhosis and ascites, but he was reported as "stable." *Id.*

On July 28th, Nurse Paynter received a verbal report from Mr. Carrin's attending nurse. ECF No. 110-5 at 31. He was "still having overall 4+ body edema with weeping of lower extremities." *Id.* He had difficulty ambulating, needed assistance, and was jaundiced. *Id.* The attending nurse indicated Mr. Carrin would be discharged that day, but Nurse Paynter advised that he was "not appropriate for discharge to" FDC.[25] *Id.* It was requested that his discharge be placed on hold until further notice. *Id.*

---

[25] Dr. Jimenez explained in his deposition that FDC was a "level two" care facility and if an inmate could not ambulate or care for themselves, "the administration at some level would find the proper accommodation for that patient." ECF NO. 113-10 at 6.

On July 29th, it was arranged for Mr. Carrin to be discharged from the community hospital and transferred to "Select Hospital."  ECF No. 110-5 at 34.  He remained in "Select Hospital" until he was discharged on September 10, 2019.  ECF No. 110-5 at 52.

An administrative note was entered by Mr. Rolston on September 3rd, communicating a report from the hospital.  ECF No. 108-1 at 161.  It was noted that Mr. Carrin was continuing to improve.  His ammonia level was down to 47, there had been no recent incidents of confusion or encephalopathy, his cellulitis had resolved, the edema had "vastly improved," and his weight was down 71 pounds.  ECF No. 108-1 at 161.  Mr. Rolston noted that HCV treatment should be initiated upon his return from the hospital.  *Id.*

A second administrative note was entered approximately one hour later by Mr. Rolston.  ECF No. 108-1 at 164.  He noted that Mr. Carrin was "taking narcotics 2-5 times a day for discomfort related to his edema and chronic pain in lower back and legs."  *Id.*  Mr. Carrin had physical therapy twice a day "until failure usually measured as patient stating he cannot go further secondary to pain or shortness of breath."  *Id.*  Mr. Carrin's maximum walking distance was "150 feet" and it was noted that he

required "constant supervision." *Id.* Mr. Rolston noted a recommendation from Mr. Carrin's attending physical at the Specialty Select hospital that Mr. Carrin be "transferred to a medical center." *Id.* Dr. Jimenez cosigned that note later that same day. *Id.* at 166.

On September 10th, Dr. Jimenez saw Mr. Carrin for the last time. ECF No. 108-1 at 167. Dr. Jimenez stated he was assessing Mr. Carrin after a "lengthy hospitalization," and he noted that Mr. Carrin received diuresis in the hospital, blood products to increase his platelet count, and lactulose for ammonia levels. *Id.* His abdominal examination revealed dilated veins, ascites, and stigmata of liver disease." *Id.* at 168. The recommendation entered by Dr. Jimenez was to discharge Mr. Carrin and place him on "light duty" with "non strenuous greater than 30 min." *Id.* at 167.

On September 11th, Mr. Carrin was transferred out of FCI/FDC Tallahassee to a medical center in Lexington, Kentucky. ECF No. 111-1 at 7. In late October 2019, a specialist at the Hepatology Clinic determined that HCV treatment should not be provided "due to his decompensated status." ECF No. 113-2 at 9-10. Mr. Carrin was once again hospitalized on November 13, 2019, and passed away on December 5, 2019. *Id.* at 10.

Persons who are "responsible for ensuring that inmates at the Federal Detention Center in Tallahassee receive adequate medical care" include the Clinical Director, Staff Physicians, Mid-level Practitioners, and nurses.  ECF No. 108-3 at 10.  Those positions include Dr. Jimenez and Mr. Rolston.  Ms. Smiledge, as the Health Services Administrator, has "administrative responsibilities, but not clinical responsibility."  *Id.*  Nevertheless, she is also responsible for ensuring FDC inmates "receive adequate medical care."  ECF No. 108-4 at 3-4.  She acknowledged that she dealt with inmate complaints.  ECF No. 108-7 at 11.  Additionally, she had "frequent communication" with Dr. Li, the Clinical Director about "emergent medications or emergent treatments."  *Id.* at 15.

