**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**TALLAHASSEE DIVISION**

**SANDRA GAIL CARRIN,**
as the Personal Representative of
the Estate of RAYMOND MARSHALL
CARRIN,

    *Plaintiff*,

v.                                  Case No.: 4:21cv486-MW/MAF

**SHAUNA MARIE SMILEDGE,**
et al.,

    *Defendants*.

_____/

**ORDER GRANTING DEFENDANTS' MOTIONS**
**FOR JUDGMENT ON THE PLEADINGS**

Today, this Court is faced with deciding whether Plaintiff may pursue a *Bivens* remedy following the Eleventh Circuit's decision in *Johnson v. Terry*, 119 F.4th 840 (11th Cir. 2024). *Johnson* announces a clear mandate to district courts considering *Bivens* claims: the *Bivens* remedy rarely, if ever, will exist in circumstances with "*any* relevant differences" from the three narrow scenarios in which the Supreme Court previously identified a *Bivens* remedy. *Id.* at 859 (emphasis in original). Effectively, recent precedent has left the door to a *Bivens* remedy barely ajar and with a half-working handle, "hold[ing] out the possibility that someone, someday, might walk through it" even though the courts have all but "ensure[d] that no one

ever will." *Johnson*, 119 F.4th at 849 (citing *Egbert v. Boulet,* 596 U.S. 482, 504 (2022) (Gorsuch, J. concurring) (quotation marks and ellipses omitted)). The tragedy of Plaintiff's circumstances cannot be understated. But against controlling case law that has shut out a *Bivens* remedy in "all but the most unusual circumstances," this Court is compelled to conclude that Plaintiff is not entitled to a *Bivens* remedy. *Johnson,* 119 F.4th at 843 (citing *Egbert*, 596 U.S. at 486).

## I.  Background

Raymond Marshall Carrin died in federal custody on December 5, 2019. ECF No. 64 ¶¶ 19, 252. Plaintiff, Mr. Carrin's mother and the personal representative of Mr. Carrin's estate, alleges that Mr. Carrin died because Federal Detention Center ("FDC") medical professionals failed to treat his chronic illness. *Id.* ¶¶ 3–7, 253–286. Plaintiff brings claims for damages against FDC medical professionals, including Defendant Joseph Jimenez, MD, one of Mr. Carrin's treating physicians at the FDC in Tallahassee, Florida ("FDC Tallahassee"), and Defendant Shauna Smiledge, the Health Services Administrator of FDC, pursuant to 28 U.S.C. §§ 1331, 1343, and 2201, and *Bivens v. Six Unknown Fed. Narcotics Agents*, 403 U.S. 388 (1971), for their alleged deliberate indifference to Mr. Carrin's medical needs. *Id.* ¶¶ 3–7, 253–286. Plaintiff brings two counts predicated on the Eighth Amendment and Fifth Amendment against Defendant Smiledge (Count I and Count III), and two

counts predicated on the Eighth Amendment and Fifth Amendment against Defendant Jimenez (Count II and Count IV). *Id.* ¶¶ 253–286.[1]

As alleged by Plaintiff, the events leading to Mr. Carrin's death are as follows. Approximately a year and a half before his death, Mr. Carrin was admitted into FDC Tallahassee. *Id.* ¶¶ 18–19. Shortly after his admission, Mr. Carrin was diagnosed with chronic hepatitis C virus ("HCV"), an illness that can cause liver disease, kidney disease, jaundice, and lymph disorders when left untreated. *Id.* ¶¶ 19, 23–31. Direct-acting antiviral drugs ("DAA") are the recommended course of treatment for individuals with HCV due their success rate in treating and curing HCV in nearly all cases where they are administered. *Id.* ¶¶ 33–34. The Bureau of Prisons' ("BOP") Clinical Guidance regarding the treatment of chronic HCV recognizes the effectiveness of DAA treatment. *Id.* ¶ 66. However, after diagnosing Mr. Carrin with chronic HCV, Defendants and other FDC medical staff never provided DAA treatment to Mr. Carrin. *Id.* ¶ 251. Instead, Defendants and other FDC medical staff refused to administer DAA treatment to Mr. Carrin because he was a pretrial detainee at their facility. *Id.* ¶¶ 62–63. Defendants and other FDC medical staff also withheld DAA treatment from Mr. Carrin even after he was sentenced because they claimed