Ms. Smiledge testified in her deposition that the "clinical physician" would ultimately be "responsible for making sure that an inmate gets the medical treatment after it's been approved by the regional director."  ECF No. 108-7 at 22.  Dr. Jimenez was the staff physician.  *Id.* at 18, 23.  She said it "is on the clinician to do whatever is needed to be done for that treatment . . . ."  *Id.* at 23.  Because she used the term "clinician," Ms. Smiledge was asked to clarify whether the responsibility fell on the staff physician or the clinical director.  *Id.* at 23-24.  She responded: "In my

personal opinion, it would fall on both, as the Clinical Director should be following up on patient care, especially if it was a discussed case." *Id.* at 24.

Ms. Smiledge is not a medical provider and is not "qualified to provide medical treatment" or prescribe medications. ECF No. 109-2 (Smiledge Declaration], pg. 3. She cannot "request specific treatment plans" or "referrals for medical treatments outside of FCI/FDC Tallahassee," and she lacks training as to "what kinds of treatments are required for specific illnesses, viruses, or bacteria." *Id.* She also is not "qualified to monitor or dictate the treatment rendered by medical providers." *Id.*

Dr. Litton testified in his deposition that when a non-formulary medication is approved, treatment could be started, even on a pretrial inmate. ECF No. 108-8 at 16-17. Pretrial status is considered and factored into the algorithm request. *Id.* at 17.

Dr. Donald Kern[26] is a physician, board certified in Internal Medicine and in Public Health and General Preventive Medicine.  ECF No. 113-8 at 2.  He states that "direct acting antiviral medication such as Harvoni and Epclusa" have HCV treatment "cure rates in excess of 95%."  *Id.* at 4.  Curing an HCV "infection does not reverse existing damage to the liver," but "no further damage would occur."  *Id.*  Dr. Kern opines that, upon his review of Mr. Carrin's medical records, "Mr. Carrin was clinically stable" as of October 2018 when treatment was initially approved.  *Id.*  He further opined that "had Mr. Carrin received treatment for the Hepatitis C infection beginning in October 2018, he would not have died from liver failure the following year."  *Id.*

Dr. Rosaline Vasquez is Defendants' expert.  ECF No. 114 at 27. Her affidavit, ECF No. 114-1, contains her opinion that "Mr. Carrin had clinically evident liver cirrhosis since at least [January 2018] and most likely significantly before that."  ECF No. 114-1 at 6.  She states that by the time

---

[26] Dr. Kern is Plaintiff's retained expert discussed on pages 2-3 of this Report and Recommendation.  Defendants oppose consideration of Dr. Kern's opinion for several reasons, ECF No. 114 at 26-27, which have been considered but are rejected. Defendants were offered additional time to respond to Dr. Kern's opinion.  Further, any assertions simply stating his agreement with the Court's recitation of facts as detailed in a prior Report and Recommendation are meaningless.

he was transferred to FDC from the Leon County Jail, his "liver abnormalities and signs of cirrhosis were already quite advanced with a calculated MELD score of 12."  *Id.*  "Patients with a MELD score of greater than 1- are recommended to not start antiviral medications for hepatitis C prior to the consideration of transplantation."  *Id.* at 6-7.  She advises that when Mr. Carrin was at Grady Hospital, his "MELD score" was 17 and "indicated a 6% risk of mortality in 3 months."  *Id.* at 7.  She opined that the "opportunity to start antiviral medication was very short before his significant decompensation."  *Id.* at 8.  Dr. Vasquez states that even if "therapy had been started on 10/25/18, Mr. Carrin's disease was so quickly deteriorating that it would not have allowed for the effect of a therapy of 12 to 24 weeks duration."  *Id.* at 9.

Finally, although Mr. Carrin's emails have not been provided by the parties, it is undisputed that Mr. Carrin requested HCV treatment on multiple occasions: September 14, 2018; January 9, 2019; January 15, 2019; January 24, 2019; and July 5, 2019.  *See* 108-3 at 4.  It is undisputed that treatment was approved twice, on October 25, 2018, and July 12, 2019, but was never provided.

**Analysis**

The Eighth Amendment governs the conditions under which convicted prisoners are confined and the medical treatment they receive while in prison.  Farmer v. Brennan, 511 U.S. 825, 832, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994).  The Eighth Amendment guarantees that prisoners will not be "deprive[d] ... of the minimal civilized measure of life's necessities."  Rhodes v. Chapman, 452 U.S. 337, 347, 101 S. Ct. 2392, 2399, 69 L. Ed. 2d 59 (1981) (quoted in Chandler v. Crosby, 379 F.3d 1278, 1289 (11th Cir. 2004)).  Those necessities include food, clothing, and medical care.  Harris v. Thigpen, 941 F.2d 1495, 1511 (11th Cir. 1991); *see also* Collins v. Homestead Corr. Inst., 452 F. App'x 848, 850-851 (11th Cir. 2011).