---

[1] In her amended complaint, Plaintiff also brought claims for deliberate indifference against Paul Rolston, PA-C, and Xinyu Daniel Lee, MD. *See* ECF No. 64 ¶¶ 253–286. Rolston and Lee are no longer defendants in this action. Plaintiff voluntarily dismissed her claims against Lee, ECF No. 79, and this Court adopted the Magistrate Judge's Third Report and Recommendation granting summary judgment in favor of Rolston as to Plaintiff's claims against him, ECF No. 130 and ECF No. 146.

Mr. Carrin's DAA treatment could only start once he was placed in his "permanent institution." *Id.* ¶¶ 111–119.

While at FDC Tallahassee, Mr. Carrin's health declined. Mr. Carrin developed rashes, sore kidneys, discoloration of his leg, stomach bloating, liver disease, back pains, muscle spasms, cramps in his hands and legs, swelling, severe discomfort, jaundice, rapid weight gain, and cirrhosis of the liver. *Id.* ¶¶ 81, 92, 113, 116. But despite his repeated requests for treatment, Defendants refused to administer DAA. *Id.* ¶¶ 62–63, 92–102, 106, 108–112. Mr. Carrin was then transferred to a BOP facility in Atlanta. *Id.* ¶ 121. Though Mr. Carrin received medication, his health continued to decline, as DAA treatment continued to be withheld and because some of the medicine that Mr. Carrin received aggravated his symptoms. *Id.* ¶¶ 130, 131, 133, 144. Mr. Carrin developed advanced-stage hepatitis C, cellulitis, hair loss, spasms, and severe swelling and edema in his lower body and genitals that prevented him from urinating and dressing himself, which eventually led medical staff to believe that Mr. Carrin would need a liver transplant. *Id.* ¶¶ 131, 140, 141–145, 150, 153, 166, 182. During his time in the BOP Atlanta facility, Mr. Carrin was transported to the emergency room several times for his condition. *Id.* ¶¶ 123, 145. But eventually, without DAA treatment, Mr. Carrin's condition deteriorated to the point where he had to be admitted into the intensive care unit at a hospital and receive treatment for hepatic encephalopathy and sepsis. *Id.* ¶¶ 179–186, 191–192, 194, 200.

At no point during his stays in the emergency room or the intensive care unit was Mr. Carrin started on DAA treatment. *Id.* ¶¶ 130, 149, 172, 238, 251. Instead, Mr. Carrin was released from the hospital and transported back to FDC Tallahassee, where Defendant Jimenez placed Mr. Carrin's DAA treatment on "hold." *Id.* ¶¶ 231–245. Mr. Carrin was transferred to a location in Lexington, Kentucky the day following his return from the hospital to FDC Tallahassee. *Id.* ¶ 248. Approximately three months after his transfer, Mr. Carrin died from hepatic cirrhosis. *Id.* ¶¶ 248, 250.

This suit followed. The parties have filed numerous motions regarding Plaintiff's claims. After their motions for summary judgment were denied, ECF No. 144 and ECF No. 154,[2] Defendants Jimenez and Smiledge moved for leave to file motions for judgment on the pleadings. ECF No. 179; ECF No. 181. Defendants claimed that the Eleventh Circuit's recent decision in *Johnson v. Terry* marked a "change in controlling law" that now precludes Plaintiff from pursuing a *Bivens* claim for monetary damages against them. ECF No. 179 at 2, 4; ECF No. 181 at 2–3. Plaintiff agreed that this Court should consider the impact that *Johnson* may have on her claims. ECF No. 183 at 4. Accordingly, this Court granted Defendants leave

---

[2] This Court issued orders accepting and adopting the Magistrate Judge's Fourth Report and Recommendation denying Defendant Jimenez's motion for summary judgment, ECF No. 144, and the Magistrate Judge's Amended Second Report and Recommendation denying Defendant Smiledge's motion for summary judgment, ECF No. 154.

to file motions for judgment on the pleadings and stayed the trial pending the resolution of Defendants' motions. ECF No. 185.[3] After reviewing Defendant Jimenez's motion for judgment on the pleadings as to Count II and Count IV of Plaintiff's amended complaint, ECF No. 188, Defendant Smiledge's motion for judgment on the pleadings as to Count I and Count III of Plaintiff's amended complaint, ECF No. 189, Plaintiff's consolidated response in opposition to Defendants' motions, ECF No. 192, and Defendants' combined reply, ECF No. 196, this Court now issues its ruling.