The Eighth Amendment establishes "the government's obligation to provide medical care for those whom it is punishing by incarceration." Estelle v. Gamble, 429 U.S. 97, 103, 97 S. Ct. 285, 290, 50 L. Ed. 2d 251 (1976).  That obligation exists on both the "[f]ederal and state governments . . . to provide minimally adequate medical care . . . ."  Harris, 941 F.2d at 1504 (quoted in Hoffer v. Sec'y, Fla. Dep't of Corr., 973 F.3d 1263, 1270 (11th Cir. 2020)).

Mr. Carrin was both a pretrial detainee and a convicted prisoner during the events at issue in this case. Pretrial detainees have the same right to medical care as do convicted prisoners. However, a pretrial detainee's right to medical care is protected by the Due Process Clause of the Fifth Amendment rather than the Eighth Amendment. <u>Jordan v. Doe</u>, 38 F.3d 1559, 1564 (11th Cir. 1994). The Due Process Clause "require[s] the responsible government or governmental agency to provide medical care to persons" who have not yet been convicted of a crime. <u>City of Revere v. Massachusetts Gen. Hospital.</u>, 463 U.S. 239, 244, 103 S. Ct. 2979, 2983, 77 L. Ed. 2d 605 (1983) (noting "the due process rights . . . are at least as great as the Eighth Amendment protections available to a convicted prisoner"). Nevertheless, the standard of review for a denial of medical care claim is the same, whether based on the Fifth or Eighth Amendment. <u>Jordan</u>, 38 F.3d at 1565. "[D]eliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' and violates the Constitution. <u>Estelle</u>, 429 U.S. at 104, 97 S. Ct. at 291.

Mr. Carrin had a clearly established constitutional right to medical care and was dependent upon the actions of BOP medical staff to receive

that care.  Estelle, 429 U.S. at 103, 97 S. Ct. at 290 ("An inmate must rely on prison authorities to treat his medical needs; if the authorities fail to do so, those needs will not be met").  The Constitution is violated when prison officials - whether prison doctors or prison guards - are deliberately indifferent to a prisoner's "serious medical needs."  429 U.S. at 104, 97 S. Ct. at 291.

After providing over 30 pages of evidence and a brief memorandum of law on the standard for summary judgment and an inmate's right to medical care, Plaintiff provides only 3 sentences in support of her summary judgment motion:

> Defendants admit they delayed Mr. Carrin's treatment for HCV without a medical reason. The record makes clear the Defendants completely denied Mr. Carrin necessary medical treatment causing him to needlessly suffer pain, injury, and premature death. No legitimate medical reasons can be provided to justify the delay and/or denial of medical care which all three Defendants had a duty to provide and partial summary judgment is due to be granted in favor of Plaintiff.

ECF No. 108 at 34.  Plaintiff's extremely brief argument is not supported by the record.  Moreover, Plaintiff has not provided an undisputed basis upon which to grant the motion for partial summary judgment.

To "prove a claim for deliberate indifference," a plaintiff must show: (1) a "serious medical need (the objective component)"; (2) a prison official's "deliberate indifference to that serious medical need (the subjective component); and (3) the official's wrongful conduct caused the injury." Fischer v. Fed. Bureau of Prisons, 349 F. App'x 372, 374 (11th Cir. 2009) (citing to Goebert v. Lee Cnty., 510 F.3d 1312, 1326 (11th Cir. 2007)). "To satisfy the subjective component, the plaintiff must prove the prison official subjectively knew of a risk of serious harm, the official disregarded that risk, and the official's conduct was more than gross negligence." Fischer, 349 F. App'x at 374 (citation omitted).[27]

As for the first element, the evidence is undisputed that Mr. Carrin had a serious medical need. Black v. Alabama Dep't of Corr., 578 F. App'x 794, 795 (11th Cir. 2014) ("Hepatitis C is a serious medical need"); *see,*

---

[27] The Court notes that there has been debate within the Eleventh Circuit as to whether this claim requires a showing of "more than gross negligence" or "more than mere negligence." *See* Wade v. McDade, 67 F.4th 1363, 1372 (11th Cir.), reh'g en banc granted, opinion vacated sub nom. Wade v. Georgia Corr. Health, LLC, 83 F.4th 1332 (11th Cir. 2023). That debate may ultimately be considered a matter of semantics because the standard as explained by the Supreme Court ultimately requires a Plaintiff to show that a defendant was aware of a risk of serious harm, but recklessly disregarded that risk. Farmer v. Brennan, 511 U.S. 825, 836, 114 S. Ct. 1970, 1978, 128 L. Ed. 2d 811 (1994). The "reckless" standard adequately provides a framework for evaluating this claim. Farmer, 511 U.S. at 837, 114 S. Ct. at 1979 (clarifying that recklessness requires showing that an "official knows of and disregards an excessive risk to inmate health or safety").