## II. Analysis

This Court is faced with determining whether *Johnson v. Terry* prevents Plaintiff from pursuing a *Bivens* remedy. 119 F.4th 840. To frame the issue, this Court begins with a brief overview of the *Bivens* remedy.

### A. The State of the *Bivens* Remedy

In *Bivens v. Six Unknown Fed. Narcotics Agents*, the Supreme Court first recognized an implied cause of action for damages under the Constitution against a federal official that violates the Fourth Amendment. 403 U.S. 388 (1971). The

---

[3] Defendants also moved to exclude from this Court's consideration of Plaintiff's consolidated response in opposition to Defendants' renewed motions for judgment on the pleadings matters other than the first amended complaint and Defendants' answers. ECF No. 193. Plaintiff did not oppose the motion. ECF No. 200. This Court granted Defendants' motion and agreed that it would not consider matters other than Plaintiff's first amended complaint and Defendants' answers when resolving Defendants' motions for judgment on the pleadings. ECF No. 201.

Supreme Court went on to recognize an implied cause of action for damages under the Constitution against a federal official that violates the Fifth Amendment's Due Process Clause in *Davis v. Passman*, 442 U.S. 228 (1979), and against a federal official that violates the Eighth Amendment's prohibition against cruel and unusual punishment in *Carlson v. Green*, 446 U.S. 14 (1980). However, these three scenarios "represent the only instances in which the [Supreme] Court has approved of an implied damages remedy under the Constitution itself," and the Supreme Court has since cautioned that recognizing an implied cause of action under *Bivens* beyond these scenarios is a "disfavored judicial activity." *Ziglar v. Abbasi*, 582 U.S. 120, 131, 135 (2017).

Accordingly, under the present *Bivens* framework, a plaintiff's claim must pass a restrictive two-step analysis to reach a *Bivens* remedy. *See Egbert*, 596 U.S. at 492. First, the plaintiff's situation must be factually parallel to one of the three scenarios in which the Supreme Court recognized a *Bivens* remedy. *Id.* Second, if the plaintiff's situation is instead meaningfully different from those scenarios, there cannot be any "special factors" counseling against expanding a *Bivens* remedy to the plaintiff's "new context." *Id.* at 492–93. The Supreme Court has described this analysis as boiling down to one overarching question: whether there is any reason to think that Congress, rather than a court, might be better equipped to create a damages remedy. *Id.* at 493.

While the *Bivens* analysis may seem straightforward enough, the Supreme Court has emphasized that recognizing a *Bivens* remedy in a new context is prohibited "in all but the most unusual circumstances," effectively pushing the *Bivens* remedy to the edge of extinction. *See Johnson*, 119 F.4th at 848 (explaining the Supreme Court's recent decisions and their impact on *Bivens*). Not only has the Supreme Court consistently refused to recognize the *Bivens* remedy in a new context for the past forty years, it has gone as far as to say that if it were called to decide the original *Bivens* case today, it would decline to recognize an implied cause of action for damages under the Constitution to begin with. *Egbert,* 596 U.S. at 502. None too surprisingly, lower courts have "consistently declin[ed] to extend *Bivens* to any new context" as well. *Kent v. Oge*, 2025 WL 588336, at *3 (N.D. Fla. Feb. 12, 2025).