*e.g.,* <u>Roe v. Elyea</u>, 631 F.3d 843, 862 (7th Cir. 2011)*;* <u>Hoffer</u>, 973 F.3d at 1270; <u>Gordon v. Schilling</u>, 937 F.3d 348, 356 (4th Cir. 2019); <u>Woodcock v. Correct Care Sols.</u>, 861 F. App'x 654, 659 (6th Cir. 2021). "Defendants do not deny Mr. Carrin had a serious medical issue and a risk of serious harm." ECF No. 114 at 20.

The second element, however, is unproven at this point. Further, that element is disputed.

As to Ms. Smiledge, Plaintiff has not provided any evidence to demonstrate that she was deliberately indifferent to Mr. Carrin's medical need. Showing responsibility for care is no enough. Plaintiff must also demonstrate by undisputed facts that Defendant Smiledge knew of a risk of serious harm but disregarded that risk. Plaintiff has not done so. She has omitted any evidence of the content of Mr. Carrin's emails, contact by other persons on his behalf, or her personal knowledge of Mr. Carrin's condition.[28] Without that evidence, Ms. Smiledge cannot be said to have

---

[28] More complete evidence was previously submitted in reviewing Defendant Smiledge's motion for summary judgment, ECF No. 109, and Plaintiff's opposition, ECF No. 115. Upon review of that evidence, it was concluded that a dispute of material fact precluded granting Defendant's motion. *See* ECF No. 129.

been deliberately indifferent.  The motion for summary judgment must be denied as to her.

The evidence as it pertains to Dr. Jimenez and Mr. Rolston is also lacking.  The evidence is undisputed that both of those Defendants were aware of Mr. Carrin's Hepatitis C, his symptoms, and his immediate or urgent need for care.  The evidence is undisputed that Mr. Carrin was approved for HCV treatment but it was never provided.  The problem is that Plaintiff has not shown by undisputed facts that treatment was not provided because of anything more than negligence or inattention.

A non-medical reason has been suggested as to why that did not happen - Mr. Carrin's presentencing status - but Plaintiff's own evidence creates a dispute as to that reason.  The medical records include multiple notations of his pre-trial status, but that ended as of January 15, 2019, when he was sentenced.  Further, there is some evidence that pre-trial inmates could receive HCV treatment, but a medical hold was needed. Evidence is lacking to show that the absence of a medical hold is the reason treatment did not occur and, furthermore, than the failure to enter a medical hold was the result of anything more than negligence.  Plaintiff has not demonstrated that Defendants Jimenez or Rolston were deliberately

indifferent to Mr. Carrin's medical needs.  For that reason, Plaintiff's summary judgment motion should be denied.

## **RECOMMENDATION**

In light of the foregoing, it is respectfully **RECOMMENDED** that Plaintiff's motion for partial summary judgment, ECF No. 108, be **DENIED**.

**IN CHAMBERS** at Tallahassee, Florida, on February 28, 2024.


 S/    Martin A. Fitzpatrick
**MARTIN A. FITZPATRICK**
**UNITED STATES MAGISTRATE JUDGE**


## **NOTICE TO THE PARTIES**

**Within fourteen (14) days after being served with a copy of this Report and Recommendation, a party may serve and file specific written objections to these proposed findings and recommendations.  Fed. R. Civ. P. 72(b)(2).  A copy of the objections shall be served upon all other parties.  A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.  Fed. R. Civ. P. 72(b)(2).  Any different deadline that may appear on the electronic docket is for the Court's internal use only and does not control.  If a party fails to object to the Magistrate Judge's findings or recommendations as to any particular claim or issue contained in this Report and Recommendation, that party waives the right to challenge on appeal the District Court's order based on the unobjected-to factual and legal conclusions.  *See* 11th Cir. Rule 3-1; 28 U.S.C. § 636.**