The Eleventh Circuit's decision in *Johnson* adds yet another nail in *Bivens*' coffin. In *Johnson*, the Eleventh Circuit emphasized that, when comparing a plaintiff's situation to a prior *Bivens* scenario in step one of the analysis, a court's focus should not be on whether the two situations have "significant parallels," "superficial similarities," or are even "mostly the same," but instead whether the two cases have "*any* relevant differences," which may be "even small differences." *Johnson*, 119 F.4th at 857, 859 (emphasis in original). Relevant differences include differences in the severity, type, and treatment of the plaintiff's injuries and those in a prior *Bivens* scenario, whether the plaintiff's claim is based on a different

8

constitutional amendment than was at issue in a previous *Bivens* scenario, and whether there is an alternative remedy available to the plaintiff that was not available to the plaintiff in a previous *Bivens* scenario. *Id.* at 851, 858–59. What's more, the Eleventh Circuit has declared that the existence of an alternative remedial structure is both a fact that makes a plaintiff's situation a new context and a "special factor" that prohibits expanding a *Bivens* remedy to that new context. *Id.* at 858–59.

In *Johnson*, the Eleventh Circuit opined that the BOP's administrative remedy program ("BOP ARP") was an alternative remedial structure that precluded the plaintiff, an inmate in federal custody, from pursuing a *Bivens* remedy. *Id.* In holding so, the Eleventh Circuit explained that the mere existence of the BOP ARP meant that the plaintiff's circumstances presented new *Bivens* context—as *Carlson* had not considered the existence of the BOP ARP—and prevented the court from extending the *Bivens* remedy to the plaintiff's circumstances. *Johnson*, 119 F.4th at 858–60 (11th Cir. 2024) (citing *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 74 (2001) (concluding that the BOP ARP was an appropriate alternative remedy to a *Bivens* claim)). Though the Eleventh Circuit acknowledged that prison officials may have prevented the plaintiff from accessing the BOP ARP, it nonetheless held that this was "not enough to disqualify the [BOP ARP] as a special factor" carrying significant weight in the *Bivens* analysis. *Id.* at 861. The Eleventh Circuit emphasized that the *Bivens* analysis focuses on the existence of an alternative remedial structure that

9

Congress or the Executive has created to address harms like those the plaintiff has suffered, not the availability or effectiveness of the alternative remedy in a specific circumstance. *Id.* at 860–61. The Eleventh Circuit further opined that it was immaterial if the relevant alternative remedial structure was inadequate, inefficient, or unavailable to addresses the plaintiff's specific injury. *Id.* at 860. Instead, the Eleventh Circuit announced "[t]he only consideration" before it was whether an alternative remedial structure merely existed and was intended in theory "to redress the kind of harm faced by those like the plaintiff." *Id.*

### B. Is Plaintiff Eligible for a *Bivens* Remedy?

Having addressed the diminishing scope of the *Bivens* remedy and the recent developments hastening its extinction, this Court now turns to whether Plaintiff's claims are eligible for a *Bivens* remedy. Because this Court's analysis comes on Defendants' motions for judgment on the pleadings, this Court may only grant Defendants' motions where "there are no material facts in dispute and the moving part[ies] [are] entitled to judgment as a matter of law." *Thompson v. Regions Sec. Servs., Inc.*, 67 F.4th 1301, 1305 (11th Cir. 2023) (citing *Perez v. Wells Fargo N.A.*, 774 F.3d 1329, 1335 (11th Cir. 2014)). Additionally, on a motion for judgment on the pleadings, this Court "accept[s] as true all material facts alleged in the non-moving party's pleading, and view[s] those facts in the light most favorable to the non-moving party." *Id.* (citing *Perez*, 774 F.3d at 1335).

10

This Court begins step one of the *Bivens* analysis by examining whether Plaintiff's situation is sufficiently analogous to a prior *Bivens* scenario or instead presents a new *Bivens* context. Both parties acknowledge that Mr. Carrin's circumstances as alleged by Plaintiff draw the most factual similarities to *Carlson v. Green*. ECF No. 188 at 12–16; ECF No. 189 at 7–9; ECF No. 192 at 23. Accordingly, this Court must first determine whether Mr. Carrin's situation is sufficiently analogous to *Carlson*.

In *Carlson*, an inmate with chronic asthma incarcerated in a Federal Correction Center died following an acute asthma attack. *Carlson*, 446 U.S. at 16 n.1. During the inmate's asthma attack and in the hours before his death, prison medical staff kept the inmate in the prison facility against the advice of doctors, failed to give him competent medical attention, "administered contra-indicated drugs which made his attack more severe, attempted to use a respirator known to be inoperative which further impeded his breathing, and delayed for too long a time his transfer to an outside hospital." *Id.* The inmate's estate sued prison medical officials for their alleged deliberate indifference to the inmate's serious medical needs under the Eighth Amendment. *Id.* at 16.

Defendants argue that Plaintiff's case is sufficiently distinct from *Carlson* and presents a new *Bivens* context. Defendants assert that one meaningful difference is that two of Plaintiff's deliberate indifference claims are premised on the Fifth

11

Amendment rather than the Eighth Amendment (Count III and Count IV). ECF No. 188 at 13–14; ECF No. 189 at 7. They argue that Plaintiff's claims premised on the Eighth Amendment are also meaningfully different from *Carlson* because Mr. Carrin had HCV rather than asthma, suffered from a chronic illness and progressive deterioration rather than an acute emergency asthma attack, needed long term treatment rather than immediate emergency treatment, died three months after leaving Defendants' care rather than dying while in custody following an acute emergency, and unlike the medical professionals in *Carlson*, Defendants' alleged actions did not directly exacerbate an emergency medical situation. ECF No. 188 at 14–16; ECF No. 189 at 7–8. Crucially, Defendants argue that, under *Johnson,* the existence of the BOP ARP renders Mr. Carrin's situation different from *Carlson*, since *Carlson* did not consider the existence of alternative remedies under the current *Bivens* framework, and is a special factor that prevents this Court from extending the *Bivens* remedy to Plaintiff's claims. ECF No. 188 at 16–18; ECF No. 189 at 7.

Plaintiff responds that Mr. Carrin's circumstances are sufficiently analogous to *Carlson* and do not present a new *Bivens* context. ECF No. 192 at 26. Plaintiff argues that, like the plaintiff in *Carlson*, she is bringing an Eighth Amendment challenge on behalf of Mr. Carrin's estate because he died in custody. ECF No. 192 at 26–27. She goes on to allege that, like the decedent in *Carlson*, Mr. Carrin suffered from a chronic illness that resulted in death and was denied necessary medical care

12

that proved fatal due to complications and exacerbations of his condition. *Id.* at 27–28. Notably, Plaintiff argues that *Johnson* is not controlling here because Mr. Carrin is deceased and cannot invoke the BOP ARP, and because the BOP ARP prohibits Plaintiff from invoking it on Mr. Carrin's behalf. *Id.* at 24–25; *see* 28 C.F.R. §§ 542.10, 542. 16 (providing that the BOP ARP can only be invoked by current and former inmates, and no other person can invoke it on the inmate's behalf).

Here, the fact that two of Plaintiff's claims are premised on a different constitutional amendment than was at issue in *Carlson* would make these claims present a new context. *Ziglar*, 582 U.S. at 148 ("[A] case can present a new context for *Bivens* purposes if it implicates a difference constitutional right.").[4] But more importantly, *Johnson* directs that the BOP ARP's existence is determinative in both step one and step two of the *Bivens* analysis since it serves as both a meaningful difference that will make a plaintiff's claims distinguishable from *Carlson,* and a special factor that prevents a court from expanding the *Bivens* remedy to a plaintiff's claims. *See Johnson*, 119 F.4th at 858–59. Given the dispositive weight that *Johnson*

---

[4] This Court recognizes that Mr. Carrin's case draws "significant parallels" to *Carlson*, because like in *Carlson,* Mr. Carrin died following prison medical staff's failure to properly treat his severe chronic illness. However, *Johnson* emphasizes that a situation's "significant parallels" with *Carlson* is not enough, but instead "*any* relevant difference," no matter how small, may make a case meaningfully different from *Carlson*. 119 F.4th at 859 (emphasis in original). While this Court need not address whether Mr. Carrin's situation is sufficiently factually similar to *Carlson* given the dispositive weight of the BOP ARP in the *Bivens* analysis, this Court pauses to note that it does not accept such a narrow reading of *Carlson* that would require a plaintiff's circumstances to mirror every detail of *Carlson* down to the same illness and medical complications.

directs courts to assign to the mere existence of the BOP ARP in *Carlson*-like situations, it seems that this Court's two-step *Bivens* analysis is condensed into one question: does the BOP ARP generally address the harm present here? *Johnson*, 119 F.4th at 858.

This Court recognizes the BOP ARP is unavailable to Plaintiff and that Mr. Carrin cannot presently invoke the BOP ARP. But according to the Eleventh Circuit, the BOP ARP's availability in a specific circumstance is irrelevant in a *Bivens* analysis: Courts must look to the BOP ARP's general existence as an alternative remedial structure. *See Johnson*, 119 F.4th at 859–60; *see also Bulger v. Hurwitz*, 62 F.4th 127 (4th Cir. 2023) (holding that BOP ARP is an alternative remedial process for a deceased inmate to challenge the conditions of his incarceration that precludes the court from expanding a *Bivens* remedy to the estate's action on the inmate's behalf, even where the inmate could not have actually availed himself of it before his death). Due to the limitations that *Johnson* places on courts evaluating alternative remedial schemes, especially the BOP ARP, this Court is forced to conclude that the BOP ARP is an alternative remedial structure designed to addresses the harms Mr. Carrin experienced as an inmate and pretrial detainee in federal custody. *Johnson*, 119 F.4th at 858.

Although not binding, this Court considers the Fourth Circuit's decision in *Bulger v. Hurwitz* instructive, as the Fourth Circuit likewise examined a situation

where a plaintiff who served as the personal representative of a deceased inmate's estate brought a *Bivens* claim on the decedent's behalf. 62 F.4th 127, 134–35. Though the plaintiff argued that the deceased inmate could not have used the BOP ARP to challenge his purportedly improper transfer into general population because he was killed 14 hours following his transfer, the Fourth Circuit still concluded the BOP ARP was the applicable alternative remedial structure that precluded it from extending the *Bivens* remedy to the plaintiff's claims. *Id.* at 141. In concluding that the BOP ARP prevented the plaintiff from obtaining a *Bivens* remedy, the Fourth Circuit emphasized that the potential unavailability of an alternative remedial structure in a particular circumstance does not warrant supplementing the general remedial scheme that Congress or the Executive enacted to address the general harm at issue. *Id.* And the Fourth Circuit considered the BOP ARP dispositive even though the plaintiff was the personal representative of the decedent's estate and could not use the BOP ARP on his behalf. *Id.*

The Fourth Circuit's rationale in *Bulger* aligns with the Eleventh Circuit's reasoning in *Johnson*, where it considered the BOP ARP as a controlling factor in analysis of an inmate's claims even where prison officials prevented the inmate from accessing the BOP ARP. 119 F.4th at 860–861. As the Eleventh Circuit stated, "[t]he alternative remedy question is a general one, not a specific one; a macro focus, not a micro focus." *Id.* at 860. In tandem, these two cases lead this Court to conclude

15

that Plaintiff's inability to use the BOP ARP following Mr. Carrin's death and Mr. Carrin's present inability to invoke the BOP ARP does not disqualify the BOP ARP as an alternative remedial structure that this Court must consider in its *Bivens* analysis.[5]

*Johnson* requires this Court to conclude that the BOP ARP both renders Plaintiff's claims as presenting new *Bivens* context and constitutes a special factor that prevents this Court from expanding the *Bivens* remedy to Plaintiff's claims. *Id.* While this Court may question the "adequacy or efficacy of the alternative remedy in general or in relation to a specific plaintiff," especially in this situation, that is besides the point. *Id.*

Even so, this Court cannot ignore that the emphasis *Johnson* places on the BOP ARP calls into doubt the continuing existence of the *Bivens* remedy in *Carlson*-like situations. If an inmate diagnosed with chronic heart disease in prison custody suddenly suffers a heart failure, is transferred to the prison's medical ward, placed on a broken ventilator, given injections that exacerbate his condition, and then immediately dies due to prison medical staff's actions, would he be entitled to a *Bivens* remedy today? *Johnson* suggests not, even though the inmate clearly would not have time to access the BOP ARP and the inmate's estate would not be able to

---

[5] Because this Court finds the BOP ARP an alternative remedial structure precluding this Court from expanding *Bivens* to Plaintiff's claims, it does not address Defendant Jimenez's arguments regarding other possible alternative remedial structures. ECF No. 188 at 19–20.

invoke the BOP ARP on his behalf. Under *Johnson*, it appears that the mere existence of the BOP ARP dictates that the inmate's situation—nearly identical to *Carlson*—is a new context, and the mere existence of the BOP ARP would also prohibit a court from expanding the *Bivens* remedy to the inmate's situation. Following *Johnson*, estates bringing *Bivens* claims on behalf of deceased inmates in BOP custody who die following medical emergencies appear to encounter a lose-lose situation with no recourse.

Regardless, those concerns are not present in this case. Mr. Carrin did not encounter an emergency medical situation with no time to challenge the medical staff's actions prior to his death. Plaintiff instead alleges that Mr. Carrin was in FDC custody for over a year as his health gradually declined in the face of prison medical staff's purported inaction. Plaintiff also claims that Mr. Carrin died three months after being transferred from FDC Tallahassee, which makes his death further separated from any medical emergency. Here, Mr. Carrin had time to use the BOP ARP to address his concerns with his DAA treatment.[6] Ultimately, *Johnson* prohibits this Court from extending *Bivens* to Plaintiff's claims because the BOP ARP was

---

[6] Plaintiff suggests that an interaction with a prison official made Mr. Carrin afraid to seek further medical assistance while he was in the intensive care unit. ECF No. 64 ¶ 235. But that does change this Court's analysis. The *Bivens* analysis focuses on the general availability of the alternative remedial structure rather than its specific availability to an inmate. *See Johnson*, 119 F.4th at 860–861 (stating that prison officials preventing an inmate from invoking the BOP ARP does not change the weight that courts assign the general existence of an alternative remedial structure like the BOP ARP).

generally available to inmates like Mr. Carrin to challenge the conditions of their confinement.

## III.  Conclusion

This Court recognizes that its decision granting judgment on the pleadings comes five years after Mr. Carrin's tragic death, as the parties are actively preparing for trial, and as the pre-trial conference approaches. *See* ECF No. 64 ¶ 250; ECF No. 208. This Court acknowledges that the result reached here is harsh. If the facts alleged by Plaintiff are true, Defendants withheld potentially life-saving treatment from Mr. Carrin and contributed to his death. As unfortunate as it is that Plaintiff will not be able to seek redress under *Bivens*, this Court is bound by the precedent that the Supreme Court and the Eleventh Circuit have paved towards erasing the *Bivens* remedy. The Eleventh Circuit has dictated that even small differences may create a new *Bivens* context, and the Supreme Court has warned that expanding a *Bivens* remedy to a new context is a disfavored judicial activity that courts engage in at their own peril. *Johnson,* 119 F.4th at 859; *Ziglar*, 582 U.S. at 135. And now, the Eleventh Circuit's decision in *Johnson* suggests that the mere existence of the BOP ARP blocks courts from entertaining a *Bivens* remedy in *Carlson*-like situations. *See Johnson*, 114 F.4th 858–60. Plaintiff is invited to appeal her case to the Eleventh Circuit, but this Court's hands are bound by *Johnson,* which dictates this result.

Accordingly, **IT IS ORDERED**:

1. Defendant Jimenez's Motion for Judgment on the Pleadings, ECF No. 188, is **GRANTED**.

2. Defendant Smiledge's Motion for Judgment on the Pleadings, ECF No. 189, is **GRANTED**.

3. The Telephonic Pretrial Conferenced scheduled for April 1, 2025 and the trial are **CANCELLED**.

4. Plaintiff's Motions in Limine, ECF No. 214 and ECF No. 215, are **DENIED as moot**.

5. Defendant Smiledge's and Jiminez's Motion in Limine, ECF No. 212, is **DENIED as moot**.

6. Plaintiff's First Amended Complaint, ECF No. 64 is **DISMISSED**, and Plaintiff may appeal this judgment.

7. The Clerk shall enter judgment stating, "Plaintiff's First Amended Complaint, ECF No. 64, is **DISMISSED.**" The Clerk shall close the file.

 **SO ORDERED on March 26, 2025.**

s/Mark E. Walker          
**Chief United States District Judge**
